1
2
3
4
5

JENNER & BLOCK LLP
Andrew J. Thomas (SBN 159533)
ajthomas@jenner.com
Lisa J. Kohn (SBN 260236)
lkohn@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

6
7
8
9
10
11
12
13

Susan J. Kohlmann (Pro Hac Vice)
skohlmann@jenner.com
Alison I. Stein (Pro Hac Vice)
astein@jenner.com
Jacob L. Tracer (Pro Hac Vice)
jtracer@jenner.com
Ava U. McAlpin (Pro Hac Vice)
amcalpin@jenner.com
919 Third Avenue
New York, NY 10022
Telephone: (212) 891-1690
Facsimile:  (212) 891-1699

*Counsel for Defendants Waverly Scott Kaffaga, Jean Anderson Boone, David Scott Farber, Anderson Farber King, Jebel Kaffaga, and Bahar Kaffaga*

14
15
16

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

17
18
19
20
21
22
23
24
25
26
27
28

THOMAS STEINBECK, an individual;
and BLAKE SMYLE, an individual,

             Plaintiffs,

      v.

WAVERLY SCOTT KAFFAGA, an
individual; JEAN ANDERSON
BOONE, an individual; DAVID SCOTT
FARBER, an individual; ANDERSON
FARBER KING, an individual; JEBEL
KAFFAGA, an individual; BAHAR
KAFFAGA, an individual;
DRAMATISTS PLAY SERVICE, a
New York Corporation; MCINTOSH &
OTIS, INC., a New York Corporation;
and Does 1-10, inclusive,

             Defendants.

Case No.:  2:14-cv-08681-TJH (FFMx)

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF THE
ESTATE DEFENDANTS' MOTION
TO DISMISS THE FIRST AMENDED
COMPLAINT**

**[Fed. R. Civ. P. 12(b)(6)]**

Hearing Date:    July 27, 2015
Hearing Time:    UNDER SUBMISSION
Courtroom:        17 – Spring St.

---

Estate Defendants' Memorandum in Support of Motion To Dismiss the First Amended Complaint

# **TABLE OF CONTENTS**

I.  INTRODUCTION .........................................................................1

II.  FACTUAL AND STATUTORY BACKGROUND ......................................2

    A.  The Steinbeck Works and the Parties ....................................2

    B.  The 1983 Settlement Agreement.............................................3

    C.  Elaine's Termination Notices.................................................4

    D.  The 2004 Litigation ...............................................................4

    E.  Plaintiffs' Wrongful *Of Mice and Men* Termination Notices...............7

    F.  This Lawsuit ...........................................................................8

    G.  The Termination Provisions of the 1976 Copyright Act ......................9

III.  LEGAL STANDARD FOR DISMISSAL WITH PREJUDICE .................10

IV.  THE 1983 SETTLEMENT AGREEMENT PROHIBITS PLAINTIFFS FROM EXPLOITING AND/OR TERMINATING RIGHTS IN THE STEINBECK WORKS...........................................................................11

    A.  The 1983 Settlement Agreement Governs This Dispute ...................11

        1.  Recaptured Rights.................................................................12

        2.  Wrongful Termination Notices ..............................................14

        3.  Unexercised Termination Rights ...........................................15

    B.  The 1983 Settlement Agreement Is Not an "Agreement to the Contrary." ..................................................................16

    C.  The Estate Defendants Are Not Precluded From Making Any Argument Contained Herein ...............................................20

V.  PLAINTIFFS' INDIVIDUAL CLAIMS MUST ALSO BE DISMISSED ..22

    A.  Plaintiffs Lack the Ownership Interest Necessary To State a Claim for Copyright Infringement .................................................22

B.    Plaintiffs Have No Contractual Right to Royalty Payments From the Exploitation of Non-Professional Stage Rights to *Of Mice and Men* .................................................................................23

C.    The Covenant of Good Faith and Fair Dealing Does Not Apply Without an Underlying Contractual Obligation ................................24

VI.   PLAINTIFFS ARE NOT ENTITLED TO DECLARATORY RELIEF ......25

VII.  CONCLUSION ..............................................25

Estate Defendants' Memorandum in Support of Motion To Dismiss the First Amended Complaint

# <u>TABLE OF AUTHORITIES</u>

Cases                                                                    Page(s)

*Aguilar v. Zep Inc.*,
   No. 13-cv-563, 2014 WL 1900460 (N.D. Cal. May 12, 2014) .........................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................................10, 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................10

*Briggs v. United States*,
   No. 07-cv-5760, 2009 WL 113387 (N.D. Cal. Jan. 16, 2009) .........................21

*Classic Media, Inc. v. Mewborn*,
   532 F.3d 978 (9th Cir. 2008) .....................................................................17, 18

*DC Comics v. Pacific Pictures Corp.*,
   No. 10-cv-3633-ODW, 2012 WL 4936588 (C.D. Cal. Oct. 17, 2012).............18

*Jackson v. Carey*,
   353 F.3d 750 (9th Cir. 2003) ............................................................................11

*Hydranautics v. FilmTec Corp.*,
   204 F.3d 880 (9th Cir. 2000) ...........................................................................21

*Larson v. Warner Bros. Entm't*,
   No. 2:04-cv-08766, 2013 WL 1688199 (C.D. Cal. Apr. 18, 2013) ..................18

*Lawrence v. Sony Pictures Entm't, Inc.*,
   534 F. App'x 651 (9th Cir. 2013)......................................................................23

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) .........................................................................11

*Luvdarts, LLC v. AT&T Mobility, LLC*,
   710 F.3d 1068 (9th Cir. 2013) .........................................................................22

*Martin v. Henley*,
   452 F.2d 295 (9th Cir. 1971) ...........................................................................21

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002) .....................................................................17, 18

*Milne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) .................................................................17, 18, 19

*Mueller v. Auker*,
  700 F.3d 1180 (9th Cir. 2012) ....................................................................... 11

*Palmer Kane LLC v. Scholastic Corp.*,
  No. 12-cv-3890, 2014 WL 1303135 (S.D.N.Y. Mar. 31, 2014) ...................... 24

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979)........................................................................................ 20

*Penguin Grp. (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2d Cir. 2008) ....................................................................passim

*Penguin Grp. (USA) Inc. v. Steinbeck*,
  No. 06 Civ 2438, 2009 WL 4588748 (S.D.N.Y. Dec. 2, 2009) .......................... 2

*PHL Variable Ins. Co. v. Marquez Bros. Int'l, Inc.*,
  No. 12-cv-3750, 2014 WL 215071 (N.D. Cal. Jan. 17, 2014) ........................... 11

*Sarbaz v. Wachovia Bank*,
  No. 10-cv-3462, 2011 WL 830236 (N.D. Cal. Mar. 3, 2011)............................ 24

*Silvers v. Sony Pictures Entm't, Inc.*,
  402 F.3d 881 (9th Cir. 2005) .......................................................................... 23

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) .......................................................................... 11

*Stewart v. Abend*,
  495 U.S. 207 (1990)........................................................................................ 15

*Tessera, Inc. v. UTAC (Taiwan) Corp.*,
  No. 10-cv-4435, 2012 WL 1067672 (N.D. Cal. Mar. 28, 2012)...................... 24

*The Ray Charles Found. v. Robinson*,
  919 F. Supp. 2d 1054 (C.D. Cal. 2013) ........................................................... 18

*Sidhu v. Flecto Co.*,
  279 F.3d 896 (9th Cir. 2002) .......................................................................... 21

*Steinbeck v. McIntosh & Otis, Inc.*,
  433 F. Supp. 2d 395 (S.D.N.Y. 2006) .......................................................passim

Estate Defendants' Memorandum in Support of Motion To Dismiss the First Amended Complaint

*Steinbeck v. McIntosh & Otis, Inc.*,
   No. 04 Civ. 5497, 2009 WL 928189 (S.D.N.Y. Mar. 31, 2009),
   *aff'd* 400 F. App'x 572 (2d Cir. 2010) ........................................................passim

