# Exhibit 1

12

MANATT PHELPS & PHILIPS, LLP
MARK S. LEE (CA Bar. No. 94103) (*pro hac vice* application outstanding)
11355 W. Olympic Blvd.
Los Angeles, California 90064
(310) 312-4000

MANATT, PHELPS & PHILLIPS, LLP ,
CYNTHIA S. ARATO (CA 8350)
ALON MARKOWITZ (AM 0111)
500 Fifth Avenue, 38th Floor
New York, New York 10110
(212) 382-0200

**04 CV   5497**

Attorneys for Plaintiffs
Thomas Steinbeck and Blake Smyle

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS STEINBECK, an individual, and BLAKE SMYLE, an individual,

Plaintiffs,

-against-

MCINTOSH & OTIS, INC., a New York Corporation, THE STEINBECK HERITAGE FOUNDATION, a non-profit New York corporation, EUGENE H. WINICK, an individual, SAMUEL PINKUS, an individual, JEAN ANDERSON BOONE, an individual, FRANCIS ANDERSON ATKINSON, an individual, WAVERLY SCOTT KAFFAGA, an individual and Executor of the Estate of Elaine Anderson Steinbeck, DAVID SCOTT FARBER, an individual, ANDERSON FARBER RUNKLE, an individual, JEBEL KAFFAGA, an individual, BAHAR KAFFAGA, an individual, and STEVEN FRUSITICK, an individual, and Does 1-10,

Defendants.

CASE NO. _____

**COMPLAINT**

Jury Trial Demanded

Plaintiffs Thomas Steinbeck ("Thom") and Blake Smyle ("Blake") allege as follows as

and for their complaint in this action by their attorneys, Manatt Phelps & Phillips, LLP.

### SUMMARY OF ACTION

1.      Defendants have engaged in a 30-year hidden conspiracy to deprive John Steinbeck's blood heirs of their rights in the intellectual properties of John Steinbeck and to claim ownership interests in John Steinbeck intellectual properties that rightfully belong to Plaintiffs. In furtherance of their conspiracy, Defendants:

(a)     Filed false records with the Copyright Office, concealed Plaintiffs' actual copyright ownership interests from Plaintiffs, and, despite fiduciary and other duties to Plaintiffs, refused to exercise rights recognized by the Copyright Act in order to benefit themselves at Plaintiffs' expense;

(b)     Entered into below market transactions that harmed Plaintiffs' copyright interests and breached agreements they entered into with Plaintiffs for exploitation of John Steinbeck works;

(c)     Falsely claimed trademark rights in the "Steinbeck" and "John Steinbeck" marks, and the likeness of "John Steinbeck" and entered into licensing agreements for such rights in violation of Plaintiff Thom Steinbeck's trademark rights; and

(d)     Fraudulently concealed their misconduct.

Plaintiffs seek money damages for the significant harm Defendants' actions have caused, declaratory judgments as to their ownership interests in John Steinbeck's intellectual properties, and injunctive relief as described below.

### JURISDICTION AND VENUE

2.      This court has subject matter jurisdiction over the claims in this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202, as well as pendent jurisdiction over the state law claims asserted herein. Venue is proper in this district under 28 U.S.C.

## 14

§ 1391(b) in that, *inter alia*, defendants are located in and/or do business in this district, and a substantial portion of the events described in this complaint took place in this district.

### PARTIES

3.      Plaintiff Thomas Steinbeck ("Thom") is an individual who resides in California. He is an author, screenwriter, and the only living child of noted author John Steinbeck.

4.      Plaintiff Blake Smyle ("Blake") is an individual who resides in Maryland. She is the only living grandchild of author John Steinbeck and the mother of his two great-grandchildren.

5.      Elaine Anderson Steinbeck ("Elaine") was an individual who, until April 27, 2003, resided in New York, New York. Elaine died on or about April 27, 2003. An estate has been opened in her name and an action has been filed to probate her will in Surrogates' Court, County of New York. She was the second wife and widow of John Steinbeck.

6.      Defendant McIntosh & Otis, Inc. ("M&O") is a corporation which has its offices in New York, New York. At various times described herein it has acted as the literary agent for, *inter alia*, John Steinbeck, Elaine Steinbeck, Thomas Steinbeck, John Steinbeck IV, and recently, it attempted to act on behalf of Blake Smyle. Further, Elaine's will requires certain beneficiaries to name M&O as their attorney-in-fact, as described below.

7.      Defendants Eugene H. Winick ("Winick") and Samuel Pinkus ("Pinkus") (the "M&O Principals") are principals of M&O and attorneys-at-law admitted to practice in the State of New York who, plaintiffs are informed and believe, reside and/or work in New York, New York. Plaintiffs only recently discovered that from 1985 until Elaine's death in 2003, Winick also was the attorney-in-fact for Elaine Steinbeck. Winick is also identified in Elaine's will as trustee of a trust the will establishes, and the will's substitute executor.

## A-15

8. Defendant Jean Anderson Boone ("Jean") is a sister of Elaine who resides in New York, New York and is named as the beneficiary of a one-quarter interest of all copyrights and proceeds from the exploitation of copyrights relating to the works of John Steinbeck during Jean's lifetime.

9. Defendant Francis Anderson Atkinson ("Francis") is a sister of Elaine who, plaintiffs are informed and believes, resides in Alabama and is named in Elaine's will as the beneficiary of a one-quarter interest of all copyrights and proceeds from the exploitation of copyrights relating to the works of John Steinbeck during Francis's lifetime.

10. Defendant Waverly Scott Kaffaga ("Waverly") is the daughter of Elaine by Zachary Scott, has been named executor of Elaine's will by the Surrogate's Court in New York, New York, and is named as a beneficiary in Elaine's will of one-half of Elaine's interest in all copyrights and proceeds from the exploitation of copyrights relating to the works of John Steinbeck during Waverly's lifetime. Plaintiffs are informed and believe that Waverly resides in Austin, Texas. When named in her individual capacity herein she is described as "Waverly;" when named as the Executor of Elaine's estate, she is referred to as the "Estate of Elaine."

11. Defendants David Scott Farber, Anderson Farber Runkle, Jebel Kaffaga, and Bahar Kaffaga are grandchildren of Elaine who are named as contingent beneficiaries in Elaine's will of Elaine's interest in copyrights in and proceeds from the exploitation of copyrights related to the works of John Steinbeck following the deaths of Elaine, Jean, Francis and Waverly. Plaintiffs are informed and believe that these individuals reside in Oakland, California; Mount Pleasant, South Carolina; East Meadow, New York; and Venice, California, respectively.

12. Defendant The Steinbeck Heritage Foundation (the "Foundation") purports to be a non-profit corporation organized by Elaine Steinbeck in or about 1998, which has its offices in

**16**

New York, New York. Plaintiffs are informed and believe that Defendants Jean, Winick, Steven Frushtick, and/or Sam Pinkus and Does 1-10 are members of the Board of Directors of and/or agents for the Foundation. Plaintiffs are informed and believe that these individuals or entities reside and/or do business in New York, New York.

13. Defendants Does 1 through 10, inclusive, are sued here under fictitious names because their true names and capacities are unknown at this time and have been withheld from Plaintiffs. Plaintiffs are informed and believe that some or all of Does 1 through 10 are or have been members of the board of directors of and/or agents for the Foundation. This complaint will be amended appropriately when their true names and capacities are ascertained.

14. Plaintiffs are informed and believe that Defendants Does 1-10 are individuals and business entities who are acting in concert and active participation with the named Defendants herein and with each other in committing the wrongful acts alleged herein.

## GENERAL BACKGROUND

15. John Steinbeck was one of the greatest and most prolific literary figures of the 20th Century. Author of dozens of novels, short stories, plays, screenplays, and articles, many of his works, such as *Of Mice and Men*, *Grapes of Wrath*, *East of Eden*, *Winter of Our Discontent*, and others have become hallmarks of American literature. Many of his works also have been adapted, sometimes repeatedly, for stage, screen and television.

16. John Steinbeck received many awards as a result of his literary and artistic accomplishments. For example, he received the New York Drama Critics Circle Award for the legitimate theatrical version of *Of Mice and Men*; the Pulitzer Prize for *The Grapes of Wrath*; two Academy Award nominations for his original stories "Life Boat" and "A Medal for Benny"; the General Literature Gold Medal for his novels *Tortilla Flat*, *Of Mice and Men*, and the *Grapes of Wrath*; and the Nobel Prize in Literature for his body of work.

17.     John Steinbeck developed valuable copyrights in his works in accordance with U.S. copyright law. On information and belief, he or his purported successors and agents have complied with all procedural requirements needed to establish and protect his copyright interests in his works during his lifetime.

