David W. Kesselman (SBN 203838)
*dkesselman@kbslaw.com*
Trevor V. Stockinger (SBN 226359)
*tstockinger@kbslaw.com*
KESSELMAN BRANTLY STOCKINGER LLP
1230 Rosecrans Ave., Suite 690
Manhattan Beach, CA  90266
Telephone: (310) 307-4555
Facsimile: (310) 307-4570

Joshua G. Graubart (*pro hac vice* pending)
*jggraubart@graubartlaw.com*
LAW OFFICES OF JOSHUA GRAUBART, P.C.
6 E. 39th Street, 6th Floor
New York, NY  10016
Telephone:  (646) 781-9321
Fax:  (646) 224-8088

*Attorneys for Defendant*
DRAMATISTS PLAY SERVICE, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS STEINBECK, *et al*.,<br><br>                Plaintiffs,<br><br>        v.<br><br>WAVERLY SCOTT KAFFAGA, *et al*.,<br><br>                Defendants. | CASE NO. 14-cv-08681-TJH-FFM<br><br>**DEFENDANT DRAMATISTS PLAY SERVICE, INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Hearing Date: July 27, 2015<br><br>Hearing Time: UNDER SUBMISSION<br><br>Courtroom:   Hon. Terry J. Hatter, Jr.<br>              Courtroom 17<br>              312 N. Spring Street<br>              Los Angeles, California |

# Table of Contents

Page(s)

I.    PRELIMINARY STATEMENT ..................................................................1

II.   BACKGROUND...................................................................................2

III.  ARGUMENT ......................................................................................4

    A.    Each of Plaintiffs' Claims Against DPS Rests On The Invalid
        2006 Termination Notice....................................................................4

    B.    Plaintiffs' Claims, Which Are Based On Interpretation Of
        Unambiguous Contract Terms And Legal Provisions Of The
        Copyright Act, Should Be Dismissed As A Matter Of Law. .............5

    C.    The 1983 Agreement Unambiguously Transferred Plaintiffs'
        Termination Rights to Elaine Steinbeck and Her Heirs. ..................6

    D.    The 1983 Settlement Agreement Is Not An "Agreement To
        The Contrary." ..................................................................................8

        1.    The 1983 Agreement is Not of the Type Contemplated
            as an "Agreement to the Contrary" Under Section
            304(c)(5). .................................................................................9

        2.    The 1983 Settlement Agreement Bears All the
            Hallmarks of a Remunerative, Freely-Entered Contract
            Which May Not Be Disregarded as Contrary to
            Section 304. ............................................................................12

        3.    Plaintiffs' Hypocritical Effort Both to Evade the
            Restrictions and Enjoy the Benefits of the 1983
            Settlement Agreement is Fundamentally Inequitable. ...........15

    E.    DPS Is Not Barred From Arguing That The 1983 Agreement Is
        Not An "Agreement To The Contrary" That Invalidates The
        2006 Termination Notices. ..............................................................16

IV.   CONCLUSION ..................................................................................18

# TABLE OF AUTHORITIES

**CASES**

*Apple Computer v. Microsoft Corp.*,
  35 F.3d 1435, 1442 (9th Cir. 1994)....................................................................5

*Bedrosian v. Tenet Healthcare Corp.*,
  2000 U.S. App. LEXIS 2840 (9th Cir. 2000) ...................................................5

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2007)...............................................................10, 13

*Larson v. Warner Bros. Entm't, Inc.*,
  2013 U.S. Dist. Lexis 55950 (C.D. Cal. Apr. 18, 2013)................................13

*MAI Sys. Corp. v. Peak Computer*,
  991 F.2d 511, 518 (9th Cir. 1993).......................................................................5

*Marvel Characters v. Simon*,
  310 F.3d 280 (9th Cir. 2002).........................................................................2, 9

*McQuillion v. Schwarzenegger*,
  369 F.3d 1091 (9th Cir. 2004)..........................................................................17

*Milne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005).............................................................9, 12, 13

*Penguin Group (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2nd Cir. 2008)......................................................................9, 11, 12

*PHL Variable Ins. Co. v. Marquez Bros. Int'l, Inc.*,
  2014 WL 215071 (N.D. Cal. Jan. 17, 2014) ....................................................5

*Ray Charles Found. v. Robinson*,
  919 F. Supp. 2d 1054 (C.D. Cal. 2013) ........................................................10

*Steinbeck v. McIntosh & Otis, Inc.*,
  2009 U.S. Dist. Lexis 34841 (S.D.N.Y. March 31, 2009)..........................7, 16