*Tritz v. U.S. Postal Serv.*,
   721 F.3d 1133 (9th Cir. 2013) ............................................................................. 12

*United Commercial Ins. Serv., Inc. v. Paymaster Corp.*,
   962 F.2d 853 (9th Cir. 1992) ............................................................................... 12

**STATUTES**

17 U.S.C. § 304 ..............................................................................................passim

28 U.S.C. § 1291 ...................................................................................................... 21

**OTHER AUTHORITIES**

37 C.F.R. § 201.10 .................................................................................................. 16

## I.    INTRODUCTION

When Nobel Prize-winning author John Steinbeck ("Steinbeck") died in 1968, he left the bulk of his estate—including all of his copyright interests—to his wife of 18 years at the time of his death, Elaine Steinbeck ("Elaine").  Steinbeck's estranged sons from a previous marriage, Thomas Steinbeck ("Thom") and John Steinbeck IV ("John IV"), have since spent decades trying to undo Steinbeck's will and gain some control over the copyrights in his works (the "Steinbeck Works").  Despite their unbroken record of failure, this current lawsuit is the latest attempt by Thom and John IV's daughter, Blake Smyle ("Blake") (with Thom, "Plaintiffs"), to seize control over the Steinbeck Works from the beneficiaries of Elaine's estate (the "Estate").  As multiple other courts have held, Plaintiffs' claims must be dismissed as a matter of simple contract law.

In 1983, Thom and John IV voluntarily entered into a settlement agreement with Elaine, one which all the parties agreed would be binding on their heirs and assigns (the "1983 Settlement Agreement" or the "Agreement").  The Agreement contains a straightforward bargain: Thom and John IV each received significant increased royalties in the Steinbeck Works whose copyrights they had renewed jointly with Elaine after Steinbeck died, and, in exchange, Elaine received "the complete power and authority . . . with respect to the exploitation and/or termination of rights" in the Steinbeck Works.  Thom, John IV, and Blake have received the benefit of their bargain for over 30 years, collecting increased royalties to which they would not be entitled but for the 1983 Settlement Agreement.

Shortly after Elaine's death, Plaintiffs filed a lawsuit in the Southern District of New York in 2004, claiming, *inter alia*, the right to terminate certain pre-1978 copyright grants and licenses made by Steinbeck and to exploit the rights associated with any such terminations.  Multiple district and appellate court decisions rejected Plaintiffs' claims, recognizing that the 1983 Settlement Agreement gave Elaine, and now gives the Estate, "the complete power and authority" over the Steinbeck Works.  Nonetheless, Plaintiffs

again, through this lawsuit, claim the right to control certain works and seek to invalidate the 1983 Settlement Agreement.

Because the 1983 Settlement Agreement continues to bind Thom, Blake, and the Estate, this Court should apply its clear and unambiguous terms.  This Court should dismiss Plaintiffs' action and make clear, yet again, that the Estate continues to have the complete power and authority to exploit the Steinbeck Works.

## II.    FACTUAL AND STATUTORY BACKGROUND

### A.    The Steinbeck Works and the Parties

John Steinbeck was a prolific writer who left behind a wealth of intellectual property.  His works are considered classics of Twentieth Century American literature. First Amended Complaint ("Amended Complaint" or "AC") ¶ 24.  Upon his death, Steinbeck left a will in which he passed to Elaine, his wife of 18 years at the time of his death, all his copyright interests and rights to payment from the exploitation of his works. *Id.* ¶¶ 25-26.  Steinbeck did not leave any copyright or royalty rights to Thom and John IV.  *See Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 196 (2d Cir. 2008). Instead, Steinbeck's will provided $50,000 in trust for each of his two sons.  *See id.*

As a result of Steinbeck's will, Elaine owned outright, and had the sole right to royalties derived from, those works with respect to which Steinbeck had renewed the copyrights during his lifetime (the "Early Steinbeck Works").  But under Section 304(a) of the Copyright Act and its predecessor provisions, Thom and John IV—in addition to Elaine—were entitled to share in the renewal copyright royalties derived from those works that became eligible for renewal after Steinbeck's death (the "Late Steinbeck Works").  *See* 17 U.S.C. § 304(a)(1)(C)(ii).  In 1974, Elaine, Thom and John IV entered into a royalty distribution agreement (the "1974 Distribution Agreement") under which Thom and John IV each received 25 percent of the royalties generated from the Late Steinbeck Works, with Elaine receiving the remaining 50 percent.  *See Penguin Grp.*, No. 06 Civ. 2438, 2009 WL 4588748, at *1 (S.D.N.Y. Dec. 2, 2009).

Elaine died in 2003 and left her interests in the Steinbeck Works to members of her family, which include the named Defendants: Elaine's daughter Waverly Scott Kaffaga ("Waverly"), who is also the Estate's executrix; Elaine's sister Jean Anderson Boone ("Jean"); and four of Waverly's children (and Elaine's grandchildren), Bahar Kaffaga ("Bahar"), David Scott Farber ("David"), Jebel Kaffaga ("Jebel"), and Anderson Farber King ("Anderson"). AC ¶¶ 13-19. All the Estate's beneficiaries are collectively referred to herein as the "Estate Defendants."

## B.    The 1983 Settlement Agreement

Thom and John IV first filed suit against Elaine in 1981 in the United States District Court for the Southern District of New York (the "SDNY"), seeking among other things, to upend the 1974 Distribution Agreement, arguing that it was the product of fraud, misrepresentations, and overreaching. AC ¶ 30; *see John Steinbeck IV & Thomas Steinbeck v. Elaine Steinbeck*, No. 81 Civ. 6105 (S.D.N.Y.) ("The 1981 Litigation").

In 1983—after the district court found that Thom and John IV's allegations were conclusory and granted summary judgment in favor of Elaine, and Thom and John IV had filed a notice of appeal to the Second Circuit—the parties settled the 1981 Litigation by entering into the 1983 Settlement Agreement. AC ¶¶ 30-33 & Ex B. In the 1983 Settlement Agreement, Thom and John IV (on behalf of themselves and their heirs and assigns) ceded "complete power and authority" to Elaine (and her heirs and assigns) "to negotiate, authorize and take action with respect to the exploitation and/or termination of rights in the works of John Steinbeck in which [John IV] and [Thom] have or will have renewal or termination rights." AC Ex. B ¶ 5.[1] In exchange for ceding all control, Thom and John IV's royalty shares in the Late Steinbeck Works increased to one-third each, rather than the 25 percent share to which each had been entitled under the 1974 Distribution agreement, and Elaine's share of royalties in the Late Steinbeck Works

---

[1] Unless otherwise noted, all citations to "Ex." refer to the exhibits attached to the Amended Complaint.

Estate Defendants' Memorandum in Support of Motion To Dismiss the First Amended Complaint

1   decreased to one-third, rather than the 50 percent share to which she had been entitled.

2   *See id.* ¶ 2.

3        In sum, the 1983 Settlement Agreement was a compromise in which Thom and

4   John IV gave Elaine complete control over the Steinbeck Works in exchange for

5   increased royalties in the Late Steinbeck Works.  Plaintiffs—who have been collecting

6   increased royalties in the Late Steinbeck Works for decades—acknowledge that the 1983

7   Settlement Agreement, which includes accompanying powers of attorney, remains a

8   binding "contractual obligation[]."  AC ¶¶ 72-75.

9       **C.**    **Elaine's Termination Notices**

10        As was her right under the 1983 Settlement Agreement, over time, Elaine "[took]

11   action with respect to the exploitation and/or termination of rights in the works of John

12   Steinbeck in which [John IV] and [Thom had] . . . termination rights."  Ex. B ¶ 5.

13   Specifically and as alleged by Plaintiffs, Elaine or her agent, McIntosh & Otis, Inc.

14   ("M&O"), successfully issued two termination notices relevant here: one relating to

15   movie and other rights to Steinbeck's novel *Tortilla Flat* (the "*Tortilla Flat* Termination

16   Notice"), AC ¶ 37 & Ex. D,  and the other relating to motion picture rights to Steinbeck's

17   novel *The Grapes of Wrath* (the "*Grapes of Wrath* Termination Notice"), AC ¶ 39 & Ex.