18.     John Steinbeck married Gwyn (Conger) Steinbeck in 1943, and had two children by her, namely plaintiff Thom and John Steinbeck IV ("John IV"). John Steinbeck divorced Gwyn (Conger) Steinbeck in 1948, and married Elaine in 1950. Although he had no children by Elaine, he remained married to her until his death.

19.     Following her marriage to John Steinbeck, Elaine was jealous of and manifested hostility towards Thom and John IV as the two children John Steinbeck had by a previous marriage. Whenever possible, Elaine took action to separate and isolate Thom and John IV from their father. For example, as John Steinbeck's death neared, she refused to tell Thom, who was serving in Vietnam, of his father's eminent demise. After Thom learned of his father's grave illness through an AP wire service story, he was granted permission by his commanding officer to travel home, and traveled twelve thousand miles to see his father. However, Elaine refused to contact Thom as John Steinbeck was dying, even though Thom was within blocks of his father.

20.     John Steinbeck died on December 20, 1968 in New York. After John Steinbeck's death, Elaine continued to manifest animus towards Thom and John IV. For example, she gave away John Steinbeck's personal possessions, namely clothes, hats, mementos, etc., to various of her friends, but gave nothing to Thom and John IV, his only children. She also informed Thom and John IV that they were no longer welcome in what she now called "her" home, even though they all had resided there and their personal possessions remained stored there.

**18**

21.     John Steinbeck left a will which was probated in New York that described how he wished his assets to be divided. Although his agents M&O had during his lifetime acted to protect his copyrights in his numerous works, John Steinbeck was an artist and author who cared little for business matters, including his intellectual property, and did not realize the economic value that his works would come to possess. For this reason, his will said nothing specific about the disposition of his copyrights, or about trademarks or other intellectual property rights. Instead, it established trusts for the benefit of his sons Thom and John IV, made certain bequests to others, and left the remainder of his estate to Elaine. It also named Elaine an executor of his estate.

22.     Federal law gave Elaine Steinbeck certain rights in the copyrights of John Steinbeck. However, applicable law also gave certain rights in John Steinbeck's copyrighted works to his sons Thom and John IV and their descendants, if any. Notwithstanding Thom's and John IV's rights as John Steinbeck's heirs to certain of John Steinbeck's copyrighted works, Elaine, apparently motivated by greed and continuing animus towards Thom and John IV, in conspiracy with M&O and some of the other defendants described herein, embarked on a series of schemes to enrich herself, and to deprive John Steinbeck's sons and grandchild of their legal rights to the literary legacy of their father and grandfather.

**The Copyright Conspiracy**

23.     Copyright law at the time of John Steinbeck's death granted Elaine, Thom and John IV jointly what are called "renewal" interests in certain of John Steinbeck's works. Notwithstanding Thom's and John IV's renewal rights in the works of their father, Elaine and M&O represented to Thom and John IV shortly after their father's death that, pursuant to the provisions of his will, Elaine inherited all rights in John Steinbeck's works, and that she could and would exploit those rights as she saw fit, without regard to the wishes or desires of Thom

and John IV. To effectuate that scheme, she secretly had renewal registrations filed in the names of herself, Thom and John IV, without the knowledge or consent of Thom or John IV.

24.     Notwithstanding Elaine's acknowledgment of Thom's and John IV's rights in the renewal registrations filed on her behalf, at Elaine's direction M&O paid to Elaine all revenues obtained from sales of the above described works during their renewal terms, and Elaine kept all such revenues. Elaine and M&O concealed from and failed to disclose to Thom or John IV that they also had copyright renewal interests in said works, and that they were entitled to a proportionate share of the revenues derived from exploitation of said works, and failed to account to Thom and John IV for those sales.

25.     Thom and John IV first learned of some of Elaine's conduct as described above in or about 1981. They filed suit against Elaine in the United States District for the Southern District of New York in 1981 in that certain action entitled *John Steinbeck IV and Thom Steinbeck v. Elaine Steinbeck*, Case No. 81 Civ. 6105. That suit was settled in about February 1983 pursuant to terms that are confidential.

26.     Thom and John IV granted to Elaine a power of attorney in connection with the exploitation of those works in which Thom and John IV had renewal interests and agreed to use M&O, Elaine's agent, as their literary agent. The grant of the power of attorney gave Elaine and M&O continuing exclusive control over those works in which Thom and John IV had renewal interests, and enabled them to conceal from Thom and John IV all acts Defendants engaged in concerning the works in which Thom and John IV had acknowledged renewal interests.

27.     Elaine's designation as attorney-in-fact of Thom and John IV created a principal-agent relationship between Thom and John IV on the one hand and Elaine on the other, and established in Elaine a fiduciary duty of undivided and undiluted loyalty to Thom and John IV.

8

M&O's designation as Thom and John IV's literary agent also created a principal-agent
relationship between Thom and John IV on the one hand and M&O on the other, and established
in M&O a fiduciary duty of undivided and undiluted loyalty to Thom and John IV.

28.    Notwithstanding their fiduciary duties to Thom and John IV, Elaine, Winick, later
Pinkus, and M&O secretly continued their scheme to benefit themselves at the expense of Thom,
John IV and John IV's heir Blake to further their own ends and goals.

29.    As discussed below, said Defendants concealed their misconduct from Thom,
John IV and Blake. Further, upon becoming a principal of M&O in about 1985, Winick and
other M&O Principals and employees lulled Thom and John VI into a false sense of security by
repeatedly acknowledging that Elaine had previously treated Thom and John IV unfairly,
repeatedly advising that Winick, and later Pinkus, were attorneys-at-law who were expert in
matters involving Steinbeck works who, now that they were Thom and John IV's literary agent,
would look out for Thom's and John IV's interests, repeatedly representing that they were
"taking care" of Thom and John IV, and repeatedly asserting that they had Thom's and John VI's
best interests at heart and were acting in those best interests. Thom, who himself was and is a
writer and not a businessman, and who was not experienced in intellectual property matters,
reasonably believed, relied on, and came to depend upon the representations and legal advice of
his literary agents and M&O's Principals concerning his intellectual property rights in John
Steinbeck's works.

30.    John Steinbeck had granted book publishing, motion picture, television, or other
rights in many of his works to various third parties during his lifetime, and Elaine could have and
should have served "notices of termination" with regard to such works pursuant to rights created
by the Copyright Act of 1976. However, although service of such notices of termination would

have benefited Elaine by allowing her to gain additional rights in Steinbeck works, and/or

negotiate better royalty rates with ongoing licensees, terminating previous grants also would

have benefited Thom, John IV or Blake – at Elaine's expense – because they would have

acquired. collectively, a 50% share of such termination interests as statutory heirs under

applicable copyright law. Further, since such termination interests were not governed by the

power of attorney Thom and John IV had assigned to Elaine in 1983, serving such termination

notices would have given Thom, John IV, or Blake rights over which Elaine did not hold a

power of attorney, thus allowing them a say in how those rights were exploited, and a basis to get

information about Elaine's, Winick's, Pinkus', and M&O's dealings with regard to those

Steinbeck works.

31.     Apparently motivated by their desire to continue to maintain exclusive control

over John Steinbeck's works and to conceal their conduct from Plaintiffs, and notwithstanding

both their knowledge of Plaintiffs' rights and the representations and legal advice of M&O and

M&O's Principals, Elaine, M&O and the M&O Principals, in breach of their fiduciary and other

duties to Plaintiff, did not file or serve notices of termination with regard to such works.

Further, said Defendants breached their fiduciary and other duties to, failed to disclose to, and

actually concealed from Thom, John IV or Blake, their rights regarding terminations of

Steinbeck properties. Further, in at least one instance described below, Elaine not only failed to

serve notices of termination, she entered into an agreement for book publishing rights on behalf

of herself and Thom which made it difficult or impossible to terminate such rights in favor of

Thom and Blake. Due to these acts by said Defendants, as well as Elaine's power of attorney,

which gave her the exclusive right to terminate transfers of Steinbeck properties in which Thom

and John IV owned an interest, neither Thom, John IV during his lifetime, nor Blake, ever had a
"moment of freedom" to recoup their rights.

## The Copyright Conspiracy and Blake

32.     John IV died on February 7, 1991, leaving a single child, his daughter Blake, who
had been born in 1970. Under applicable copyright law, upon John IV's death, his inchoate
termination and renewal rights in John Steinbeck works passed to Blake. Further, the power of
attorney John IV had assigned in favor of Elaine terminated by operation of law upon John IV's
death. Since Blake had never signed a power of attorney in favor of Elaine, Elaine's
acknowledging Blake's rights would have given Blake renewal rights and, if exercised,
termination rights in a number of Steinbeck works which Elaine could not control.