*Steinbeck v. McIntosh & Otis, Inc.*,
   2009 U.S. Dist. Lexis 35607 (S.D.N.Y. March 31, 2009)...............................15

*Steinbeck v. Steinbeck Heritage Foundation*,
   400 Fed. Appx. 572 (2nd Cir. 2010) ..............................................................15

*Sutton v. Providence St. Joseph Med. Ctr.*,
   192 F.3d 826 (9th Cir. 1999)...........................................................................12

**STATUTES**

17 U.S.C. § 304 ..........................................................................................*passim*


**OTHER AUTHORITIES**

H.R. No. 94-1476, at 140 (1976),
   *reprinted in* 8 Melville B. Nimmer & David Nimmer,
   Nimmer on Copyright, Appx. 4 (2013) ..........................................................13

S. Rep. No. 94-473, at 108 (1976),
   *reprinted in* 8 Melville B. Nimmer & David Nimmer,
   Nimmer on Copyright, Appx. 4A (2013).........................................................13

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

The present action is the latest act in a decades-long drama played out between two camps of the extended family of Nobel laureate John Steinbeck (the "Author").  Prior acts have been heard by the Southern District of New York and the Second Circuit Court of Appeals; now the stage has shifted to this Court, and Plaintiffs clearly hope that this Court will award them some of what they were denied in their earlier, failed attempts in New York.

Plaintiffs' claims against defendant Dramatists Play Service, Inc. ("DPS") rest on a single faulty premise: that a purported "notice of termination" Plaintiffs issued in 2006 (the "2006 Termination Notice") is effective to terminate a seventy-five year old agreement with the Author to license amateur productions of his stage play *Of Mice and Men* (the "1940 License Agreement")[1].

It isn't.  Plaintiffs (and their predecessors-in-interest) surrendered authority to exercise their termination rights to the Author's widow, Elaine Steinbeck ("Elaine") and her estate and heirs under a 1983 agreement (the "1983 Settlement Agreement") that settled an earlier outbreak of litigation between the two camps. Plaintiffs remain bound by that 1983 Settlement Agreement, under which – in exchange for surrendering their termination rights – they obtained substantially greater shares of the royalties flowing from the Author's works. In their First Amended Complaint, Plaintiffs demand that this Court enforce (against other defendants) particular terms of that agreement concerning those royalty streams while at the same time demanding that the Court declare Plaintiffs not bound by their obligations concerning their termination rights.

Plaintiffs seek to justify this hypocrisy by invoking section 304(d) of the Copyright Act. They contend that they are permitted to disregard their explicit obligations under the 1983 Settlement Agreement because those obligations are

---

[1] First Amended Complaint, Docket No. 21 ("FAC"), Ex. L.

contrary to the free exercise of their termination rights under section 304(d) – that is, Plaintiffs claim the 1983 Agreement is an "agreement to the contrary," a phrase used in section 304(c)(5).

On examination, it becomes clear that Plaintiffs' legal conclusion will not support the weight of their claims. The Ninth Circuit has recognized that Congress intended section 304(c)(5) to prevent less powerful and sophisticated and authors and their heirs from preemptively negotiating away their termination rights to "litigation savvy publishers" and similar sophisticated market actors, such as record companies and other media industry gatekeepers, before exploitation could provide a fair valuation of the work. *Marvel Characters v. Simon*, 310 F.3d 280, 290 (9th Cir. 2002). To that end, section 304(c)(5) permits the courts to disregard certain provisions which would operate to prevent authors or their heirs exercising their termination rights under section 304 as "agreements to the contrary." Congress did not intend, as Plaintiffs argue, to permit the Plaintiffs to disregard agreements with other heirs, with whom Plaintiffs bargained with full knowledge of their actions and with equal bargaining power.

Once Plaintiffs' misplaced reliance on section 304(c)(5) is exposed, all their claims against DPS must fail: since section 304 does not permit the Plaintiffs or the Court to disregard the 1983 Settlement Agreement, Plaintiffs' purported 2006 Termination Notice is invalid. Absent the invalid termination of the 1940 License Agreement, Plaintiffs are entitled neither to a declaration that they are the holders of the copyright in the *Of Mice and Men* stage play nor to damages arising from alleged infringement by DPS.

## II.    BACKGROUND

In 1940, the Author and DPS entered into the 1940 License Agreement, granting DPS the exclusive right to license the Author's 1937 play *Of Mice and Men* for non-professional productions worldwide, and to print and sell scripts in

connection with that market.  FAC, Ex. L.  For seventy-five years, DPS has faithfully performed its obligations under that agreement, remitting royalty payments first to the Author, and then to his widow, Elaine, and finally, upon her death, to Elaine's estate.