18   E.  Upon the effective dates of the *Tortilla Flat* Termination Notice and the *Grapes of*

19   *Wrath* Termination Notice, the reclaimed rights in those works reverted back to Elaine,

20   Thom, and Blake[2]—Steinbeck's statutory heirs.  *See* 17 U.S.C. §§ 304(c)(2) &

21   304(c)(6)(C).

22       **D.**    **The 2004 Litigation**

23        After Elaine's death in 2003, Thom and Blake embarked on a campaign to overturn

24   the 1983 Settlement Agreement.  In early 2004, in direct contravention of the Agreement,

25   they attempted to terminate various grants of copyright interests that Steinbeck made

26   during his lifetime.  AC ¶ 41.  Among the termination notices Plaintiffs sent in early 2004

27   _____

28   [2] John IV died in 1991 and was survived by Blake, his only child.  AC ¶ 36.

was a termination notice relating to a 1938 publishing agreement that gave the predecessor to the Penguin Group ("Penguin") the right to publish all the Steinbeck Works (the "Penguin Termination Notice").  *Id.*  Around this time, Plaintiffs also sent termination notices relating to certain motion picture rights  in *The Red Pony* (the "*Red Pony* Termination Notice") and *The Long Valley* (the "*Long Valley* Termination Notice").  *Id.* & Exs. F, G.

Shortly thereafter, in July 2004, Thom and Blake sued the Estate Defendants, M&O, and several other entities associated with the Steinbeck legacy, in the SDNY, in a case captioned *Thomas Steinbeck & Blake Smyle v. McIntosh & Otis, Inc., et al.*, No. 04 Civ. 5497 ("The 2004 Litigation").  AC ¶ 44.  Repeating many of the allegations they made in 1981, Thom and Blake asserted claims against the Estate Defendants for trademark infringement, fraud, breach of fiduciary duty, promissory estoppel, unjust enrichment, imposition of a constructive trust, and declaratory relief.  *See* Request for Judicial Notice ("RJN"), Ex. 1 (The 2004 Litigation Complaint).  In August 2004, Penguin brought a declaratory judgment action against Thom and Blake in the SDNY, captioned *Penguin Grp. (USA) Inc. v. Thomas Steinbeck & Blake Smyle*, No. 04 Civ. 6795, which sought a declaration that the Penguin Termination Notice was invalid (the "Penguin Group Litigation").  *See* RJN, Ex. 2 (Penguin Group Litigation Complaint).

In the 2004 Litigation, the Estate brought counterclaims against Thom and Blake, seeking in part a declaration that all the termination notices Thom and Blake had issued by that point in time were invalid.  *See* RJN, Ex. 3 (Estate Defendants' Answer, Affirmative Defenses, and Counterclaims).  On June 8, 2006, Judge Owen of the SDNY held that the *Red Pony*, *Long Valley*, and Penguin Termination Notices were valid.  *See* The 2004 Litigation, 433 F. Supp. 2d 395, 403-04 (S.D.N.Y. 2006).

On August 4, 2006, Judge Owen certified the portion of his opinion that related to the Penguin Termination Notice, so that the Estate Defendants could appeal.  *See* RJN, Ex. 4 (Order Certifying Under Rule 54(b)).  Critically, Judge Owen's certification order was expressly limited to the Penguin Termination Notice.  *Id.*  Judge Owen noted that the

1  parties to the 2004 Litigation had "not waived their rights" to seek certification of or

2  otherwise appeal from the other portions of his June 8, 2006 opinion, including the

3  portion that related to the *Red Pony* and *Long Valley* Termination Notices.  *Id.*

4      In accordance with Judge Owen's limited certification order, the Estate Defendants

5  appealed "solely with respect to the validity of the Penguin Termination Notice."  *See*

6  RJN, Ex. 5 (Estate Defendants' Notice of Appeal).  The Estate Defendants reserved their

7  right to appeal from Judge Owen's other holdings—including those related to the *Red*

8  *Pony* and *Long Valley* Termination Notices—once a final judgment was entered in the

9  2004 Litigation.

10     The Second Circuit, acknowledging that the appeal was limited to a "portion" of

11  Judge Owen's opinion, reversed Judge Owen, and held that the Penguin Termination

12  Notice was invalid.  *See Penguin Grp.*, 537 F.3d at 200, 202; *see also* AC ¶ 45.  Among

13  other things,  the Second Circuit held that Elaine's 1994 agreement with Penguin was not

14  an "agreement to the contrary" under Section 304(c)(5) of the Copyright Act[3] because

15  that phrase should not be read "so broadly that it would include any agreement that has

16  the effect of eliminating a termination right."  *Penguin Grp.*, 537 F.3d at 202.  The

17  Second Circuit reasoned that "[i]f the holders of a majority of an author's termination

18  interest were to agree that they would not exercise their termination rights, this would

19  have the effect of eliminating a termination right . . . [y]et such an agreement could not be

20  held ineffective as an 'agreement to the contrary.'"  *Id.*[4]

21     On remand, the 2004 Litigation was reassigned to Judge Daniels, who granted the

22  Estate Defendants' motion for summary judgment on Thom and Blake's remaining

---

[3] Section 304(c)(5) provides that termination "may be effected notwithstanding any
agreement to the contrary."  17 U.S.C. § 304(c)(5).

[4] The court noted that, although it was "unclear" whether the 1983 Settlement Agreement
limited Thom and Blake's ability to send *any* termination notice, that issue was
"immaterial to the resolution of this appeal."  *Penguin Grp.*, 537 F.3d at 203 n.5.

1   claims.  *See* The 2004 Litigation, No. 04 Civ. 5497, 2009 WL 928189, at *12 (S.D.N.Y.

2   Mar. 31, 2009).  Thom and Blake then appealed.

3        So that Judge Daniels' decision would be a final order, on December 2, 2009,

4   Judge Daniels approved a stipulation in which the parties agreed in part that "[j]udgment

5   shall be entered in favor of the Estate" on its counterclaim that *all* of Thom and Blake's

6   termination notices were invalid.  RJN, Ex. 6 (Stipulation and Order with Respect to

7   Counterclaims and Intervenor Complaint).  That stipulation included the counterclaims

8   with respect to the *Red Pony* and *Long Valley* Termination Notices.  The Second Circuit

9   ultimately affirmed Judge Daniels' opinion dismissing the remainder of Thom and

10  Blake's claims in the 2004 Litigation.  *See* The 2004 Litigation, 400 F. App'x 572, 579

11  (2d Cir. 2010).

12        **E.**    **Plaintiffs' Wrongful *Of Mice and Men* Termination Notices**

13        Since the 2004 Litigation, Thom and Blake have served additional termination

14  notices in direct contravention of the clear language of the 1983 Settlement Agreement

15  that gave Elaine the complete power and authority to control the Steinbeck Works,

16  including with respect to termination.  *See* Ex. B ¶ 5.  On or about April 13, 2006,

17  Plaintiffs issued a termination notice purporting to terminate Steinbeck's grant of non-

18  professional stage rights in the play version of *Of Mice and Men* to Dramatists Play

19  Service, Inc. ("DPS"), with an effective date beginning on February 27, 2012 (the "DPS

20  Termination Notice").  AC ¶ 41 & Ex. H.  Most recently, on or about December 3, 2014,

21  Plaintiffs also issued a termination notice purporting to terminate Steinbeck's grant of

22  professional stage rights in the play version of *Of Mice and Men* to Samuel French, Inc.

23  ("Samuel French"), with an effective date beginning on December 11, 2016 (the "Samuel

24  French Termination Notice").  AC ¶ 41 & Ex. I.[5]

25  _____

26  [5] Plaintiffs have also interfered with the Estate's ability to "exploit[]" the Steinbeck
    Works outside of the context of termination.  Ex. B ¶ 5.  As a result, on November 10,
27  2014, the Estate sued Thom, Gail Knight Steinbeck (Thom's wife), and their business
    venture, The Palladin Group, Inc., in this district, bringing claims for breach of contract,
28  (Continued…)

**F.     This Lawsuit**

This action is the latest salvo in Plaintiffs' campaign to wrest control over the Steinbeck Works from the Estate, in direct contravention of the 1983 Settlement Agreement.  Here, Plaintiffs seek a declaration that they control three sets of rights in the Steinbeck Works.