33.     However, Blake did not know or have any reason to know of any of the facts
which would entitle her to any ownership interest in John Steinbeck works. Blake's mother and
John IV separated when Blake was a young child, and Blake relied on her mother and adopted
father, and Elaine to advise her of her rights. Elaine advised Blake's mother that Elaine was the
executor of John Steinbeck's estate and the owner of all rights in John Steinbeck's works, such
that Blake owned none. As a result of Elaine's statements and actions, Blake's parents, and later
Blake, were led to believe that Blake had no rights in any of John Steinbeck's work.

34.     Blake also had periodic contact with Elaine, who she thought of as her
grandmother. Blake, her mother and John IV lived with Elaine in New York for a period of
time. Elaine sent birthday and holiday presents and cards to Blake throughout Blake's
childhood, referring to herself as Blake's "Granny," sent money to help pay for Blake's college
education, and had Blake stay with her when Blake visited New York as an adult. Blake placed
trust and confidence in Elaine, especially with regard to matters involving her grandfather John
Steinbeck, because of their family relationship and the fact that Elaine was the Executor of her

40664317.1                                                      11

grandfather John Steinbeck's estate. In all of their conversations and dealings, Elaine concealed from Blake the fact that Blake rightfully owned interests in John Steinbeck's works, instead leaving Blake with the impression that Elaine owned and controlled all such interests. In reasonable reliance on these representations and concealments, Blake was misled into believing that she had no basis to claim any rights in John Steinbeck works, and had no reason to investigate her rights.

35. To ensure that Blake would continue to be misled as to her rights regarding John Steinbeck works, Elaine actively concealed Blake's and Thom's whereabouts from each other. Thom only found Blake through Elaine's sister Jean in late 2002, less than a year before Elaine's death. Further, Elaine consistently failed to acknowledge Blake in renewal registrations, notices of termination and termination confirmations she filed with the Copyright Office as described more fully below. Elaine, through the M&O Principals and M&O, instead falsely claimed that either Elaine alone or Elaine and Thom were the only persons with rights in the John Steinbeck copyrights.

**Lost Book Publishing Termination Interests**

36. Through Defendants' actions and inactions as described above and below, Thom has lost his opportunity to obtain his 17 U.S.C. § 304(c) termination interests in book publishing rights in a number of Steinbeck works, and thus has been denied the revenue he would have received as a 25% owner of U.S. book publishing rights in the following works for the years in which book publishing rights could have been but were not terminated. Copyright law creates a second opportunity to terminate certain copyright transfers pursuant to 17 U.S.C. § 304(d), and Thom has served 17 U.S.C. § 304(d) notices of termination where he could, the validity of which he is informed and believes Defendants and/or others may dispute. Should his notices of termination be deemed valid, Thom has been damaged for the years in which he did not receive

revenues as a Section 304(c) terminating party. Otherwise, he has been damaged for the life of

U.S. copyright in said works. Further, one work is not subject to 17 U.S.C. § 304(d) termination,

and thus said Defendants' failure to serve a timely 17 U.S.C. § 304(c) termination notice has

caused the irretrievable loss of termination rights to such work. The relevant damage periods are

as follows:

| Title | Potential Termination Dates | Period of Lost Book Revenue (Lost § 304(c) Termination) | Period of Lost Book Revenue (Life of Copyright) |
|---|---|---|---|
| Cup of Gold | 1985 | '85-'06 | '85-'24 |
| The Pastures of Heaven | 1988 | '88-'07 | '88-'27 |
| The Red Pony | 1989 | '89-'12 | '89-'27 |
| To A God Unknown | 1989 | '89-'08 | '89-'27 |
| Tortilla Flat | 1991 | '91-'10 | '91-'30 |
| In Dubious Battle | 1992 | '92-'11 | '92-'31 |
| Of Mice and Men | 1993 | '93-'12 | '93-'32 |
| Of Mice and Men (Play) | 1993 | '93-'12 | '93-'32 |
| The Long Valley | 1994 | '94-'13 | '94-'33 |
| The Grapes of Wrath | 1995 | '95-'14 | '95-'34 |
| Forgotten Village | 1997 | N/A | '97-'36 |

37.     Through Defendants' actions and inactions as described above and below, Blake

has lost her opportunity to obtain her termination interests in book publishing rights in a number

of Steinbeck works, and thus has been denied the revenue she would have received as a 25%

owner of U.S. book publishing rights in the following works for the years in which book

publishing rights could have been but were not terminated. Blake has served 17 U.S.C. § 304(d)

notices of termination for some of those works, the validity of which she is informed and

believes Defendants and/or others may dispute. Should her notices of termination be deemed

valid, Blake has been damaged for the years in which she did not receive revenues as a

Section 304(c) terminating party. Otherwise, she has been damaged for the life of

U.S. Copyright in said works. Further, some of the works are not subject to 17 U.S.C. § 304(d)

termination, and thus said Defendants' failure to serve timely 17 U.S.C. § 304(c) termination

## A-25

notices has caused the irretrievable loss of termination rights to such works. The relevant

damage periods are as follows:

| Title | Potential Termination Dates | Period of Lost Book Revenue (Lost § 304(c) Termination) | Period of Lost Book Revenue (Life of Copyright) |
|---|---|---|---|
| Cup of Gold | 1993 | '93-'06 | '93-'24 |
| The Pastures of Heaven | 1993 | '93-'07 | '93-'27 |
| The Red Pony | 1993 | '93-'07 | '93-'27 |
| To A God Unknown | 1993 | '93-'12 | '93-'27 |
| Tortilla Flat | 1993 | '93-'08 | '93-'30 |
| In Dubious Battle | 1993 | '93-'10 | '93-'31 |
| Of Mice and Men | 1993 | '93-'11 | '93-'32 |
| Of Mice and Men (Play) | 1993 | '93-'12 | '93-'32 |
| The Long Valley | 1993 | '93-'13 | '94-'33 |
| The Grapes of Wrath | 1995 | '94-'14 | '95-'34 |
| Forgotten Village | 1997 | N/A | '97-'36 |
| Sea of Cortez | 1997 | N/A | '97-'36 |
| The Moon is Down | 1998 | N/A | '98-'37 |
| Bombs Away | 1998 | N/A | '98-'37 |
| Cannery Row | 2001 | N/A | '01-'40 |
| The Pearl | 2003 | N/A | '03-'42 |
| The Wayward Bus | 2003 | N/A | '03-'42 |
| A Russian Journal | 2004 | N/A | '04-'43 |
| Burning Bright | 2006 | N/A | '06-'45 |
| Log from the Sea of Cortez | 2007 | N/A | '07-'46 |
| East of Eden | 2008 | N/A | '08-'47 |
| Sweet Thursday | 2010 | N/A | '10-'49 |
| The Short Reign of Pippin IV | 2013 | N/A | '13-'52 |
| Once There Was A War | 2014 | N/A | '14-'53 |
| Winter Of Our Discontent | 2017 | N/A | '17-'56 |
| Travels with Charley | 2018 | N/A | '18-'57 |
| America and Americans | 2022 | N/A | '22-'61 |

## Lost Motion Picture, Television And Related Termination Interests

38.  Due to Defendants' actions and inactions as described herein, Thom and Blake

have lost motion picture, television, and related termination interests in at least the following

Steinbeck works:

| Title | Section 304(c) Notice of Termination Periods |
|---|---|
| The Red Pony | '83-'96 |
| The Gift | '79-'92 |

14

**26**

| | |
|---|---|
| The Great Mountains | '79-'92 |
| The Promise | '83-'96 |
| The Long Valley | '84-'97 |
| Forgotten Village | '87-'00 |
| The Moon is Down | '88-'01 |

39.    Further, Elaine, the M&O Principals and M&O improperly submitted the few

renewal notices and notices of termination they did file to maximize their control over the

Steinbeck literary properties and to exclude John Steinbeck's blood heirs. For example, although

Elaine was well aware of Blake, Elaine failed to acknowledge Blake when, through Winick,

Pinkus and M&O, she filed a renewal registration in the following work:

| Title | Renewal No. | Renewal Date | Purported Renewal Claimants |
|---|---|---|---|
| America and Americans | RE 672-043 | August 29, 1994 | Elaine & Thom |

40.    Elaine also failed to acknowledge Blake when, with the M&O Principals and

M&O, she filed notices of termination in the following works:

| Title | Date Termination Rights Exercised | Purported Renewal Claimants |
|---|---|---|
| Tortilla Flat | May 26, 1994 | Elaine & Thom |
| Grapes of Wrath | February 11, 1998 | Elaine & Thom |

41.    Elaine also failed to acknowledge Blake or Thom when, with Pinkus and M&O,

she filed with the Copyright Office "confirmations" of terminations which were never recorded

with the Copyright Office as follows:

| Title | Date Termination Rights Confirmed | Purported Claimants |
|---|---|---|
| Grapes of Wrath | March 4, 1998 | Elaine |
| The Long Valley | March 4, 1998 | Elaine |

42.    As a result of Defendants' actions and inactions as described in paragraphs 36-41

above, Elaine owned the above-described interests in the above-described works as constructive

trustee for Blake and Thom, who became the beneficial owners of the interests they should have

received under copyright law. As a constructive trustee, Elaine, Elaine's agents M&O and the M&O Principals had a confidential and fiduciary relationship with Blake and Thom, and have fiduciary and other duties to Blake and Thom in connection with such works.