The Plaintiffs do not receive royalties from the *Of Mice and Men* stage play, as all copyright therein was left to Elaine and her heirs by the Author.  The Plaintiffs do receive royalties from other of the Author's works, and for decades have been quarreling with Elaine and her heirs in repeated attempts to obtain more.  Earlier battles have been fought – and largely lost by the Plaintiffs – in multiple cases heard and decided in the Southern District of New York and the Second Circuit Court of Appeals. A detailed history of those earlier cases is set forth in the Memorandum of Points and Authorities in Support of the Estate Defendants' Motion to Dismiss the Complaint (the "Estate Brief"). For the purposes of this Memorandum, it is sufficient to understand that, in 1983, an early suit brought by Plaintiffs was resolved by a settlement agreement (the "1983 Settlement Agreement"), FAC, Ex. B.

Under the 1983 Settlement Agreement, the parties – Thom and his late brother John Steinbeck IV (father of Blake) on the one hand, and Elaine on the other – struck a bargain. Elaine agreed to reduce her royalty shares in certain of the Author's works in order to increase the royalty shares of Plaintiffs. FAC, Ex. B at ¶¶ 1 & 2). In exchange for receiving increased royalty shares – including lump sum payments for past royalties already received – Plaintiffs, on behalf of themselves and their heirs and assigns, agreed to cede to Elaine (and her heirs and assigns) "complete power and authority to negotiate, authorize, and take action with respect to the exploitation and/or termination of rights in the works of John Steinbeck in which [Plaintiffs] have or will have renewal or termination rights."

1  FAC, Ex. B at ¶ 5.  *See id.* at ¶ 14.  Plaintiffs continue to receive the increased

2  royalty shares conferred by the 1983 Settlement Agreement.

3         Notwithstanding their continued acceptance of these increased royalty

4  shares, following Elaine's 2003 death, Plaintiffs purported to terminate several

5  pre-1978 license agreements.  This campaign precipitated new litigation in New

6  York — litigation that was ultimately resolved in favor of Elaine's estate.

7  (Further detail is set forth in the Estate Brief at section II.D.)  In 2006, Plaintiffs

8  expanded their campaign, this time engulfing DPS, by serving on it a purported

9  "Amended Notice of Termination."  *See* Estate Brief, § II.E.  However, the plain

10  language of the 1983 Settlement Agreement states that the right to terminate the

11  1940 License Agreement rests not with Plaintiffs, but exclusively with Elaine's

12  Estate.  FAC, Ex. B at ¶ 5, ¶ 14.  Because Plaintiffs lack the authority to terminate

13  the 1940 License Agreement, the purported 2006 Termination Notice is invalid

14  and the 1940 License Agreement remains in effect.

15  **III.   ARGUMENT[2]**

16         **A.   Each of Plaintiffs' Claims Against DPS Rests On The Invalid**

17              **2006 Termination Notice.**

18         Plaintiffs assert two claims against DPS.  First, they demand that the Court

19  declare that they "own the copyright interests in … [the stage play] *Of Mice and*

20  *Men*."  FAC ¶56(h).  Second, they demand that the Court (i) declare that DPS's

21  licensing of amateur stage rights in *Of Mice and Men* infringes Plaintiffs' putative

22  copyright interests therein, and (ii) award damages for copyright infringement

23  premised on DPS's licensing activities since Plaintiffs' service of the 2006

24  Termination Notice. FAC ¶¶ 56(i)-56(j), 59-66.

_____

25  [2] The legal standard for dismissal with prejudice is set forth in the Estate Brief at

26  section III.  To spare the Court tedium, DPS does not recite it in this

     Memorandum.  DPS also joins in Estate Defendants' arguments set out in Section

27  IV. A.2, IV. B., V. A, V. B. and VI of their memorandum of points and authorities

28  supporting their Motion to Dismiss.

Both of these claims are premised on the assertion that the 1940 License Agreement was properly terminated by the 2006 Termination Notice.  Only if the 1940 License Agreement was not in place could they claim that DPS violated the right to make and distribute copies of or license public performances of the stage play *Of Mice and Men*. 17 U.S.C. §§ 106, 501. *See MAI Sys. Corp. v. Peak Computer,* 991 F.2d 511, 518 (9th Cir. 1993) (infringement shown only "[i]n the absence of … express permission by license"); *Apple Computer v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994) (to succeed on infringement claim, copyright holder must show that the alleged infringer "copied unlicensed … elements of its copyrighted … works").

Consequently, all of Plaintiffs' claims depend upon the validity of the 2006 Termination Notice. As set forth below, the 2006 Termination Notice is invalid, as Plaintiffs lack the authority to issue termination notices under the 1983 Agreement.  Plaintiffs' claims should be dismissed as a matter of law.