First, Plaintiffs seek the power to exploit the rights covered by the pre-1978 grants and licenses that have indisputably been terminated (the "Recaptured Rights").  The Recaptured Rights include: (1) Plaintiffs' claim that they own a "collective interest in the domestic ancillary rights" to *The Grapes of Wrath* due to the *Grapes of Wrath* Termination Notice, AC ¶ 1 n.1; *see also id.* ¶ 39 & Ex. E; and (2) Plaintiffs' claim that they own an undefined interest in "the ancillary rights" to *Tortilla Flat* due to the *Tortilla Flat* Termination Notice, AC ¶ 35 n.4; *see also id.* ¶ 37 & Ex. D.

Second, Plaintiffs seek a declaration that the termination notices that they issued without the Estate's consent (the "Wrongful Termination Notices") are valid.  The Wrongful Termination Notices include: (1) the *Red Pony* and *Long Valley* Termination Notices, AC ¶ 1 n.1 & 41 & Exs. F, G; (2) the DPS Termination Notice, AC ¶ 1 n.1 & 41 & Ex. H; and (3) the Samuel French Termination Notice, AC ¶ 1 n.1 & 41 & Ex. I.[6]

Third, Plaintiffs seek the right in the future to terminate other pre-1978 grants or licenses to the Steinbeck Works (the "Unexercised Termination Rights").  AC ¶ 3.  The Amended Complaint, however,  does not identify any such grant or license that may be subject to termination under Section 304.[7]

---

slander of title, intentional interference with prospective economic advantage, and declaratory relief.  *See* Amended Compl. ¶¶ 64-91, *Waverly Scott Kaffaga v. Thomas Steinbeck, Gail Knight Steinbeck, & The Palladin Group, Inc.*, No. 14-cv-8699-TJH (FFMx) (C.D. Cal. Nov. 17, 2014), Dkt. 11.

[6] As noted above, the Samuel French Termination Notice does not purport to become effective until, at the earliest, December 11, 2016.  *See* Ex. I.  The *Red Pony*, *Long Valley*, and DPS Termination Notices purport to have become effective already.  *See* Exs. F, G & H.

[7] Indeed, no pre-1978 grants exist for those Steinbeck Works whose Section 304 (Continued…)

Plaintiffs also seek a declaration as to the validity of an attempt they alleged they made in 2004 to rescind the powers of attorney that Thom and John IV executed as part of the 1983 Settlement Agreement. *Id.* ¶¶ 43, 55(b) & 56(c).[8]

In addition to seeking declaratory relief, Plaintiffs also bring claims against the Estate Defendants for (1) contributory copyright infringement based on DPS's continued exploitation of the non-professional stage rights to the play version of *Of Mice and Men*, *id.* ¶¶ 67-70; (2) breach of the 1983 Settlement Agreement, *id.* ¶¶ 71-75; and (3) breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 76-79.[9]

All of Plaintiffs' claims must be dismissed as a matter of law. As the SDNY and Second Circuit have repeatedly held, the 1983 Settlement Agreement governs disputes arising out of ownership or control of the Steinbeck Works. *See generally* The 2004 Litigation, 2009 WL 928189, *aff'd* 400 F. App'x 572. The clear terms of the 1983 Settlement Agreement compel dismissal of Plaintiffs' claims relating to (1) exploiting the Recaptured Rights, (2) issuing the Wrongful Termination Notices, and (3) exercising any Unexercised Termination Rights in the Steinbeck Works. In addition, the Agreement compels the dismissal of Plaintiffs' individual claims against the Estate Defendants for contributory copyright infringement, breach of contract, and breach of the implied covenant and fair dealing.

## G.    The Termination Provisions of the 1976 Copyright Act

The Copyright Act of 1976 allows authors or specified statutory heirs to terminate certain copyright grants or licenses executed before January 1, 1978. *See* 17 U.S.C. § 304(c) & (d). This termination right was enacted "[i]n order to revitalize the ability of

---

termination periods have not expired. Accordingly, the Unexercised Termination Rights amount to nothing. *See infra*, pp. 15-16.

[8] Inexplicably, Plaintiffs also seek to re-litigate their authority to terminate M&O, despite the fact that this issue has already been decided by the SDNY and the Second Circuit. AC ¶¶ 43, 55(c) & 56(b). This claim is addressed in the memorandum of points and authorities filed by M&O.

[9] Plaintiffs also allege direct copyright infringement, but only against DPS. AC ¶¶ 59-66.

1   authors to revisit the terms of earlier grants of rights" and to "recapture some of the
2   additional value produced by the lengthened copyright term." *Penguin Grp.*, 537 F.3d at
3   197-98.

4       Termination under Section 304(c) may occur during a limited five-year window of
5   time "beginning at the end of fifty-six years from the date copyright was originally
6   secured, or beginning on January 1, 1978, whichever is later." 17 U.S.C. § 304(c)(3).
7   When Congress extended the copyright term in 1998, it added an additional period of five
8   years during which termination could occur if the right was not exercised previously,
9   "beginning at the end of 75 years from the date copyright was originally secured." *Id.* §
10  304(d)(2); *see generally Penguin Grp.*, 537 F.3d at 197-99 (describing Section 304
11  termination rights).

12      Critically here, when an author dies, the right to terminate pre-1978 copyright
13  grants or licenses lies with the statutory heirs of the author as defined by Section 304.
14  Specifically, "[t]he author's surviving children, and the surviving children of any dead
15  child of the author, own the author's entire termination interest unless there is a widow or
16  widower, in which case the ownership of one-half of the author's interest is divided
17  among them." 17 U.S.C. § 304(c)(2)(B). If a widow or widower is alive, she or he owns
18  the other half of the author's termination interest. *See id.* § 304(c)(2)(A). A majority of
19  an author's termination interest is required to terminate a pre-1978 grant or license. *See*
20  *id.* § 304(c)(1). When a grant or license is terminated, the recaptured rights revert to all
21  those who had the ability to terminate. *See id.* § 304(c)(6).

22  ### III.   LEGAL STANDARD FOR DISMISSAL WITH PREJUDICE

23      To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough
24  facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,
25  550 U.S. 544, 570 (2007). "A pleading that offers 'labels and conclusions' or 'a
26  formulaic recitation of the elements of a cause of action will not do.' Nor does a
27  complaint suffice if it tenders 'naked assertions' devoid of 'further factual
28  enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S.

at 555, 557).  A claim satisfies the plausibility standard only when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Put another way, the Court should not make "unreasonable inferences" or "unwarranted deductions of fact" to save a complaint from dismissal.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Iqbal*, 556 U.S. at 679 ("the mere possibility of misconduct" is insufficient to satisfy the plausibility standard).

Dismissal without leave to amend is appropriate where, as here, the deficiencies in the complaint could not be cured by amendment.  *See Mueller v. Auker*, 700 F.3d 1180, 1191-92 (9th Cir. 2012); *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  Amendment is futile when a case presents a "pure question of law based on the interpretation of a contract."  *PHL Variable Ins. Co. v. Marquez Bros. Int'l, Inc.*, No. 12-cv-3750, 2014 WL 215071, at *4 (N.D. Cal. Jan. 17, 2014) (dismissing complaint and denying leave to amend).

## IV.   THE 1983 SETTLEMENT AGREEMENT PROHIBITS PLAINTIFFS FROM EXPLOITING AND/OR TERMINATING RIGHTS IN THE STEINBECK WORKS.

Neither the Copyright Act nor the history of litigation between the parties  prevents this Court from enforcing the straightforward provisions of the 1983 Settlement Agreement and once and for all cementing its central bargain.