43. None of the above-described actions and inactions were known to Thom or Blake, and were fraudulently concealed from them by Elaine, M&O and the M&O Principals. Notwithstanding said Defendants' fiduciary and other duties towards Thom and Blake, their status as Thom's agents, and the fact that both Winick and Pinkus were attorneys-at-law on whom Thom relied to give legal advice as to his termination interests in John Steinbeck properties, and their false representations that they would look out for and take care of Thom's and Blake's interests, none of said Defendants advised Thom or Blake of their termination interests, the potential consequences to Thom's and Blake's termination interests of said Defendants' entry into a 1994 publishing agreement described in paragraph 48 below, the notice of termination periods and termination dates for the works described above, or the lost revenue and other consequences flowing from failure to file timely 17 U.S.C. § 304(c) notices of termination.

44. Further, Defendant Winick, on behalf of himself and M&O, affirmatively misled Thom as to his termination rights. Winick in 1996 told Thom that Thom did not need to worry about Thom's termination interests in Steinbeck works because, once Elaine is gone, M&O would terminate the copyrights, and Thom and Blake would then have everything. Winick further represented and advised that the terminations would include book publishing rights, and that Winick and M&O were looking out for Thom and had Thom's best interests at heart. As Winick was an attorney-at-law and a principal of M&O, Thom's literary agent, Thom reasonably relied on Winick's and M&O's representations and legal advice. He did not discover the true

**28**

facts concerning his and Blake's renewal and termination rights until after Elaine's death in 2003, when, due to health problems of Winick, he retained his own counsel to follow up on Winick's legal advice to exercise his termination rights in John Steinbeck works upon Elaine's death.

45.     Elaine, M&O and M&O's Principals also fraudulently concealed from, and failed to disclose to Blake that she also had copyright renewal and termination interests in said works and that she was entitled to a proportionate share of the revenues derived from exploitation of such works, and they failed to account to Blake for the monies received from such exploitation. Notwithstanding Elaine's, M&O's and the M&O Principals' knowledge of Blake as described above, their status as constructive trustees of Blake's interests in certain Steinbeck properties, and Blake's rightful ownership interests in certain Steinbeck works described above, Elaine, M&O and the M&O Principals failed to disclose to Blake her rights relating to John Steinbeck works, and also have kept Blake's share of revenues obtained from book sales and other commercial exploitation of the above described works for themselves.

46.     Elaine, M&O and the M&O Principals planned to continue their misconduct even after Elaine's death, and her will contains provisions which are intended to permanently effectuate their respective goals. Elaine executed her last will and testament on October 29, 1999. In her will, she noted that "I have specifically made no provision in this my last will for my stepson, Thom Steinbeck . . ." The will did not mention John IV's only child and John Steinbeck's only grandchild Blake. The will purports to exclude Thom and Blake from any interest in John Steinbeck's works by granting Elaine's interests in those works, including interests rightfully belonging to Thom or Blake as described above, to various individuals, namely Elaine's sisters Jean and Francis, her daughter Waverly, and after their deaths to her

**A-29**

grandchildren David Scott Farber, Anderson Farber Runkle, Jebel Kaffaga, and Bahar Kaffaga, none of whom are John Steinbeck's blood heirs. Moreover, Elaine's will requires all such beneficiaries to grant Winick and M&O an irrevocable power of attorney over those works, and further stipulates that any heir who disputes that designation will lose his or her interest in the Steinbeck properties and other bequests in the will.

**Malfeasance re Copyrighted Works**

47.   Notwithstanding their fiduciary and other duties to Thom and Blake as described above, and the copyright interests Elaine jointly owned with Thom and Blake as described above, beginning in about 1983 and continuing to the present, Elaine, M&O and the M&O Principals managed the valuable Steinbeck intellectual properties they control to benefit themselves to the harm and damage of Thom and Blake. Although M&O repeatedly advised Thom that M&O fielded up to 15 offers per month for exploitation of Steinbeck works, during the 20+ year period from 1983 to the present, Plaintiffs are informed and believe that Defendants entered into only one agreement for a television production of one Steinbeck work, one motion picture option agreement that was never exercised but has reportedly encumbered the property for over 15 years, and, as described below, a few agreements which licensed or assigned rights to certain works for less than their market value because of Elaine's personal friendships. Said Defendants' refusal to properly manage those valuable assets has damaged Thom and Blake in that, *inter alia*, it deprived them of their share of the additional revenues that would have been derived from the judicious ancillary exploitation of those works, deprived them of their share of the additional revenues that would have been derived from the additional book sales generated by such ancillary exploitation, and reduced the fair market value of their ownership interests in John Steinbeck's works by reducing public awareness of and interest in those works.

48.     Further, beginning in about 1983 and continuing to the present, the few transactions Elaine, M&O and the M&O Principals did authorize without Thom's or Blake's knowledge, input or advice were "below market" transactions which preferentially benefited Elaine and/or M&O to the detriment of Thom and Blake. Defendants also broke promises to and otherwise acted contrary to the interests of Thom when they believed it suited their purposes. Specifically:

(a)     Defendants entered into what Plaintiffs are informed and believe is a "below market" transaction involving a work in which Thom, John IV, and/or Blake have an ownership interest because of Elaine's personal whim and friendship with individuals involved with a theatre company. Elaine had briefly worked as a stage manager in the 1940s before her marriage to John Steinbeck, and thought of herself as a "theatre" person thereafter. When approached by individuals associated with a theatre company, she approved a 2001 option agreement for motion picture rights to "Winter Of Our Discontent" with the theatre company.

Although that transaction was satisfying to Elaine's ego, and furthered M&O's goals of keeping Elaine happy so as to ultimately control all John Steinbeck works, Elaine's, M&O's and the M&O Principals' entry into the above described transactions damaged Thom and Blake by making it difficult or impossible to exercise termination rights in said works, depriving Plaintiffs of their share of the additional revenues that would have been generated by entry into "market value" transactions, and depriving Plaintiffs of their share of revenue which would have been derived from additional book sales that would have been generated by entry into a "market level" agreement with a company which would have been able to devote the resources needed to produce a more widely seen motion picture. Defendants disclosed the terms of that agreement to Thom, but falsely represented that it was a "market value" transaction, and Thom reasonably

relied on their advice. Thom did not discover the true facts concerning the value of that transaction until after Elaine's death in 2003.

(b)     Defendants, purporting in part to act on Thom's behalf, entered into a series of book publication agreements with Viking Penguin in 1994 for many Steinbeck works. Thom received revenues pursuant to one of these agreements because of his renewal copyright interests in some Steinbeck works. However, although her existence and rights in and to certain Steinbeck works was known to Elaine, M&O and the M&O Principals, Defendants ignored and concealed from Thom the existence of Blake as described above and made no provisions for Blake to receive any royalties pursuant to the 1994 Agreement. Further, although the M&O Principals were attorneys at law on whose legal advise Thom relied who were purportedly acting in Thom's "best interests" with regard to Thom's intellectual property rights in John Steinbeck works as described above, they actively concealed from Thom the fact that those agreements could adversely affect his termination interests in the works that were the subject of the agreements. Winick in fact later represented that Thom did not need to "worry" about termination rights as described in paragraph 44 above. In fact, Defendants' entering into [certain of] these agreements made it more difficult for Thom and Blake to get the benefit of their termination rights in certain Steinbeck works governed by an earlier agreement entered into between Viking Penguin and John Steinbeck.