**B.      Plaintiffs' Claims, Which Are Based On Interpretation Of Unambiguous Contract Terms And Legal Provisions Of The Copyright Act, Should Be Dismissed As A Matter Of Law.**

Because the validity of the 2006 Termination Notice turns on the interpretation of unambiguous terms in the 1983 Agreement and Section 304 of the Copyright Act, Plaintiffs' claims against DPS can and should be resolved as a matter of law.  "Resolution of contractual claims on a motion to dismiss is proper if the terms of the contract are unambiguous." *Bedrosian v. Tenet Healthcare Corp.*, 2000 U.S. App. LEXIS 2840, at *2 (9th Cir. 2000). Indeed, even amendment of allegations is futile when a case presents a "pure question of law based on the interpretation of a contract." *PHL Variable Ins. Co. v. Marquez Bros. Int'l, Inc.*, 2014 U.S. Dist. Lexis 6809 at *15 (N.D. Cal. Jan. 17, 2014).

Here, these two instruments – the 1983 Settlement Agreement and the Copyright Act – unambiguously resolve the rights of the parties.

**C.     The 1983 Agreement Unambiguously Transferred Plaintiffs' Termination Rights to Elaine Steinbeck and Her Heirs.**

Section 304 of the Copyright Act of 1976 empowers an author or, after his death, certain of his family members, to terminate certain copyright grants or licenses executed before January 1, 1978 during one of two five-year statutory windows. 17 U.S.C. §§ 304(c) & (d).[3] Where, as here, the Author died in 1968 and left both a widow <u>and</u> surviving children, each of (i) the widow and (ii) all surviving children hold a 50 percent interest in the statutory termination right. *Id*. thus, before the 1983 Agreement, Elaine Steinbeck held a 50 percent interest and the Author's sons Thom Steinbeck and John Steinbeck IV each held a 25 percent interest.  Because a majority of termination rights is required to terminate a pre-1978 grant or license, *id*., none of Elaine, Thom or John IV could have exercised termination rights, at all, on their own; Thom or John IV had to reach agreement with Elaine to exercise their rights.

Given the decades-long history of disputes and litigation, the parties were unlikely to agree. As noted in the First Amended Complaint, disputes arose between them following the Author's death in 1968, and escalated to litigation in 1981. To resolve those disputes finally, the Plaintiffs – or in the case of Plaintiff Blake Smyle, her father and predecessor-in-interest – on the one hand, and Elaine Steinbeck, the predecessor-in-interest of the Estate Defendants, on the other, entered into the 1983 Settlement Agreement. Under this agreement, Plaintiffs

---

[3] At the time of the 1983 Settlement Agreement, only one such window existed, under § 304(c); for the purposes of the *Of Mice and Men* stage play at issue here, it would have been open from 1993 to 1998.  A second window under § 304(d) – in this case, from 2012 to 2017 – was provided in 1998 by the Sonny Bono Copyright Term Extension Act.  The 2006 Termination Notice contemplates termination under § 304(d).

1  unambiguously surrendered the authority to issue termination notices to Elaine

2  and her heirs in exchange for a greater share of royalties from those of the

3  Author's works which were subject to the section 304 termination right.

4       Paragraph 5 of that agreement states:

5       Elaine Steinbeck and/or her agent shall have the complete power and

6       authority to negotiate, authorize and take action with respect to the

7       exploitation and/or termination of rights in the works of John

8       Steinbeck in which John Steinbeck IV and Thom Steinbeck have or

9       will have renewal or termination rights.

10  FAC, Ex. B at ¶ 5.  In exchange, Thom and John IV, each increased their share of

11  royalties from certain of John Steinbeck's works from 25 percent each under a

12  former agreement to 33 percent each; Elaine reduced hers from 50 percent to 33

13  percent.  Id. at ¶¶ 1 & 2.

14       Further, the 1983 Agreement clearly contemplates that it will bind and inure

15  to the benefit of, on the one hand, Elaine's, and on the other hand, Thom and John

16  IV's, heirs. FAC, Ex. B at ¶ 14. This issue has already been litigated in the

17  Southern District of New York, and Judge Daniels has confirmed that the rights

18  under the agreement are descendible. In that earlier litigation, Thom Steinbeck

19  attempted to terminate McIntosh & Otis, Inc., the literary agent for the Author's

20  works, notwithstanding surrender of Plaintiffs' authority under the 1983

21  Agreement. *Steinbeck v. McIntosh & Otis, Inc.*, 2009 U.S. Dist. Lexis 34841 at *7

22  (S.D.N.Y. March 31, 2009).  *See* FAC, Ex. B at ¶ 5. Thom contended that a Power

23  of Attorney granted to Elaine in conjunction with the 1983 Agreement became

24  "obsolete upon [Elaine's] death." *Id.* Judge Daniels rejected this argument holding

25  that the rights in the 1983 Agreement were descendible and binding after Elaine's

26  death. *Id.* at *11-*12.