### A.   The 1983 Settlement Agreement Governs This Dispute.

The 1983 Settlement Agreement gave Elaine "the complete power and authority to negotiate, authorize and take action with respect to the exploitation and/or termination of rights in the works of John Steinbeck in which [John IV] and [Thom] have or will have renewal or termination rights."  Ex. B ¶ 5.  The Second Circuit has already concluded that this provision is "unambiguous and forecloses any argument that the parties intended the Steinbeck sons to retain control over Elaine Steinbeck's exercise of the authority

conferred upon her," barring all of Plaintiffs' claims here.  *See* The 2004 Litigation, 400 F. App'x at 575.

The Amended Complaint includes no allegations suggesting that the 1983 Settlement Agreement is void as a matter of contract law or somehow not applicable to this dispute.  Plaintiffs do not dispute that they entered into the 1983 Settlement Agreement knowingly and without coercion.  *See* AC ¶¶ 30-31.  Indeed, Plaintiffs raise a breach of contract claim *based on* the 1983 Settlement Agreement and acknowledge it continues to impose binding "contractual obligations."  *Id.* ¶¶ 72-75.  Accordingly, there is no dispute that the 1983 Settlement Agreement is an enforceable contract.  This Court should therefore apply its terms as a basic matter of contract law.[10]

### 1. Recaptured Rights

Plaintiffs claim they possess a "collective interest in the domestic ancillary rights" to *The Grapes of Wrath*, AC ¶ 1 n.1, and "certain rights, including motion picture rights," in *Tortilla Flat*, *id.* ¶ 37.[11]  As a preliminary matter, it should be recognized that this claim assumes that the *Grapes of Wrath* and *Tortilla Flat* Termination Notices—issued by Elaine or her agent—were valid and effective.  Plainly they were.  Both were executed pursuant to the express terms of the 1983 Settlement Agreement.  Ex. B ¶ 5; *see also* Exs.

---

[10] It is fundamental that a "settlement agreement is treated as any other contract for purposes of interpretation."  *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992).  Settlement agreements are "subject to all defenses to the enforcement of a contract, including fraud, duress, statutory defenses, and unconscionability."  *Aguilar v. Zep Inc.*, No. 13-cv-563, 2014 WL 1900460, at *6 (N.D. Cal. May 12, 2014); *accord Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1141 (9th Cir. 2013) (dismissing complaint for failure to allege ground to void settlement agreement as a matter of contract law).

[11] Although Plaintiffs mention *Tortilla Flat* in their Amended Complaint and seek, in part, an "order declaring that [Plaintiffs] own the copyright interests in . . . *Tortilla Flat* . . . as alleged herein," AC at 25 (Prayer for Relief), they do not include *Tortilla Flat* in their definition of "Plaintiffs' Terminated Rights," *id.* ¶ 1 n.1.  While it is therefore unclear what interest in *Tortilla Flat* Plaintiffs claim to possess, it *is* clear that the right to exploit any Recaptured Right in *Tortilla Flat* belongs to the Estate under the 1983 Settlement Agreement.

D, E.  By basing their claim on notices sent by Elaine, or those under her direction, Plaintiffs in effect acknowledge that these termination notices were valid, and thus concede that the 1983 Settlement Agreement gave Elaine the power to terminate—and to direct M&O to terminate—pre-1978 grants or licenses on Plaintiffs' behalf.

On the dates the *Grapes of Wrath* and *Tortilla Flat* Termination Notices became effective, control over the Recaptured Rights transferred to Elaine exclusively under the 1983 Settlement Agreement and accompanying powers of attorney.  *See* Ex. B ¶ 5; Ex. C. When Elaine died, control over the Recaptured Rights passed to the Estate.  *See* The 2004 Litigation, 2009 WL 928171, at *3 (S.D.N.Y. Mar. 31, 2009) (holding that because the powers of attorney were coupled with an interest, they "persist[] beyond [Elaine's] death"), *aff'd* 400 F. App'x at 576.  The 1983 Settlement Agreement therefore forecloses Plaintiffs' claim that they may exercise control over the Recaptured Rights.

Plaintiffs nonetheless retain a pecuniary interest in the Recaptured Rights.  As noted above, Section 304 provides that, as Steinbeck's widow, Elaine retained 50 percent of the Recaptured Rights and that, as Steinbeck's son and granddaughter, Thom and Blake retained 25 percent each.  *See* 17 U.S.C. § 304(c)(2).  Accordingly, the Estate Defendants do not dispute that Plaintiffs each posses a 25 percent ownership interest in the Recaptured Rights, and that they are each entitled to 25 percent of any royalties deriving from the Estate's exploitation of those rights.[12]  Such a result is consistent with the 1983 Settlement Agreement, which recognized Plaintiffs' economic interest in the

---

[12] The Recaptured Rights in *The Grapes of Wrath* and *Tortilla Flat* are not subject to the royalty distribution scheme set forth in the 1983 Settlement Agreement.  The 1983 Settlement Agreement clearly describes the subset of Steinbeck Works subject to increased royalty payments to Plaintiffs as the "renewed works," Ex. B ¶ 2, which are defined as "those works of John Steinbeck which entered their copyright renewal terms after his death," *id.* ¶ 1.  Those are the works referred to herein as the "Late Steinbeck Works."  Both *The Grapes of Wrath* and *Tortilla Flat* entered their renewal terms before Steinbeck died in 1968, and thus are "Early Steinbeck Works."  *See* The 2004 Litigation, 433 F. Supp. 2d at 399 n.12.  Accordingly, Section 304 governs the parties' ownership shares in the Recaptured Rights at issue here.

Steinbeck Works while giving Elaine—and, after her death, the Estate—the power to "exploit[]" all rights in the Steinbeck Works, including "termination rights."  Ex. B ¶ 5.

### 2.   Wrongful Termination Notices

Plaintiffs also claim they possess a "collective one hundred percent (100%) interest" in the rights referenced in the Wrongful Termination Notices (the *Red Pony*, *Long Valley*, DPS, and Samuel French Termination Notices).  AC ¶ 1 n.1 & Exs. F, G, H & I.[13]  Thom and Blake issued the Wrongful Termination Notices between 2004 and 2014, after Elaine died.  AC ¶ 41.  However, Plaintiffs previously stipulated in the 2004 Litigation that two of these terminations (the *Red Pony* and *Long Valley* Termination Notices) were invalid, *see* RJN Ex. 6, and those two and the remaining two are invalid as a matter of law because Thom and Blake had no authority under the 1983 Settlement Agreement to issue these termination notices.

The 1983 Settlement Agreement gave Elaine (and when she died, the Estate) the exclusive right to "take action with respect to the . . . termination of rights" in the Steinbeck Works.  Ex. B ¶ 5.  Moreover, the powers of attorney Thom and John IV executed in conjunction with the 1983 Settlement Agreement gave Elaine (and when she died, the Estate) the power "to exercise [their] . . . rights to terminate grants to third parties . . . with respect to" the Steinbeck Works.  Ex. C.  The clear language in the 1983 Settlement Agreement and its accompanying powers of attorney plainly bars Plaintiffs from issuing any termination notice relating to the Steinbeck Works.  Accordingly, the

---

[13] The Samuel French Termination Notice—which Plaintiffs allege relates to "the domestic professional stage rights" to the play version of *Of Mice and Men*, AC ¶ 1 n.1— by its own terms is effective no earlier than December 11, 2016.  *See* Ex. I.  Accordingly, Plaintiffs do not (and cannot) claim any damages related to this termination notice.  Nor do Plaintiffs allege any damages related to the *Red Pony* and *Long Valley* Termination Notices.  Plaintiffs do, however, seek damages related to the DPS Termination Notice, which they allege relates to "the domestic non-professional stage rights" to the play version of *Of Mice and Men*, AC ¶ 1 n.1.  *See id.* ¶¶ 67-70.

Wrongful Termination Notices are invalid and the pre-1978 grants and licenses they reference remain in effect.