(c)     Defendants made false representations about, and in 2004 breached or induced the breach of, an agreement Elaine had previously entered into with Thom concerning the John Steinbeck work "Travels with Charley." Thom for years has wanted to develop a motion picture or television series based on the John Steinbeck work "Travels with Charley," in which Thom owns renewal rights. After extended discussions, Elaine agreed that Thom could

**32**

produce this project in about 1990, and market all rights in this property. Thom spent tens of
thousands of dollars and extended his business reputation and goodwill in the entertainment
community to develop this project in good faith reliance on Elaine's promises and agreement.
However, although Thom has now reached agreements-in-principle with Warner Bros.
Television and Mark Wolper Productions for a television miniseries based on "Travels with
Charley," in April 2004 Elaine's estate through M&O maliciously reneged on Elaine's previous
agreement with Thom and refused to enter into that agreement, instead advising the parties with
whom Thom had entered into the agreements-in-principle that the project is "off the table." Such
conduct damages Thom by depriving him of the revenue he would have received had this project
proceeded, damages his business reputation and goodwill, and costs him his share of the
additional revenues that would have been derived from additional book sales of "Travels with
Charley" and other John Steinbeck works that would have been generated by the production and
distribution of this programming.

        (d)    In April 2004 M&O approached Thom about a proposal for "Grapes of
Wrath." Due to the number of other projects for which agreements had been reached in principle
within the past year, as well as certain creative concerns, Thom declined the proposal. M&O and
the Estate of Elaine thereafter attempted to coerce and continue their efforts to coerce Thom to
agree to the proposal in various ways in violation of their fiduciary duties to him. First, M&O
made inconsistent representations to Thom, Blake and others concerning the financial terms of
the proposal to make the proposal appear more financially remunerative than it actually was.
Second, Pinkus, and M&O attempted to pressure Blake, who was not represented by counsel and
whom Defendants had ignored for years, into agreeing to the proposal notwithstanding Thom's
objections. Third, notwithstanding M&O's fiduciary obligations to Thom, M&O advised Thom

21

**A-33**

that on behalf of the estate of Elaine it had entered into a "nonexclusive" agreement with Fox for the "Grapes of Wrath" on behalf of the Estate of Elaine, which, M&O claimed, would permit Fox to proceed to produce a motion picture based on "Grapes of Wrath" without Thom's approval, even though Thom and Blake own or control two-thirds of the renewal interest and a 50 percent termination interest in motion picture rights in "Grapes of Wrath."

**Thom's and Blake's Damages**

49. Thom and Blake have been damaged by Defendants' conduct as described above. Thom has been damaged by the loss of his termination interests in the John Steinbeck works described above; by the loss of his share of revenues that would have been received from judicious exploitation of John Steinbeck's works from February 1983 to the present; from the loss of revenues caused by Defendants' intentionally agreeing to enter into "below market" deals in violation of their fiduciary duties to him; by the losses caused by failure to increase book sales through judicious ancillary exploitation of the John Steinbeck works in motion picture, television, and other media; and by the reduced fair market value of Thom's interest in John Steinbeck's literary works caused by Defendants' misconduct regarding those works. The amount of those damages will be proved at trial, but in no event have a value of less than $10 million.

50. Blake has been damaged by the loss of her termination interests in the John Steinbeck works described above; by the misappropriation of her one-third renewal interests in the John Steinbeck work "America and Americans;" by the conversion and misappropriation by Defendants of revenues owed to her from sales of "America and Americans," and by the less than fair market value of her share of John Steinbeck works caused by Defendants' misconduct regarding those intellectual properties. The amount of those damages will be proved at trial, but in no event have a value of less than $8 million.

22

**34**

### The Trademark Conspiracy

51.     John Steinbeck did not claim trademark rights in his name or likeness during his lifetime, and he did not seek to register his name or likeness as trademarks with the U.S. Patent & Trademark office. Further, his will did not mention any trademark rights as described above. Thus, no trademark rights passed to any of his heirs following his death.

52.     Trademark law takes descriptive and other words and symbols from the public domain and protects them as trademarks when they come to identify the source or origin of goods or services to the consuming public. As his son and the only living direct descendant of John Steinbeck who carries the "Steinbeck" family name, Thom has, beginning in the early 1980's and continuing to the present, commercially utilized his "Steinbeck" name in interstate commerce, and has authorized and has licensed others to use the names "Steinbeck" and "John Steinbeck," and/or the likeness of "John Steinbeck" in various commercial endeavors. Thom has developed a valuable goodwill in the names "Steinbeck," "John Steinbeck," and the likeness of John Steinbeck through those endeavors, and those works have come to identify goods or services he performs or licenses.

53.     Notwithstanding Thom's rights, Elaine, Pinkus, M&O, and the Foundation have conspired to deny Thom's trademark rights in those names and that likeness by falsely claiming that they are the exclusive owners of such rights. Plaintiffs are informed and believe that Elaine formed the Foundation in 1998 as a nonprofit corporation, then purported to "assign" to it trademark rights she did not possess in the name, likeness, and signature of John Steinbeck. Although neither Elaine nor the Foundation had previously made any trademark uses of "Steinbeck," "John Steinbeck," the signature of "John Steinbeck," or any image of John Steinbeck, and thus had no trademark rights in those names or images, beginning in 1998, the Foundation and its directors, Jean, Steven Frushtick and others whose identities are not presently

40664317 1                                                23

known to Plaintiffs but who are identified as Does 1 through 10, purported to enter into "license"
agreements for trademark rights associated with the names "Steinbeck," "John Steinbeck," a
purported "signature" of John Steinbeck, and certain images of John Steinbeck.

54.    Further, beginning in about 1999 and continuing to the present, the Foundation, at
the direction of Elaine and its directors, has filed five trademark applications with the U.S. Patent
& Trademark office, asserting trademark rights in "Steinbeck," "John Steinbeck," and
"Steinbeck Studies" as follows:

**"Steinbeck Heritage Foundation" Marks**

| Mark | Filing Date | Purported First Use | Reg. Date | Reg. # |
|---|---|---|---|---|
| John Steinbeck (signature) | 6-17-99 | 1998 | 6-4-02 | 2574954 |
| John Steinbeck (signature) | 10-19-99 | 2002 | 3-23-04 | 2825467 |
| John Steinbeck (Word) | 10-19-99 | 2002 | 3-23-04 | 2825466 |
| Steinbeck Studies | 3-12-03 | 1986 | -- | -- |
| Steinbeck | 10-19-99 | ITU | -- | -- |

55.    Said Defendants both concealed their conduct as described above and misled
Thom as to his trademark rights in connection with these matters. In October 1999, when Thom
first heard about said Defendants conduct as described in paragraphs 53 above, he inquired of
Winick about the Foundation's purported licensing of "Steinbeck" trademarks. Winick advised
Thom in October 1999 that based on his reading of John Steinbeck's will, "Elaine was granted
all of those trademark rights by will since John Steinbeck had left her all of his personal
property." Pinkus confirmed the accuracy of Winick's advice in 2001, and further represented
that Elaine transferred those rights to the Foundation. As Winick and Pinkus were and are
attorneys-at-law and principals of Thom's agent, M&O, Thom reasonably relied on Winick's and

**36**

M&O's representations and legal advice. Although previous licenses continued, he suspended new licensing activities in reliance on their representations. He did not discover the true facts concerning said Defendants' actions and his rights until after Elaine's death in 2003.

56.     As a result of said Defendants' actions as described above, said Defendants have infringed upon Thom's trademark rights to his irreparable harm and damage. Thom has been damaged by said Defendants' conduct in an amount that will be proved at trial, but in no event having a value of less than $1 million.

**The Conversion of Steinbeck Letters**

57.     In about 1974, Elaine decided to publish a book consisting predominantly of letters from John Steinbeck. However, she did not own all of the letters she wished to publish. Thom was, at that time, serving in Vietnam and a number of his personal items, including letters he had received from his father, were stored in what had been the Steinbeck family home in New York. Without Thom's knowledge or consent, Elaine took about eleven letters from Thom's personal possessions, copied them, and included them in a book which was eventually published under the title, "A Life in Letters." Elaine identified herself as co-editor of that book. She did not share any royalties she received from publication of that book with Thom.

58.     Thom did not know that Elaine had taken his letters and used them in the above-described book in 1974, because he was serving in Vietnam, did not read the book, and Elaine did not tell him what she had done. He continued to believe those letters were among his personal possessions.

59.     Without Thom's knowledge or consent, John IV later took many of Thom's personal items with him when John IV moved to Colorado. In the 1980s Thom learned that John IV had taken his personal items, and asked for their return. However, John IV told Thom at that time that he (John IV) had destroyed them.

A-37

60.    Thom read "A Life in Letters" for the first time in 1986, and discovered that eleven of his letters had been taken by Elaine and published in the book. However, based on his brother's representations, he believed the original letters had been returned to his possessions in the New York home by Elaine in about 1974, and subsequently had been taken and destroyed by John IV.