27

28

The 1983 Agreement worked for decades. Until Elaine's death in 2003, disputes over the exercise of the termination right were eliminated and, as noted in the First Amended Complaint, Elaine exercised the right on behalf of all the heirs with respect to certain of the Author's works, including *The Grapes of Wrath* and *Tortilla Flat*. FAC ¶¶ 35, 37-40. Thom and John IV (and later Blake), thus, received increased royalty streams. Since Elaine's death, however, Plaintiffs have contended that the 1983 Settlement Agreement no longer binds them with respect to exercise of termination rights (although they still seek the benefit of increased royalties under that Agreement) because they characterize the 1983 Agreement as "an agreement to the contrary" – that is, an agreement which may be disregarded under section 304(c)(5) of the Copyright Act. As discussed below, that contention is wrong.

## D.    The 1983 Settlement Agreement Is Not An "Agreement To The Contrary."

Having failed to persuade the Southern District of New York that Elaine's exclusive authority under the 1983 Settlement Agreement to terminate pre-1978 grants ended after her death, Plaintiffs now attempt to argue that – despite its survival – they may nonetheless disregard it. This argument too fails.

As the Ninth Circuit Court of Appeals has held, the legislative history behind section 304 makes it clear that Congress intended that only certain agreements can be considered "agreements to the contrary" under section 304(c)(5), and that agreements like the 1983 Settlement Agreement, are not among them. First, Congress aimed the statutory "agreements to the contrary" language at a particular class of counterparties – "litigation savvy publishers" with unfair bargaining power: this simply does not describe Elaine and her estate. Second, Plaintiffs entered the 1983 Agreement with equal bargaining power and after the *Of Mice and Men* stage play had been in publication for nearly a half-

century, long enough to have established its market value.  Third, Plaintiffs argument as to the 1983 Settlement Agreement being an "agreement to the contrary" is fundamentally unfair and should be disregarded.

### 1.   The 1983 Agreement is Not of the Type Contemplated as an "Agreement to the Contrary" Under Section 304(c)(5).

The legislative history behind the Copyright Act of 1976 and section 304(c) affirms that the 1983 Settlement Agreement is not an "agreement to the contrary." Courts have warned that the "agreement to the contrary" language should not be read "so broadly [to] include any agreement that has the effect of eliminating a termination right.  To do so would negate the effect of other provisions of the Copyright Act that explicitly contemplate the loss of termination rights." *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 202 (2nd Cir. 2008).  The "agreement to the contrary" language must be read in line with Congressional intent.  Here, the 1983 Agreement furthers Congress's intent to ensure that termination rights will not be unjustly lost to authors and their heirs as a result of the overwhelming negotiating leverage of publishers and their ilk.

The Ninth Circuit Court of Appeal has held section 304 was intended to level the playing field between authors and "litigation-savvy publishers." *Marvel Characters v. Simon*, 310 F.3d at 280, 290 (citing *Mills Music, Inc. v Snyder*, 469 U.S. 153, 172-73 (1985)). "[T]he termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Id.*; *see also Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1045-47 (9th Cir. 2005).

Read in this light, it is not surprising that cases finding that an "agreement[] to the contrary" exists almost always concern agreements where a publisher or equivalent party has used its superior bargaining power to strip termination rights

from an author or his heirs. *See, e.g., Marvel Characters*, 310 F.3d 280 (9th Cir. 2002) (holding 1969 agreement between author and publisher re-characterizing properties as works for hire was "agreement to the contrary"); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2007) (holding 1978 agreement between author's heirs and publisher that did not reference termination rights was "agreement to the contrary" if read to include termination rights).[4]

The 1983 Settlement Agreement thus does not contravene Congressional intent; it furthers it. It is not an agreement between a "litigation-savvy publisher,"

---

[4] DPS has identified only a single case that did not involve an agreement between, on the one hand, a publisher or equivalent party, and on the other, an author or his heirs:  *Ray Charles Found. v. Robinson*, 919 F. Supp. 2d 1054 (C.D. Cal. 2013). In that case, the musician Ray Charles endowed each of his children with a $500,000 trust in exchange for their agreement that they would not inherit any further assets from his estate. *Id.* at 1060.  The agreements between Mr. Charles and children did not contain any explicit reference to copyright right interests or termination rights. *Id.*  The copyright interests in Mr. Charles's works were bequeathed to his foundation upon his death. *Id.* When one of his children served termination notices on publishers and others of Mr. Charles's grantees and licensees, the foundation brought suit. In evaluating whether the foundation had standing to sue and a probability of success on the merits, the Court – amongst other reasons cited for a probability of success – held that the agreements between Mr. Charles and his children were "agreements to the contrary." *Id.* at 1065-66. In that case, however, the agreements purported to strip Mr. Charles's children of their termination rights entirely.