### 3.      Unexercised Termination Rights

Finally, Plaintiffs claim they possess the "future ability to terminate grants of rights" in the Steinbeck Works.  AC ¶ 3.  However, for the same reasons the Wrongful Termination Notices were invalid under the 1983 Settlement Agreement and powers of attorney, the purported Unexercised Termination Rights, if any, may be exercised "solely at the discretion of" the Estate.  Ex. B ¶ 5.  Moreover, no Unexercised Termination Rights actually exist.

Indeed, Plaintiffs' hypothetical Unexercised Termination Rights *could* exist in only one narrow circumstance that implicates only the Steinbeck Works already at issue in this lawsuit, making the scope of any Unexercised Termination Rights purely academic. First, there can be no Unexercised Termination Rights in any grant or license that *Steinbeck* may himself have made in any Late Steinbeck Work.  This is because when an author dies before the copyright renewal period begins (*i.e.*, as with the Late Steinbeck Works), assignees may not continue to exploit the work during the renewal term unless "the author's successor transfers the renewal rights to the assignee."  *Stewart v. Abend*, 495 U.S. 207, 220-21 (1990); *see also* The 2004 Litigation, 433 F. Supp. 2d at 402-03 (holding that termination notices related to grants Steinbeck made with respect to the Late Steinbeck Works were invalid under *Stewart*).

Second, there can be no Unexercised Termination Rights in any grant that *Elaine* may have made in any Late Steinbeck Work.  For Elaine to have made a grant or license for the renewal period of a Late Steinbeck Work before January 1, 1978 (which would make it subject to termination under Section 304), the work had to have been copyrighted after 1940 (so that the renewal occurred after Steinbeck died)[14] and before 1950 (so that

---

[14] Twenty-eight years after 1940 was 1968, the year Steinbeck died.

Estate Defendants' Memorandum in Support of Motion To Dismiss the First Amended Complaint

1    the renewal period began before 1978).[15]  However, under Section 304(c), termination of

2    pre-1978 grants in works originally copyrighted between 1941 and 1949 had to occur

3    between 1997[16] and 2010.[17]  *See* 17 U.S.C. § 304(c)(3); *see also* 37 C.F.R. § 201.10

4    (termination under § 304(d) not available for works published after October 26, 1939).

5    Accordingly, the window to terminate any pre-1978 grant that Elaine might have made

6    during the renewal period of any Late Steinbeck Work is already closed.

7         Thus, there remains only one circumstance in which an Unexercised Termination

8    Right could exist in the Steinbeck Works, namely, grants Steinbeck himself may have

9    made in Early Steinbeck Works for which the time period to terminate under Section

10   304(d) has not yet expired.  Accordingly, the only Steinbeck Works that could possibly

11   have Unexercised Termination Rights are *Of Mice and Men* (© 1937), *The Red Pony* (©

12   1937), *The Long Valley* (© 1938), and *The Grapes of Wrath* (© 1939)—*exactly* the

13   Steinbeck Works already at issue here.

14      **B.**     **The 1983 Settlement Agreement Is Not an "Agreement to the Contrary."**

15         Plaintiffs now attempt to circumvent the plain language of the 1983 Settlement

16   Agreement—and ignore the benefits of the bargain they have amassed over the last 30

17   years—by arguing that, to the extent the Agreement prohibits Plaintiffs from exercising

18   termination rights, it is an "agreement to the contrary" barred by Section 304.  AC ¶

19   56(d).[18]  However, courts have made clear that the "agreement to the contrary" language

20   contained in the Copyright Act does not foreclose the power of private parties to contract,

21

22   [15] Twenty-eight years after 1950 was 1978.

23   [16] Termination of a grant or license in a work copyrighted in 1941 could first occur 56 years later, in 1997.

24   [17] Termination of a grant or license in a work copyrighted in 1949 could occur as late as 61 years later, in 2010.

25   [18] Of course, Plaintiffs do not claim that the entire 1983 Settlement Agreement is an

26   "agreement to the contrary," nor could they, as they continue to reap the benefit of their side of the bargain in the Agreement, namely, increased royalties in the Late Steinbeck

27   Works.  As explained above, they also seek to reap the benefits of the *Grapes of Wrath*

28   Termination Notice, which was issued by Elaine under the 1983 Settlement Agreement.

1   and it is not intended to prevent statutory heirs from agreeing *among themselves* how to

2   allocate their termination rights.  *See Penguin Grp.*, 537 F.3d at 202-03; *Milne v. Stephen*

3   *Slesinger, Inc.*, 430 F.3d 1036, 1042, 1045-46 (9th Cir. 2005).

4        Section 304(c)(5) provides that termination "may be effected notwithstanding any

5   agreement to the contrary."  17 U.S.C. § 304(c)(5).  The Copyright Act does not define

6   "agreement to the contrary."  Courts have found that the phrase is ambiguous and that an

7   analysis of legislative history is thus required to glean its meaning.  *See Marvel*

8   *Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002); *Milne*, 430 F.3d at 1045.

9        Looking to legislative history, the rationale behind the termination provision was to

10  "'safeguard[] authors against unremunerative transfers' and to improve their 'bargaining

11  position . . .' by giving them a second chance to negotiate more advantageous grants in

12  their works after the works had been sufficiently 'exploited' to determine their 'value.'"

13  *Milne*, 430 F.3d at 1046 (quoting H.R. Rep. No. 94-1476 at 124, 94th Cong., 2d Sess.

14  (1976)); *see also Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 984 (9th Cir. 2008) ("the

15  termination right was expressly intended to relieve authors of the consequences of ill-

16  advised and unremunerative grants that had been made before the author had a fair

17  opportunity to appreciate the true value of his work product" (quoting *Mills Music, Inc. v.*

18  *Snyder*, 469 U.S. 153, 172-73 (1985))).  Congress sought to foster this purpose by

19  permitting an author's statutorily-defined heirs "to enter into new, more advantageous

20  grants."  *Milne*, 430 F.3d at 1046.

21       In light of this legislative history, the small number of courts that have interpreted

22  the "agreement to the contrary" language have found that the language is intended to

23  prevent the recipients of grants—*i.e.*, "litigation-savvy publishers" or producers—from

24  using their superior bargaining power to compel authors and their heirs to relinquish their

25  termination rights.  *See Marvel*, 310 F.3d at 290-91 ("the clear Congressional purpose

26  behind § 304(c) was to prevent authors from waiving their termination right by

27  contract").  This is consistent with the examples of agreements to the contrary given in

28  the statutory text, namely "an agreement to make a will or to make any future grant."  17

U.S.C. § 304(c)(5).  Courts have made clear that, outside of that narrow context, the language should *not* to be read "so broadly that it would include any agreement that has the effect of eliminating a termination right."  *Penguin Grp.*, 537 F.3d at 202.

The agreements at issue in the few decisions that have analyzed whether an agreement is an "agreement to the contrary" have all been agreements between publishers/producers and heirs, not agreements *among* heirs (such as the Agreement at issue here).  Even with respect to those agreements between publishers and heirs that eliminate an heir's termination right—*i.e.*, the very agreements that fall squarely within the legislative purpose of the termination provision—the majority of courts reviewing those agreements have found that they are not actually "agreements to the contrary," because the heir "freely and knowingly" entered into the agreement, was aware of the fact that his termination rights were at stake, and was receiving some sort of benefit in exchange for abandoning the termination right.  *Milne*, 430 F.3d at 1045-46; *see also Penguin Grp.*, 537 F.3d at 202; *DC Comics v. Pacific Pictures Corp.*, No. 10-cv-3633-ODW, 2012 WL 4936588, at *8-9 (C.D. Cal. Oct. 17, 2012); *Larson v. Warner Bros. Entm't*, No. 2:04-cv-08766, 2013 WL 1688199, at *4-6 (C.D. Cal. Apr. 18, 2013).[19]

---

[19] By contrast, the few decisions (we have identified only three) in which a court found that an agreement eliminating an heir's termination right was an agreement to the contrary involved situations that clearly implicated the purpose of the provision, namely, to protect heirs against publishers with superior bargaining power or to protect heirs who were unaware of the fact that they were relinquishing their termination rights.  *See Marvel*, 310 F.3d at 290-91 (agreement in which publisher recharacterized an already-published work as a "work made for hire" so as to eliminate a termination right was found to be an agreement to the contrary); *The Ray Charles Found. v. Robinson*, 919 F. Supp. 2d 1054, 1066 (C.D. Cal. 2013) (agreement which forced statutory heirs to choose between incurring a penalty for breaching an agreement or abandoning their termination rights is an agreement to the contrary); *see also Mewborn*, 532 F.3d at 984-89 (finding that if an agreement between an heir and a publisher had transferred the heir's termination rights, it would have been an agreement to the contrary because there was no evidence that the heir was aware that she was extinguishing such a right).