61.    In or about 2002 Thom learned for the first time that John IV had not destroyed Thom's personal items as John IV had represented to him in the 1980s, but that instead he and his wife Nancy had taken those items and either kept them or sold them for profit. Thom had filed suit against John IV's estate and Nancy to, *inter alia*, retrieve any of his personal items which were unsold, and in 2002 he received an inventory of materials which John IV and Nancy had taken. That inventory did not include the eleven letters Elaine had taken and published in "A Life in Letters." Thus, Thom learned for the first time in 2002 that Elaine, rather than John IV, had taken and kept his personal letters.

62.    Thom thereafter repeatedly requested the return of the letters Elaine took from M&O during Elaine's lifetime and from Elaine's estate since her death, but M&O has denied knowledge of the letters and Elaine's estate has refused to return the letters, or to give him the courtesy of a substantive reply. Those original letters written by John Steinbeck have considerable value, to be proved at trial, but in no event have a value of less than $750,000.

**Fraudulent Concealment of Misconduct**

63.    Notwithstanding their fiduciary and other duties to Thom, John IV and Blake, Elaine, M&O, the M&O Principals, the Foundation and its board members and/or agents actively concealed their misconduct from Plaintiffs herein in numerous ways as described in paragraphs 28, 29, 32-35, 43-45, 48, 55 and 58, above. If Plaintiffs had known the true facts, they would have conducted an investigation and undertaken other efforts necessary to protect their rights.

**38**

However, because of said Defendants' decades-long exclusive control over relevant records,

false representations, active concealment of information needed to discover their wrongdoing,

and failure to disclose information needed to place Thom or Blake on notice of the facts needed

for them to inquire into Defendants' actions, it was not reasonably possible for Plaintiffs to

discover the nature and extent of Defendants' wrongdoing until Elaine died and her power of

attorney lapsed in April 2003, and Plaintiffs' ability to access relevant documents and records to

ascertain the true facts increased.

## FIRST CLAIM FOR RELIEF

(Trademark Infringement and Unfair Competition pursuant to 15 U.S.C. § 1125(a) by Thom
against the Estate of Elaine, the Foundation, Jean, Frushtick and Does 1 through 10)

64.     Thom realleges paragraphs 1 through 63 herein.

65.     The names "Steinbeck," "John Steinbeck," and the image of John Steinbeck are

valid, protectable trademarks.

66.     Thom owns trademark rights in "Steinbeck," "John Steinbeck," and the image of

John Steinbeck.

67.     Defendants used the marks "Steinbeck," "John Steinbeck," and the image of John

Steinbeck without the consent of Thom in a manner that is likely to cause confusion among

ordinary purchasers as to the source of the goods they have licensed.

68.     Thom has been damaged by Defendants' infringement.

69.     By reason of the foregoing, Thom asserts a claim against the Estate of Elaine, the

Foundation, Jean, Frushtick and Does 1 through 10 for injunctive and monetary relief, treble

damages, costs and attorneys' fees pursuant to 15 U.S.C. §§ 1116, 1117 and 1125.

## SECOND CLAIM FOR RELIEF

(Fraud By Thom against Winick, Pinkus, M&O, and the Estate of Elaine)

**A-39**

70.     Thom realleges paragraphs 1 through 69 herein.

71.     Winick and Pinkus, on behalf of themselves, M&O and the Estate of Elaine, have made the following representations to Thom:

(a)      In mid 1996, Winick represented to Thom that he did not need to worry about Thom's termination interests in John Steinbeck works because Thom could exercise his termination rights in those works after Elaine died as described in paragraph 44, at which point he and Blake would "own everything;"

(b)      In October 1999, Winick represented to Thom that Thom had no trademark rights relating to John Steinbeck because all such rights passed by will to Elaine as described in paragraph 55 and Elaine owned those rights;

(c)      In 2001, Pinkus also represented to Thom that Thom had no trademark rights relating to John Steinbeck because all such rights passed by will to Elaine as described in paragraph 55 and Elaine transferred them to the Foundation.

72.     Winick's and Pinkus's representations were false, and they knew they were false when they made them. The true facts were that:

(a)      Thom's and Blake's termination rights could only be exercised during limited windows of time; Thom and Blake could lose some or all of their termination rights if they were not timely exercised; Elaine, M&O, and the M&O Principals had not exercised termination rights as to certain works in a timely manner, did not intend to exercise termination rights as to certain works, had failed to accurately identify termination rights owners in the few notices of termination they prepared, and had entered into certain agreements which were intended to make it more difficult or impossible for Thom or Blake to terminate certain grants;

40664317 1                                        28

and many of the termination rights either already had expired or would expire before Elaine died in April 2003;

      (b)     John Steinbeck did not claim or register trademark rights in his name or likeness during his lifetime; no John Steinbeck-related trademark rights passed by John Steinbeck's will to Elaine; Thom had developed Steinbeck related trademark rights through his own efforts; and neither Elaine nor the Foundation had any right to infringe Thom's trademark rights or license "Steinbeck" related trademarks to third-parties as described in paragraphs 51-56.

      73.     Thom reasonably relied upon Winick's and Pinkus's representations. In reliance on Defendants' representations and fraudulent concealments as described above, Thom did not investigate Defendants' actions, seek to exercise his termination interests, or object to Defendants' claims to or exploitation of trademark rights as described in paragraph 55 above.

      74.     Thom has been damaged by Defendants' fraudulent misrepresentations. Said Defendants in committing the aforementioned fraudulent acts engaged in gross, wanton and willful, and morally culpable conduct. These acts were committed with the intent to willfully and wantonly injure Thom, and with a conscious disregard for Thom's rights. All of the aforementioned alleged acts were done or ratified by employees, officers, and/or agents of the Estate of Elaine and M&O, who acted with knowledge that said conducts would cause Thom harm. Thom is therefore entitled to recover punitive damages against Defendants for said misconduct.

### THIRD CLAIM FOR RELIEF

(Negligent Misrepresentation by Thom against Winick and Pinkus)

      75.     Thom realleges paragraphs 1 through 74 herein.

      76.     Defendants Pinkus and Winick made or caused to be made certain misrepresentations, as described above in paragraph 71.

A-41

77.     Defendants Pinkus and Winick had no reasonable basis for believing the statements were accurate, and neglected to exercise due care and competency in communicating said promises to Thom Steinbeck. Instead, they represented certain facts to Thom for the purpose of guiding him in certain aspects of his business, in an area where Thom possessed less knowledge than either Pinkus or Winick.

78.     Pinkus and Winick were bound to a fiduciary relationship with Thom Steinbeck flowing from their responsibilities as his literary agents, and as such shared a relationship of particular trust and confidence. The Defendants further contrived a relationship of heightened trust and reliance by holding themselves out as experts in matters involving John Steinbeck's works.

79.     Winick and Pinkus not only possessed superior knowledge of the matter derived from their position as Thom and Elaine Steinbeck's literary agent, but their responsibilities as Elaine's attorney gave them a particular expertise in these specific copyright interests.

80.     Defendants Pinkus and Winick were aware of the reasons for which Thom desired information regarding John Steinbeck's intellectual property, and relayed said misrepresentations with full knowledge that Thom would rely on the information to his disadvantage.

81.     Thom Steinbeck was ignorant of the falsity of the representations, and reasonably believed them to be true. In justified reliance upon such misrepresentations, Thom was induced to and did fail to investigate termination and renewal interests deriving from his father's work, seek to exercise his termination interests or object to Defendants' claims to exploitation of trademark rights as described in paragraphs 55 and 73 above.

82.     The Defendants' negligent misrepresentation was the proximate cause of injuries suffered by Thom Steinbeck in failing to terminate, renew or exercise his copyright and

40664317.1                                    30

trademark interests. Thom is entitled to be compensated for these injuries, in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty by Thom against the Estate of Elaine, M&O, Winick, and Pinkus)

83.     Thom realleges paragraphs 1 through 82 herein.

84.     As attorney-in-fact to Thom, Elaine was a fiduciary to Thom and was required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

85.     As Thom's literary agents, M&O, Winick and Pinkus were Thom's fiduciaries and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

86.     As set forth above, Thom has been specially injured as a direct, proximate and foreseeable result of the breaches by Elaine, M&O, Winick and Pinkus of their fiduciary duties and has consequently suffered substantial damages in excess of $75,000.

87.     In conducting the acts set forth above, Elaine, M&O, Winick and Pinkus have acted maliciously, wantonly and/or recklessly so as to entitle Thom to an award of punitive damages in an amount that is not presently ascertainable, but which Thom is entitled to recover according to proof at trial.