The present case is clearly distinguishable.  In this case, the 1983 Settlement Agreement did not eliminate the heir's termination rights; it simply allocated control of those rights to one of the holders so that they could be efficiently exercised.

In addition, there is no indication that Mr. Charles' children entered the agreements knowingly; no reference was made to the termination rights, and the Court found some coercion. *Id.*  By contrast, as discussed in section III.D.2, *infra*, the 1983 Settlement Agreement was – by Plaintiffs' own admission – freely entered into with full knowledge of its significance; it explicitly references the Plaintiffs' termination rights; and there is no evidence that Plaintiffs were coerced into executing it.

on the one hand, and an author or his heirs, on the other. Instead, <u>the 1983 Settlement Agreement is an agreement among the Author's heirs themselves, providing an efficient means to allocate and control the termination rights that they hold</u>.  As noted above, prior to the 1983 Settlement Agreement, neither Elaine nor Plaintiffs held a majority share of termination rights; therefore none of them, individually, could have exercised those termination rights. *See* 17 U.S.C. 304(c)(1). The 1983 Settlement Agreement enabled the heirs to exchange control over termination for an increased share of royalties. Such an agreement furthers the purpose envisioned by Congress by consolidating the termination rights relating to the Author's works and allowing them to be exercised, which – as the Plaintiffs concede – Elaine has repeatedly done.  FAC ¶¶ 35, 37-40.  Given the animosity between the two camps, absent the 1983 Settlement Agreement, it is unlikely Plaintiffs' termination rights would ever have been exercised.

Indeed, at least one Court has recognized the legitimacy of agreements among heirs holding termination rights – even where the agreement might be not to exercise those rights. The *Penguin Group* court wrote:

> If the holders of a majority of an author's termination interest were to agree that they would not exercise their termination rights, this would have the effect of eliminating a termination right as to the minority termination interests. Yet such an agreement could not be held ineffective as an "agreement to the contrary" inasmuch as section 304 itself contemplates elimination of termination rights in that manner.

537 F. 3d at 202.

Moreover, referring to a different agreement that these Plaintiffs challenged in earlier litigation, the *Penguin Group* court noted that, as in the present case, at the time that agreement was executed, the section 304(d) termination right – the

right Plaintiffs sought to exercise in the 2006 Termination Notice – did not yet exist, as it was not enacted until several years later.  Consequently, that agreement

> did not deprive [Plaintiffs] of any rights they could have realized at that time.  None of the parties could have contemplated that Congress would create a second termination right….  We cannot see how the [agreement] could be an "agreement to the contrary" solely because it had the effect of eliminating termination rights that did not yet exist.

*Id*. at 202-03.

Finally, section 304(c) cites two examples of "agreements to the contrary" – "an agreement to make a will" and an agreement "to make any future grants" – both of which would affirmatively bind the copyright holder to license its rights in the future. *Milne*, 430 F.3d at 1043 (9th Cir. 2005).  In *Milne*, the Ninth Circuit held that where an agreement – like the 1983 Settlement Agreement – does not fall into these categories, it should not be interpreted as an "agreement to the contrary." *Id.* at 1043 (citing *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999) ("When a statute contains … specific items and a general item, we usually deem the general item to be of the same category or class as the more specifically enumerated items.") (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999) (ellipsis in original)).  Here, the 1983 Agreement does not require Plaintiffs to make a will or to make future grants; it simply gives control of termination and exploitation rights to Elaine and her heirs.

### 2.   The 1983 Settlement Agreement Bears All the Hallmarks of a Remunerative, Freely-Entered Contract Which May Not Be Disregarded as Contrary to Section 304.