Estate Defendants' Memorandum in Support of Motion To Dismiss the First Amended Complaint

For example, in *Milne v. Slesinger*, the court found that an agreement between an heir and a producer in which the heir agreed not to pursue his termination rights was not an agreement to the contrary.  *See* 430 F.3d at 1039, 1046.  The Ninth Circuit held that the 1983 agreement between film and TV producer Stephen Slesinger, Inc. ("SSI") and the author's son, Christopher, was a revocation of the 1930 agreement and a re-grant of the rights granted in 1930, and thus, there was no pre-1978 grant of rights for Christopher's daughter Clare to terminate.  In concluding that the renegotiated 1983 agreement was not an "agreement to the contrary" (even though it resulted in the elimination of the right to terminate the 1930 agreement),  the court focused on the fact that the 1983 agreement was "freely and intelligently" entered into by Christopher (the heir), that Christopher was aware of the fact that he had possessed a termination right that he was forgoing, and that the new grant resulted in an "increased royalty stream" for Christopher and Clare, and thus achieved the policy objectives underlying the termination provision.  *Id.* at 1044-45.

As in *Milne*, here, Plaintiffs "freely and intelligently" entered into the 1983 Settlement Agreement—an agreement that they have continued to rely upon for decades, including with respect to termination notices issued pursuant to the Agreement.  In addition, at the time they entered into the 1983 Settlement Agreement, Thom and John IV were clearly aware of their termination rights, which they agreed Elaine could exercise exclusively.  As with the 1930 agreement in *Milne*, the relinquishing of Thom and John IV's termination rights is noted explicitly in multiple places in the Agreement.  *See*  Ex. B ¶ 5.  Finally, like Christopher, Thom and John IV received, and have continued to receive, an "increased royalty stream" as a result of forgoing their termination rights.

In fact, in the 2004 Litigation, the Second Circuit recognized that a decision among heirs that effectively extinguishes the termination rights of statutory heirs is not an "agreement to the contrary."  *See Penguin Grp.*, 537 F.3d at 202.  Specifically, the Second Circuit held that Elaine's 1994 agreement with Penguin was not an "agreement to the contrary" because that phrase should not be read "so broadly that it would include any

agreement that has the effect of eliminating a termination right." *Id.* The court noted that "[i]f the holders of a majority of an author's termination interest were to agree that they would not exercise their termination rights, this would have the effect of eliminating a termination right." *Id.* The court went on to make clear that "such an agreement could not be held ineffective as an 'agreement to the contrary.'" *Id.* If an agreement among a subset of heirs not to terminate is not an agreement to the contrary, regardless of whether some of them change their minds or other heirs dissent, then it certainly is not the case that the 1983 Settlement Agreement, an agreement among *all* heirs regarding the exercise of termination rights, is an agreement to the contrary.

## C.   The Estate Defendants Are Not Precluded From Making Any Argument Contained Herein.

Plaintiffs allege that under principles of *res judicata* and collateral estoppal, a portion of Judge Owen's decision in the 2004 Litigation bars the Estate from "disputing the validity" of the *Red Pony* and *Long Valley* Termination Notices, the other Wrongful Termination Notices, and any future termination notice Plaintiffs may issue pursuant to their alleged Unexercised Termination Rights.  AC ¶ ¶ 45, 56(e), (f) & (g).   Plaintiffs ignore the relevant procedural history of the 2004 Litigation—namely, their own stipulation acknowledging that the *Red Pony* and *Long Valley* Termination Notices were *invalid.* Further, Plaintiffs rely on dicta in Judge Owen's decision that the Second Circuit expressly declined to consider.[20]

The doctrines of *res judicata* and collateral estoppel share "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).  "To trigger the doctrine of *res judicata*, the earlier suit must have (1) involved the same 'claim' or cause of action as the

---

[20] Plaintiffs concede that no preclusion doctrine could apply to any argument related to the Estate's exclusive right to exploit any Recaptured Rights in the Steinbeck Works, as the 2004 Litigation (and the Penguin Group Litigation) "did not determine the issue." AC ¶ 2 n.2.

later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies." *Sidhu v. Flecto Co.*, 279 F.3d 896, 900 (9th Cir. 2002) (citing *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 887 (9th Cir. 2000)).   Similarly, collateral estoppel prevents a party from litigating an issue when "(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding." *Hydranautics*, 204 F.3d at 885.

Critically, when a court acting in an appellate capacity "expressly decline[s] to rule" on an issue decided by a lower court, that issue "is no longer conclusively established" and "has no *res judicata* or collateral estoppel effect." *Martin v. Henley*, 452 F.2d 295, 300 (9th Cir. 1971); *see also Briggs v. United States*, No. 07-cv-5760, 2009 WL 113387, at *4 (N.D. Cal. Jan. 16, 2009) (considering merits of issue that was discussed in prior court order when prior court "expressly limited" the scope of its decision and "declined to decide" the question).

On December 2, 2009, Thom and Blake, to achieve finality in order to appeal Judge Daniels' decision, decided to stipulate that "[j]udgment shall be entered in favor of the Estate" on its counterclaim that Thom and Blake's termination notices—including the *Red Pony* and *Long Valley* Termination Notices—were *invalid*.   RJN, Ex. 6 (Stipulation and Order with Respect to Counterclaims and Intervenor Complaint).[21]   Thus, Judge Owen's ruling does not bar the Estate from contesting the validity of any termination

---

[21] The stipulation is clear that its purpose was to "achieve finality and thereby[] confer jurisdiction on the Second Circuit."   RJN, Ex. 6 at 2 (Stipulation and Order with Respect to Counterclaims and Intervenor Complaint).   Because the parties stipulated that Thom and Blake's termination notices were invalid, there was no need for the Estate Defendants to cross-appeal from Judge Daniels' March 31, 2009 order and seek direct appellate review of those portions of Judge Owen's opinion.   *See* 28 U.S.C. § 1291 (courts of appeal have jurisdiction of appeals "from all final decisions" of U.S. district courts).

notice issued by Plaintiffs.  If anything, Plaintiffs' stipulation collaterally estops them from disputing the *invalidity* of the *Red Pony* and *Long Valley* Termination Notices.

Moreover, the Second Circuit expressly declined to rule on the question of whether the 1983 Settlement Agreement was an "agreement to the contrary," concluding that the issue was "immaterial to the resolution of this appeal."  *Penguin Grp.*, 537 F.3d at 203 n.5.  In dismissing Thom and Blake's claims on remand, Judge Daniels recognized that the "issue was not resolved by the Second Circuit."  The 2004 Litigation, 2009 WL 928189, at *7 n.10.  By expressly declining to rule on the correctness of Judge Owen's musings, the Second Circuit stripped Judge Owen's dicta about the *Red Pony* and *Long Valley* Termination Notices of any preclusive effect.[22]

## V.    PLAINTIFFS' INDIVIDUAL CLAIMS MUST ALSO BE DISMISSED.

Plaintiffs allege that the Estate is also liable for (1) contributory copyright infringement, *see* AC ¶¶ 67-70, (2) breach of contract, *id.* ¶¶ 71-75, and (3) breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 76-79.  These claims must also be dismissed as a matter of law.

### A.    Plaintiffs Lack the Ownership Interest Necessary To State a Claim for Copyright Infringement.

Plaintiffs claim that the Estate "induced, encouraged, persuaded and caused [defendant] DPS to directly infringe" their alleged interest in the non-professional stage rights to the play version of *Of Mice and Men*.  AC ¶ 68.  However, Plaintiffs cannot state a claim for direct copyright infringement, let alone contributory copyright infringement.