### FIFTH CLAIM FOR RELIEF

(Promissory Estoppel By Thom against the Estate of Elaine)

88.     Thom realleges paragraphs 1 through 87 herein.

89.     Elaine made a clear and unambiguous promise to Thom that he could produce a motion picture or television series based on the John Steinbeck work "Travels with Charley," and could market all rights in this property. Thom reasonably and foreseeably relied on this promise and spent tens of thousands of dollars and extended his business reputation and goodwill

40664317 1                                                    31

in the entertainment community to develop this project. Eventually, in reasonable and foreseeable reliance on Elaine's promise, Thom reached an agreement-in-principle with Warner Bros. Television and Mark Wolper Productions for a television miniseries based on "Travels with Charley." However, the Estate of Elaine has now recanted Elaine's promise.

90.     As a result of the recantation of Elaine's promise, Thom has incurred actual and consequential damages in an amount to be determined at trial, measured by the extent of his reliance on Elaine's representations, including but not limited to, the tens of thousands of dollars he invested in developing "Travels With Charley."

## SIXTH CLAIM FOR RELIEF

(Interference with Prospective Economic Advantage by Thom against M&O)

91.     Thom realleges paragraphs 1 through 90 herein.

92.     As set forth above, Thom had reached an agreement-in-principle with Warner Bros. Televisions and Mark Wolper Productions for a televisions miniseries based on "Travels with Charley" (the "Agreement-in-Principle"). The parties had begun the process of formalizing the Agreement-in-Principle into a written document. M&O knew of the Agreement-in-Principle.

93.     M&O intentionally interfered with the Agreement-in-Principle. M&O advised the other parties to the Agreement-in-Principle that the "Travels with Charley" project was "off the table" and that Elaine's Estate would not consent to use of the Estate's interests in "Travels with Charley" in such a project.

94.     The Agreement-in-Principle would have been consummated and entered into except for the interference of M&O.

95.     M&O deliberately interfered with the Agreement-in-Principle notwithstanding and in breach of its fiduciary obligations to Thom as his literary agent and Elaine's promises to Thom that he could enter into the Agreement-in-Principle with respect to all rights in "Travels

with Charley." M&O employed wrongful means to interfere with the Agreement-in-Principle, recognizing that its interference would prevent consummation of the Agreement-in-Principle. M&O acted with the sole purpose of hurting Thom.

96.     As a result of M&O's improper interference with the Agreement-in-Principle, Thom was injured in an amount to be determined according to proof at trial. Moreover, in conducting the acts set forth above, M&O acted maliciously, wantonly and/or recklessly and/or in violation of its fiduciary duties so as to entitle Thom to an award of punitive damages in an amount that is not presently ascertainable, but which Thom is entitled to recover according to proof at trial.

## SEVENTH CLAIM FOR RELIEF

(Unjust Enrichment by Thom and Blake against the Estate of Elaine)

97.     Thom and Blake reallege paragraphs 1 through 96 herein.

98.     Due to Elaine's refusal to exercise Thom's and Blake's termination rights with respect to certain Steinbeck works, Elaine has been unjustly enriched. Specifically, Elaine has improperly retained control of 100% of certain Steinbeck works (50% of which would have passed to Thom and Blake upon exercise of such termination rights) and has received payments for licensing works which Thom and Blake could have licensed had Elaine exercised such termination rights. By receipt of such payments, Elaine has obtained a benefit that in equity and good conscience she should not have obtained or possessed because it rightfully belongs to another.

99.     As a result of the aforesaid actions, the Estate of Elaine has obtained benefits at Thom's and Blake's expense that in equity and good conscience require restitution. Restitution of these benefits should be made to Thom and Blake in an amount to be determined at trial.

A-45

## EIGHTH CLAIM FOR RELIEF

(For Imposition of Constructive Trust by Thom
against the Estate of Elaine)

100.    Thom realleges paragraphs 1 through 99 herein.

101.    Elaine's relation to Thom as both his step-mother and attorney-in-fact created a
confidential relationship of trust and reliance. In reliance upon promises, assurances and
representations made by Elaine, Thom failed to exercise his copyright ownership rights and
interests such that Elaine was unjustly enriched.

102.    The Estate of Elaine has acquired money, property and copyright ownership
interests to which it is not entitled through the unfair, unlawful, and fraudulent practices
described above. In each instance, such money, property, and copyright interests rightfully
belong to Thom, and the Estate of Elaine has acquired such money, property and copyright
interests through fraud, undue influence, breach of trust and/or other improper means. Through
this wrongful conduct, the Estate of Elaine has fraudulently assumed title to property-- including
but not limited to the ownership interest in various copyrighted works, book publishing rights
derived from John Steinbeck's works, and trademark rights related to John Steinbeck. The
Estate of Elaine should be found to be trustees holding title to such money, property, and
copyright interests for the benefit of Thom, who is the rightful owner.

103.    The Estate of Elaine has wrongfully acquired property belonging to Thom. As a
result of such conduct, a constructive trust should be imposed against the Estate of Elaine on the
revenue derived from all copyright interests controlled by the estate, and on those copyright and
trademark interests in John Steinbeck or John Steinbeck works described in paragraphs 36, 38,
54, 111, and 119 herein.

4066-4317 1                                                    34

## NINTH CLAIM FOR RELIEF

(For Imposition of a Constructive Trust By Blake Against The Estate of Elaine)

104.    Blake hereby realleges paragraphs 1 through 103 herein.

105.    Elaine's relation to Blake as her "Granny" created a relationship of trust and reliance. In reliance upon Elaine's statements and assurances, Blake failed to exercise her copyright ownership rights and interests such that Elaine was unjustly enriched.

106.    The Estate of Elaine has acquired property and ownership interests to which it is not entitled through the unfair, unlawful and fraudulent practices described above. In each instance, such money, property, and copyright interests rightfully belong to Blake, and the Estate of Elaine has acquired such money, property and copyright interests through fraud, undue influence, breach of trust and/or other improper means. Through this wrongful conduct, the defendants have fraudulently assumed title to property—including but not limited to the ownership interest in various copyrighted works and book publishing rights derived from John Steinbeck's works. The Estate of Elaine should be found to be trustees holding title to such money, property, and copyright interests for the benefit of Blake, who is the rightful owner.

107.    The Estate of Elaine has wrongfully acquired property belonging to Blake, and the keeping of said property would constitute unjust enrichment. As a result of such conduct, a constructive trust should be imposed against the Estate of Elaine on the revenue derived from all copyright interests controlled by the estate, and on those copyright interests in John Steinbeck works described in paragraphs 37, 38 and 116 herein.

## TENTH CLAIM FOR RELIEF

(Declaratory Relief re Copyrighted works by Thom
against the Estate of Elaine, Jean, Francis, Waverly Scott Kaffaga, Davis Scott Farber, Anderson
Farber Runkle, Jebel Kaffaga, and Bahar Kaffaga)

108.    Thom realleges paragraphs 1 through 107 herein.

40664317.1                                                      35

A-47

109. By reason of the foregoing, a genuine controversy exists between Thom and the Defendants herein as to Thom's ownership interests in various copyrighted works, and his right to receive monies for works which Elaine, M&O, Winick and/or Pinkus have wrongfully denied to Thom. Specifically, Thom contends that:

(a) Through the misconduct of said Defendants as described above, Thom has been denied his proper termination interests in book publishing rights in those Steinbeck works described in paragraph 36 above, and thus should be entitled to receive the value of such interests from the Estate of Elaine, M&O, Winick, and Pinkus, including but not limited to a 25% interest in U.S. copyrights in said works presently claimed by Defendants;

(b) Through the misconduct of said Defendants as described above, Thom has been denied his proper termination interests in motion picture, television, and related rights in those Steinbeck works described in paragraph 38 above, and thus to should be entitled to receive the value of such interest from the Estate of Elaine, M&O, Winick, and Pinkus, including but not limited to a 25% interest in U.S. copyrights in said works presently claimed by Defendants;

110. Upon information and belief, Defendants dispute Thom's contentions as described in paragraph 109 above, contend that Thom has no right to complain about their actions and inactions in terminating Steinbeck works, deny that Thom has or is entitled to any ownership interest in said Steinbeck works, and deny that Thom is entitled to any monies from Defendants.