Moreover, as the legislative history makes clear, Congress ascertained the need for the termination provisions in the Copyright Act "because of the unequal

1  bargaining position of authors, resulting in part from the impossibility of

2  determining a work's value until it has been exploited."  S. Rep. No. 94-473, at

3  108 (1976), reprinted in 8 Melville B. Nimmer & David Nimmer, Nimmer On

4  Copyright, Appx. 4A (2013).[5]

5       Consequently, one must conclude – and courts such as the Ninth Circuit

6  Court of Appeals have concluded – that an agreement is not one "to the contrary"

7  where (i) parties "freely and intelligently" agree to transfer or forbear from

8  exercising their rights of termination; (ii) that agreement is not the product of

9  coercion; (iii) the transferring or forbearing party receives increased remuneration

10  in exchange; and (iv) the agreement explicitly references the existence of

11  termination rights. *Milne*, 430 F.3d at 1046; c*f. Marvel Characters*, 310 F.3d at

12  290-91 ("agreement to the contrary" found where it evinced publisher's superior

13  bargaining power); *Classic Media, Inc.*, 532 F.3d at 986 (agreement would be

14  "agreement to the contrary" where it did not reference termination rights).

15       *Milne v. Slesinger* is illustrative.  There, the Ninth Circuit found that a 1983

16  agreement which renegotiated a 1930 license between Christopher Milne (son of

17  A.A. Milne, author of the Winnie-the-Pooh stories), and SSI, the 1930 licensee,

18  was not an "agreement to the contrary" despite the explicit agreement of

19  Christopher Milne not to pursue termination rights. *Id.* at 1039.  When

20  Christopher Milne's daughter attempted to terminate the 1983 agreement, the

21  Ninth Circuit found that there was no question that the parties "freely and

22  intelligently" entered the agreement. *Id.* at 1044-45. Christopher used the threat of

23  a termination right as "leverage," and was therefore able to "obtain considerably

24  more money" in a "more lucrative" deal. *Id. See also Larson v. Warner Bros.*

25  [5] This language is addressed to § 203 which provides a similar termination right

26  for works created after January 1, 1978.  The House, in its report, noted that "[t]he

27  arguments for granting rights of termination are even more persuasive under § 304

   than they are under § 203.  H.R. No. 94-1476, at 140 (1976), reprinted in 8

28  Melville B. Nimmer & David Nimmer, Nimmer On Copyright, Appx. 4 (2013).

*Entm't, Inc.*, 2013 U.S. Dist. Lexis 55950 at *14-17 (C.D. Cal. Apr. 18, 2013) ("highly remunerative" agreement that was "knowingly and intelligently" entered "as a direct result" of notice of termination was not "agreement to the contrary" despite the surrender of certain termination rights).

The 1983 Settlement Agreement likewise meets these requirements. It was knowingly entered by Plaintiffs who had litigated the matter and decided to settle their dispute with Elaine.  It was entered into 46 years after the first Broadway production of *Of Mice and Men*, during which time its market value had been established becoming a mainstay of modern American theatre.  As noted above, it expressly referenced Thom and John IV's termination and exploitation rights in the Author's works:

> Elaine Steinbeck and/or her agent shall have the complete power and authority to negotiate, authorize and take action with respect to the exploitation and/or <u>termination of rights</u> in the works of John Steinbeck in which John Steinbeck IV and Thom Steinbeck have or will have renewal or <u>termination rights</u>.

FAC, Ex. B at ¶ 5 (emphasis added).  The powers of attorney executed by Thom and John IV concurrently with the 1983 Settlement Agreement further underscore the point.  They state that the Plaintiffs permit Elaine Steinbeck:

> To exercise [their] rights of renewal and <u>rights to terminate grants</u> to third parties and make new contracts and grants and assignments of copyrights, and to negotiate and sign contracts and agreements and otherwise take and authorize action on [their behalf]….

FAC ¶ 31 and Ex. C.

That the unambiguous purpose of these clauses is to grant Elaine Steinbeck control over termination rights has been confirmed by prior Courts. The Second Circuit has affirmed: "[The] language [in Paragraph 5] is unambiguous and

forecloses any argument that the parties intended the Steinbeck sons to retain control over Elaine Steinbeck's exercise of authority conferred on her…." *Steinbeck v. Steinbeck Heritage Foundation*, 400 Fed. Appx. 572, 575 (2nd Cir. 2010). And, further: "The 1983 Agreement makes clear that the powers of attorney were executed solely to effectuate the authority conferred upon Elaine Steinbeck under that Agreement.  That authority was 'complete' with no control retained by the Steinbeck sons." *Id.* at 576. Indeed, Thom himself testified in a sworn declaration that he was aware he was ceding control of his copyrights to Elaine:  "By signing [the settlement agreement and power of attorney], [he] understood that [he] was giving Elaine power of attorney over all [of his] copyright interests in [his] father's works."  *See Steinbeck v. McIntosh & Otis, Inc.*, 2009 U.S. Dist. Lexis 35607 at * 29 (S.D.N.Y. March 31, 2009) (quoting Declaration of Thom Steinbeck).