Liability for contributory copyright infringement requires that a defendant "(1) knew of the direct infringement; and (2) [] either induced, caused, or materially contributed to the infringing conduct."  *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013).  It naturally follows that when a plaintiff fails to establish any

---

[22] Judge Owen held only that the Estate Defendants had abandoned their argument that the *Red Pony* and *Long Valley* Termination Notices were invalid, and that Thom and Blake were entitled to summary judgment as a result.  *See* The 2004 Litigation, 433 F. Supp. 2d at 404.

direct copyright infringement, he or she "necessarily fails to establish contributory or vicarious copyright infringement." *Lawrence v. Sony Pictures Entm't, Inc.*, 534 F. App'x 651, 654 n.2 (9th Cir. 2013).

Here, Plaintiffs cannot state a claim for any direct copyright infringement. For the reasons stated above, *see supra*, pp. 14-15, all the Wrongful Termination Notices—including the DPS Termination Notice—were invalid. Accordingly, Plaintiffs do not possess any rights related to the play version of *Of Mice and Men*. Any claim alleging infringement of a copyright interest Plaintiffs do not possess must be dismissed. *See Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 884 (9th Cir. 2005) ("To be entitled to sue for copyright infringement, the plaintiff must be the legal or beneficial owner of an exclusive right under a copyright.") (internal quotations omitted).

**B.    Plaintiffs Have No Contractual Right to Royalty Payments From the Exploitation of Non-Professional Stage Rights to *Of Mice and Men*.**

Plaintiffs allege the Estate breached the 1983 Settlement Agreement "by failing to pay [Plaintiffs] the monies [Plaintiffs] are owed due to [Plaintiffs'] ownership interest in non-professional stage rights in *Of Mice and Men*" as a result of the DPS Termination Notice. AC ¶ 73. Plaintiffs further allege that the Estate "divert[ed] . . . the monies that should have been paid to [Plaintiffs] based on those rights and distribut[ed] that money" to M&O and the Estate Defendants. *Id.* This claim fails for two independent reasons.

First, as discussed above, Plaintiffs have no interest in the non-professional stage rights to the play version of *Of Mice and Men* because all the Wrongful Termination Notices—including the DPS Termination Notice—were invalid. *See supra*, pp. 14-15.

Second, the 1983 Settlement Agreement created a contractual obligation to compensate Plaintiffs only for the "domestic exploitation during their copyright renewal terms of those works of John Steinbeck which entered their copyright renewal terms after his death." Ex. B ¶ 1. Both the novel and play versions of *Of Mice and Men* entered their copyright renewal terms *before* Steinbeck's death. *See* The 2004 Litigation, 433 F. Supp. 2d at 399 n.12. Thus, rights associated with *Of Mice and Men* (an Early Steinbeck Work)

1   are not subject to the royalty distributions in the 1983 Settlement Agreement.[23]  Without

2   an underlying contractual obligation, Plaintiffs' breach of contract claim must fail.[24]

3   **C. The Covenant of Good Faith and Fair Dealing Does Not Apply Without**

4   **an Underlying Contractual Obligation.**

5       Plaintiffs claim that the Estate has violated the covenant of good faith and fair

6   dealing present in both California and New York law by "inducing DPS to pay to M&O .

7   . . the monies generated by DPS's exploitation of non-professional stage rights in *Of Mice*

8   *and Men*," which Plaintiffs allege the Estate did "in bad faith to frustrate the benefits

9   [Plaintiffs] were to receive from their ownership interests" in that work.   AC ¶ 78.

10  Because the Estate had no contractual obligation to compensate Plaintiffs for DPS's

11  exploitation of *Of Mice and Men*, however, there can be no violation of the covenant of

12  good faith and fair dealing.

13      Under both California and New York law, the covenant of good faith and fair

14  dealing applies only to conduct "covered by the contract" between the parties.  *Tessera,*

15  *Inc. v. UTAC (Taiwan) Corp.*, No. 10-cv-4435, 2012 WL 1067672, at *3 (N.D. Cal. Mar.

16  28, 2012) (California law); *Sarbaz v. Wachovia Bank*, No. 10-cv-3462, 2011 WL 830236,

17  at *3 (N.D. Cal. Mar. 3, 2011) (California law); *Palmer Kane LLC v. Scholastic Corp.*,

---

18  [23] Were the DPS Termination Notice valid (it is not), Plaintiffs would retain a pecuniary

19  interest in their recaptured rights as a function of Section 304, not the 1983 Settlement

20  Agreement.  *See supra*, p. 13 n.12.  The 1983 Settlement Agreement would nonetheless

21  give the Estate "complete power and authority . . . with respect to the exploitation" of all recaptured rights.  Ex. B ¶ 5.

22  [24] Although Plaintiffs mention only *Of Mice and Men* in their breach of contract claim,

23  *see* AC ¶¶ 71-75, Plaintiffs also imply—in a conclusory fashion—that they failed to

24  receive royalty payments for the Estate's exploitation of Recaptured Rights in *The*

25  *Grapes of Wrath*, *see id.* ¶ 53.  To whatever extent Plaintiffs' breach of contract claim can be read to include *The Grapes of Wrath*, the claim also fails.  *The Grapes of Wrath* is an

26  Early Steinbeck Work and thus not subject to the royalty distribution provisions in the

27  1983 Settlement Agreement.  *See supra*, p. 13 n.12.  Accordingly, Plaintiffs have a pecuniary interest in their recaptured rights as a function of Section 304, not the 1983

28  Settlement Agreement, meaning that they are each entitled to 25 percent of the royalties. Such royalties have been properly distributed.

No. 12-cv-3890, 2014 WL 1303135, at *6-7 (S.D.N.Y. Mar. 31, 2014) (New York law).
As discussed above, Plaintiffs have no rights under the 1983 Settlement Agreement to
any royalty payments related to *Of Mice and Men* or any other Early Steinbeck Work.
*See supra*, p. 2.  Accordingly, any claim based on the Estate's alleged failure to distribute
such payments must be dismissed.

## VI.   PLAINTIFFS ARE NOT ENTITLED TO DECLARATORY RELIEF.

For all the reasons stated above, Plaintiffs are not entitled to the declaratory relief
they seek in their Amended Complaint.  *See* AC ¶¶ 54-58.  First, the 1983 Settlement
Agreement remains valid and enforceable, is not an agreement to the contrary, and makes
clear that Elaine has "the complete power and authority to negotiate, authorize and take
action with respect to the exploitation and/or termination of rights in the works of John
Steinbeck in which [John IV] and [Thom] have or will have renewal or termination
rights."  Ex. B ¶ 5.  *See supra*, pp. 11-20.  Second, the Estate is not precluded from
disputing the validity of any of the Wrongful Termination Notices, which are all invalid.
*See supra*, pp. 20-22.  Third, because Plaintiffs cannot state a claim for any direct
copyright infringement, they cannot allege the Estate has contributorily infringed any
copyright.  *See supra*, pp. 22-23.  Finally, because the Estate has not breached any
contractual obligation to Plaintiffs under the 1983 Settlement Agreement, no action of
any Estate Defendant "justif[ies]" terminating the powers of attorney executed by Thom
and John IV as part of the 1983 Settlement Agreement.  *See supra*, pp. 23-24.
Accordingly, Plaintiffs have stated no viable claim for declaratory relief.

## VII.   CONCLUSION

For all the foregoing reasons, this Court should dismiss with prejudice all of
Plaintiffs' claims as they relate to the Estate Defendants.

1

DATED:  June 1, 2015

JENNER & BLOCK LLP

2

3

_____/s/ Susan J. Kohlmann_____
Susan J. Kohlmann

4

5

6

*Counsel for Defendants Waverly Scott Kaffaga, Jean Anderson Boone, David Scott Farber, Anderson Farber King, Jebel Kaffaga, and Bahar Kaffaga*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Estate Defendants' Memorandum in Support of Motion To Dismiss the First Amended Complaint