111. Thom requests that this court declare that in lieu of his lost termination Thom be awarded from Defendants a 25% interest in U.S. copyright in the following John Steinbeck works:

> Cup of Gold
> The Pastures of Heaven
> The Red Pony
> To A God Unknown

4060431711

36

Tortilla Flat
In Dubious Battle
Of Mice and Men
Of Mice and Men (Play)
The Long Valley
The Grapes of Wrath
Forgotten Village
The Moon is Down

112. Thom has no adequate remedy at law.

## ELEVENTH CLAIM FOR RELIEF

(Declaratory Relief re Copyrighted works by Blake
against the Estate of Elaine, Jean, Francis, Waverly Scott Kaffaga, Davis Scott Farber, Anderson
Farber Runkle, Jebel Kaffaga, and Bahar Kaffaga)

113. Blake realleges paragraphs 1 through 112 herein.

114. By reason of the foregoing, a genuine controversy exists between Blake and the

defendants herein as to Blake's ownership interests in various copyrighted works, and her right

to receive monies for works which Elaine, M&O, Winick, and M&O's Principals have

wrongfully denied to Blake. Specifically, Blake contends that:

(a) Through the misconduct of said defendants as described above, Blake has

been denied her proper termination interests in book publishing rights in those Steinbeck works

described in paragraph 37 above, and thus should be entitled to receive the value of such

interests from the Estate of Elaine, M&O, Winick, and Pinkus, including but not limited to a

25% interest in U.S. copyright in said works presently claimed by defendants;

(b) Through the misconduct of Defendants as described above, Blake has

been denied her proper termination interests in motion picture, television and related rights in

those Steinbeck works described in paragraph 38 above, and thus should receive the value of

such interests from the Estate of Elaine, M&O, and M&O's Principals, including but not limited

to a 25% interest in U.S. copyright in said works presently claimed by defendants;

37

**A-49**

(c) Through the misconduct of said defendants as described above, Blake has been denied her proper renewal interest in that certain Steinbeck work called "America and Americans," as described in paragraph 40 above, and thus should be deemed the beneficial owner of a 1/3 interest in all U.S. rights in said book.

115. On information and belief, Defendants dispute Blake's contentions as described in paragraph 110 above, contend that Blake has no right to complain about their actions and inactions in terminating and/or renewing Steinbeck works, deny that Blake has or is entitled to any ownership interest in Steinbeck works, and denies that Blake is entitled to any monies from Defendants.

116. Blake requests this Court declare that in lieu of her lost termination rights caused y Defendants' misconduct Blake owns at least a 25% interest in U.S. copyright in the following John Steinbeck works:

> The Pastures of Heaven
> The Red Pony
> To A God Unknown
> Tortilla Flat
> In Dubious Battle
> Of Mice and Men
> The Long Valley
> The Grapes of Wrath
> Forgotten Village
> Sea of Cortez
> The Moon is Down
> Bombs Away
> Cannery Row
> The Pearl
> The Wayward Bus
> A Russian Journal
> Burning Bright
> Log from the Sea of Cortez
> East of Eden
> Sweet Thursday
> The Short Reign of Pippin IV
> Once There Was A War

**50**

Winter Of Our Discontent
Travels with Charley
America and Americans

117.    Blake has no adequate remedy at law.

## TWELFTH CLAIM FOR RELIEF

(Declaratory Relief Re Trademarks by Thom
against the Estate of Elaine, the Foundation, Jean, Frushtick, and Does 1 through 10)

118.    Thom realleges paragraphs number 1 through 117 herein.

119.    By reason of the foregoing, a genuine controversy exists between Thom and the

named defendants herein as to Thom's ownership in the various trademarks that embody the

name or likeness of John Steinbeck which defendants have wrongfully attempted to

misappropriate to themselves. Specifically, Thom contends that:

(a)    Thom has superior trademark rights in the names "Steinbeck" and "John

Steinbeck," the purported signature of "John Steinbeck," and/or the likeness of "John Steinbeck"

to those possessed by the named Defendants herein;

(b)    That the named defendants herein have infringed Thom's trademarks by

purporting to license trademark rights in the names "Steinbeck" and "John Steinbeck," the

purported signature of John Steinbeck, and/or the image of John Steinbeck to third parties; and

(c)    Defendant's trademark applications as described in paragraph 53 above

should be cancelled or transferred to Thom.

120.    Upon information and belief, Defendants dispute Thom's contention as described

in paragraph 119 above, contend that Thom has no trademark rights in the names "Steinbeck,"

"John Steinbeck," the purported signature of John Steinbeck, or the image of John Steinbeck,

and deny that Thom is entitled to any monies from defendants.

121.    Thom requests that this court determine:

**A-51**

(a)     That Thom has superior trademark rights in the names "Steinbeck" and "John Steinbeck," the signature of "John Steinbeck," and the "likeness" of John Steinbeck to those possessed by the named Defendants herein;

(b)     That the named Defendants herein have infringed Thom's trademarks by purporting to license trademark rights in the names "Steinbeck" and "John Steinbeck," the purported signature of John Steinbeck, and/or the image of John Steinbeck to third parties; and

(c)     That Defendants' trademark applications as described in paragraph 53 above be cancelled or transferred to Thom.

122.     Thom has no adequate remedy at law.

## THIRTEENTH CLAIM FOR RELIEF

(Declaratory Relief Re Literary Agency Agreement by Thom against M&O)

123.     Thom realleges paragraph numbers 1 through 122 herein.

124.     By reason of the foregoing, a genuine controversy exists between Thom and M&O herein as to Thom's continuing obligations, if any, to use M&O as his literary agent in connection with the John Steinbeck works in which he has an interest or over which he has control. Specifically, Thom contends that Defendant' misconduct as described above constitutes a breach of M&O's fiduciary duties to Thom, and a material breach of the terms and conditions of Thom's literary agency agreement with M&O, that justifies an order terminating the agreement and clarifying that Thom is free to designate another literary agent of his choosing for all Steinbeck works in which he owns or controls any copyright interests.

125.     On information and belief, M&O disputes Thom's contentions as described in paragraph 124 above, contends that it has not breached any fiduciary duties to Thom nor materially breached its literary agency agreement with Thom and John IV, and denies that Thom has any basis to terminate his literary agency agreement with it.

40664317.1                                                        40

126. Thom requests that this Court determine that Thom may terminate his literary agency agreement with M&O with regard to all John Steinbeck works in which he owns or controls any copyright interest.

127. Thom has no adequate remedy at law.

### PRAYER FOR RELIEF

Wherefore, Thom and Blake pray for judgment against Defendants as follows:

(1) For compensatory damages in an amount to be proven at trial;

(2) For punitive and exemplary damages;

(3) For declaratory relief as requested in paragraphs 111, 116, 121, and 126 herein;

(4) For an injunction prohibiting Defendants, their officers, agents and employees, and all persons in active concert or participation with them from infringing Thom's trademark rights in the names "Steinbeck" and "John Steinbeck," the purported signature of "John Steinbeck," and the image of John Steinbeck;

(5) For an order canceling Defendant's trademark registrations as described in paragraph 54, or ordering the transfer of such trademark registrations to Thom;

(6) For an order declaring that Defendants hold the copyright and trademark interests and monies they have received as described in paragraphs 36, 38 and 111 above in trust for Thom;

(7) For the imposition of a constructive trust on monies due Plaintiffs that Defendants have received from U.S. book sales of the John Steinbeck works described in paragraphs 95 through 101 above;

(8) For an order declaring that Defendants hold the copyright interests described in paragraphs 37, 38 and 121 above in trust for Blake;

41

## A-53

(9)     For an order compelling Defendants to convey to Thom those interests in the copyrights in John Steinbeck works described in paragraph 106 above;

(10)    For an order compelling Defendants to convey to Blake those interests in the copyrights in John Steinbeck works described in paragraph 113 above;

(11)    For an accounting to Thom and Blake, respectively of all monies owed to them from U.S. sales of John Steinbeck works described in paragraphs 36 and 37 for payment over to Thom and Blake of an amount equal to 25% of all revenues received from such U.S. books sales from the dates stated in paragraphs 36 through 37 through the present;

(12)    For an order terminating M&O's literary agency agreement with Thom and John IV;

(13)    For Plaintiffs' attorneys' fees and costs pursuant to 15 U.S.C. § 1117;

(14)    For prejudgment interest on any recovery by Plaintiffs;

(15)    For costs of suit incurred herein; and

(16)    For such other and further relief as the court deems just and proper.

Dated: New York, New York.          MANATT, PHELPS & PHILLIPS, LLP
July 14, 2004

By: _____

Mark S. Lee (CA Bar No. 094103)
(*pro hac vice* application outstanding)
11355 West Olympic Boulevard
Los Angeles, California 90064
(310) 312-4000

Cynthia S. Arato (CA 8350)
Alon Markowitz (AM 0111)
500 Fifth Avenue, 38th Floor
New York, New York 10110
(212) 382-0200
Attorneys for Plaintiffs Thomas Steinbeck
and Blake Smyle