Plaintiffs' cession of control over their termination rights, used as leverage in negotiation, garnered them a more lucrative deal from Elaine:  an increase from a 25 percent to a 33 percent share of royalties in certain of the Author's works. See FAC, ¶ 1 & 2.  In exchange for proportionally reducing her own royalty share in those works from 50 percent to 33 percent, Elaine (and her heirs) received control of all termination and exploitation rights.  *Id.*  Thus, the 1983 agreement is both highly remunerative for Plaintiffs and not the result of Elaine's "superior bargaining power."  It is not, in sum, an "agreement to the contrary."

### 3.   Plaintiffs' Hypocritical Effort Both to Evade the Restrictions and Enjoy the Benefits of the 1983 Settlement Agreement is Fundamentally Inequitable.

Finally, as a matter of equity, Plaintiffs must not be permitted to demand benefits under the 1983 Settlement Agreement, but at the same time disregard

restrictions under that agreement.  Plaintiffs – or at any rate Thom – have tried this tactic before, and been rebuked by Judge Daniels:

> Elaine Steinbeck garnered the right to terminate … in her sole discretion, as part of a negotiated settlement. Plaintiff cannot now argue that her benefit of the bargain does not subsist. Meanwhile, plaintiff raises no question that his benefit under the [1983 Settlement Agreement], a one-third, as opposed to a one-quarter, share of royalty distributions for the domestic exploitation of certain Steinbeck works, remains in effect, and is descendible to his would-be heirs.

*Steinbeck v. McIntosh & Otis, Inc.*, 2009 U.S. Dist. Lexis 34841 at *12.  Here, Plaintiffs are also claiming that they may disregard the 1983 Settlement Agreement at will, while at the same time claiming that McIntosh & Otis, Inc. and the Estate Defendants owe Plaintiffs a "contractual obligation" under that same agreement. *See, e.g.*, FAC at ¶ 73. This Court should reject Plaintiffs' have-their-cake-and-eat-it-too argument and hold that the 1983 Settlement Agreement is valid and may not be disregarded as an "agreement to the contrary."

**E.     DPS Is Not Barred From Arguing That The 1983 Agreement Is Not An "Agreement To The Contrary" That Invalidates The 2006 Termination Notices.**

Plaintiffs attempt to avoid even addressing the above dispositive points by claiming that DPS is collaterally estopped from making that argument. *See* FAC ¶ 56(e). Plaintiffs' contention makes no sense, even on its face. The issues presented in the First Amended Complaint are different than those previously determined in any lawsuit, and in any case, DPS has not been a party to any lawsuit involving the 1983 Agreement.

1    Collateral estoppel applies only where: "(1) the issue at stake must be

2  identical to the one alleged in the prior litigation; (2) the issue must have been

3  actually litigated [by the party against whom preclusion is asserted] in the prior

4  litigation; and (3) the determination of the issue in the prior litigation must have

5  been a critical and necessary part of the judgment in the earlier action."

6  *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004) (alteration in

7  original; internal citation omitted).

8    Plaintiffs in their Complaint do not allege – nor can Plaintiffs allege – that

9  DPS was a party to any other cases against Plaintiffs or concerning the 1983

10  Settlement Agreement.

11    Moreover, the Complaint does not – and cannot – assert that the validity of

12  the 2006 Termination Notice to DPS regarding the stage play *Of Mice and Men*

13  was argued or determined in prior litigation. The Complaint only alleges that two

14  *other* termination notices – served on *other* parties regarding *other* works – were

15  held valid under a ruling by Judge Owen in prior litigation in the Southern District

16  of New York.  FAC ¶¶ 45-46. Indeed, Judge Owen's opinion never references the

17  2006 Termination Notice served by Plaintiffs at all, *Steinbeck v. McIntosh & Otis,*

18  *Inc.*, 433 F. Sup. 2d 395 (S.D.N.Y. 2006), and no other filings suggest they were

19  put in front of that Court. Consequently, DPS cannot be estopped from disputing

20  the validity of the 2006 Termination Notice in light of the 1983 Agreement.

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

# IV.    CONCLUSION

For the foregoing reasons, Plaintiffs have failed to allege claims against DPS as a matter of law. The motion to dismiss should be granted without leave to amend as such leave would be futile.

DATED:  June 1, 2015              By:  _____/s/ Trevor V. Stockinger_____

                                KESSELMAN BRANTLY STOCKINGER LLP
                                     David W. Kesselman
                                     Trevor V. Stockinger

                                LAW OFFICES OF JOSHUA GRAUBART, P.C.
                                     Joshua G. Graubart

                                Attorneys for Defendant
                                DRAMATISTS PLAY SERVICE, INC.