Kenneth D. Freundlich (SBN: 119806)
Michael J. Kaiser (SBN: 258717)
FREUNDLICH LAW
16133 Ventura Blvd. Suite 1270
Encino, CA 91436
P: (310) 275-5350
P: (818) 377-3790
F: (310) 275-5351
E-Mail:      ken@freundlichlaw.com
             mkaiser@freundlichlaw.com

*Attorneys for Plaintiffs*
THOMAS STEINBECK and BLAKE SMYLE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS STEINBECK, an individual; and BLAKE SMYLE, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>WAVERLY SCOTT KAFFAGA, an individual and as executrix of the ESTATE OF ELAINE STEINBECK; JEAN ANDERSON BOONE, an individual; DAVID SCOTT FARBER, an individual; ANDERSON FARBER KING, an individual; JEBEL KAFFAGA, an individual; BAHAR KAFFAGA, an individual; DRAMATISTS PLAY SERVICE, a New York Corporation; MCINTOSH & OTIS, INC., a New York Corporation; and Does 1-10, inclusive,<br><br>Defendants. | No. 14-cv-08681-TJH-GJS<br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Date:          July 27, 2015<br>Time:          UNDER SUBMISSION<br>Courtroom: 17 – Spring Street |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     FACTS ....................................................................................................2

III.    LEGAL STANDARD FOR MOTION TO DISMISS ...................................4

IV.     ARGUMENT ..........................................................................................4

        A.      The 1983 Settlement Agreement is an Agreement to the
                Contrary Proscribed by the Copyright Act ......................................4

                1.      To the Extent the 1983 Settlement Agreement
                Purports to Prevent Plaintiffs from Exercising Their Termination
                Rights, it is Plainly Void as an "Agreement to the Contrary" ........5

                2.      To the Extent the 1983 Settlement Agreement
                Purports to Grant the Estate the Ability to Exploit the Recaptured
                Rights, it is Void as an Unambiguous Example of a Statutorily
                Proscribed Agreement "To Make Any Future Grant" ......................6

                3.      In any Event, Defendants' Contortion of Legislative
                Intent and the Statute's Express Language Should Be Rejected ...................8

                4.      The Instant Case Does Not Fall Into the "Narrow
                Factual Scenario" Where Courts Have Found Extinguishment of
                Statutory Termination Rights ........................................................10

        B.      Plaintiffs Have Sufficiently Averred that Judge Owen's
                Decision Bars Defendants from Challenging the *Red Pony* and
                *Long Valley* Terminations ...............................................................12

        C.      Collateral Estoppel Does Not Bar Plaintiffs from
                Exercising Their Termination Rights and Dominion over
                Recaptured Rights ..........................................................................16

        D.      Plaintiffs Have Adequately Pled a Claim for Direct and
                Contributory Copyright Infringement Concerning the Exploitation
                of the Non-Professional Stage Rights in *Of Mice and Men* ..........................17

                1.      Direct Infringement.............................................................18

                2.      Contributory Infringement...................................................18

        E.      Plaintiffs Have Adequately Pled Breach of the Implied
                Covenant of Good Faith and Fair Dealing ......................................20

                1.      M&O is bound by the 1983 Settlement Agreement .................20

                2.      Plaintiffs Have Stated a Cognizable Claim for
                Breach of the Implied Covenant of Good Faith and Fair Dealing ...............22

V.      CONCLUSION .....................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Bank of New York Trust, N.A. v. Franklin Advisors, Inc.*,
  522 F.Supp.2d 632 (S.D.N.Y. 2007) ..................................................... 13

*Celador Intern. Ltd. v. Walt Disney Co.*,
  347 F.Supp.2d 846 (C.D. Cal. 2004)..................................................... 24

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008) ........................................................*passim*

*Davis v. Blige*,
  505 F.3d 90 (2d Cir. 2007) ................................................................... 7

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013) .................................................. 11

*DC Comics v. Pac. Pictures Corp.*,
  No. CV 10-3633 ODW RZX, 2012 WL 4936588 (C.D. Cal. Oct. 17,
  2012) *aff'd*, 545 F. App'x 678 (9th Cir. 2013)...................................... 11

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir.2004) .............................................................. 19

*Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*,
  97 A.D.3d 781, 949 N.Y.S.2d 115 (2012)............................................ 23

*ESI, Inc. v. Coastel Corp.*,
  61 F.Supp.2d 35 (S.D.N.Y. 2009) ....................................................... 21

*Gilligan v. Jamco Development Corp.*,
  108 F. 3d 246 (9th Cir. 1997) ............................................................... 4

*Haas v. Palace Hotel Co. of San Francisco*,
  101 Cal.App.2d 108 (1950) ................................................................. 22

*Hydranautics v. FilmTec Corp.*,
  204 F.3d 880 (9th Cir 2000) ................................................................ 16

*Kinzli v. City of Santa Cruz*,
  539 F. Supp. 887 (N.D. Cal. 1982)....................................................... 13

*Larson v. Warner Bros. Entm't Inc.,*
   No. 2:04-CV-08776-ODW, 2013 WL 1688199 (C.D. Cal. Apr. 18,
   2013) ................................................................................................ 10, 11

*Legend Autorama, Ltd. v. Audi of Am., Inc.,*
   100 A.D.3d 714, 954 N.Y.S.2d 141 (2012) .......................................... 23

*Malmsteen v. Universal Music Group*
   940 F.Supp.2d 123 (S.D.N.Y. 2013) .................................................... 20

*Marvel Characters, Inc. v. Simon,*
   310 F. 3d 280 (2d. Cir. 2002) .......................................................... 8, 11

*MBIA Ins. Corp. v. Royal Bank of Canada,*
   706 F. Supp. 2d 380 (S.D.N.Y. 2009) ............................................ 20, 21

*MGM v. Grokster ("Grokster"),*
   545 U.S. 913 (2005) ...................................................................... 18, 19

*Mills Music, Inc. v. Snyder,*
   469 U.S. 153 (1985) ............................................................................ 10

*Milne v. Stephen Slesinger, Inc.,*
   430 F. 3d 1036 ...................................................................... 8, 10, 11

*Mohamad v. Palestinian Auth.,*
   132 S. Ct. 1702 (2012) ......................................................................... 8

*Pareto v. F.D.I.C.,*
   139 F. 3d 696 (9th Cir. 1998) ............................................................... 4

*Penguin Group (USA) Inc. v. Steinbeck,*
   537 F. 3d 193 (2d Cir. 2008) ......................................................*passim*

*Perfect 10, Inc. v. Amazon.com, Inc. ("Amazon"),*
   508 F.3d 1146 (9th Cir. 2007) ...................................................... 18, 19

*Perfect 10, Inc. v. Visa Intern. Service Ass'n ("Visa"),*
   494 F.3d 788 (9th Cir 2007) ......................................................... 18, 19

*Ray Charles Foundation v. Robinson,*
   919 F.Supp.2d 1054 (C.D. Cal. 2013) ................................. 5, 6, 10, 11

*Ryan v. Editions Limited West, Inc.,*
   417 Fed.Appx. 669 (9th Cir. 2011) ..................................................... 20

*Sanchez v. City of Fresno*,
  914 F.Supp.2d 1079 (E.D. Cal 2012) ................................................. 22

*Schwartzco Enterprises LLC v. TMH Management, LLC*,
  60 F.supp.3d 331 (E.D.N.Y. 2014).......................................................... 21

*Simonyan v. Ally Fin. Inc.*,
  2013 WL 45453 (C.D. Cal. Jan. 3, 2013)..................................... 4, 12, 25

*Steinbeck v. McIntosh & Otis, Inc.*,
  433 F. Supp. 2d 395 (S.D.N.Y. 2006) ............................................. 14, 15

*Steinbeck v. McIntosh & Otis, Inc.*,
  Case No. 4-cv-5497 (GBD), 2009 WL 928171 (S.D.N.Y Mar. 31,
  2009) ...........................................................................................*passim*

*Steinbeck v. Steinbeck Heritage Found.*,
  400 Fed.Appx. 572 (2d Cir. 2010) ......................................................... 20

*Steinbeck v. Steinbeck Heritage Foundation*,
  400 F.App'x. 572 (2nd Cir. 2010)................................................... 16, 17

*Stewart v. Abend*,
  495 U.S. 207 (1990) ................................................................................ 9

*Thomas Steinbeck & Blake Smyle v. McIntosh & Otis, Inc., et al.*,
  S.D.N.Y. Case No.04 Civ. 5497................................................ 13, 17, 21

*Travelers Cas. & Sur. Co. v. Dormitory Authority–State of N.Y.*,
  735 F.Supp.2d 42 (S.D.N.Y.2010) ........................................................ 20

*United States v. City of Redwood City*,
  640 F. 2d 963 (9th Cir, 1981) ................................................................ 4

*In re Yahoo! Litig.*,
  251 F.R.D. 459 (C.D. Cal. 2008)........................................................... 13

## Statutes

17 U.S.C. § 304, et seq. ......................................................................*passim*

## Other Authorities

FRCP 12(b)(6) ......................................................................................... 4

H.R. Rep. 94-1476 at 125 ....................................................................... 9

3 *Nimmer on Copyright* §11.07[D][1] ........................................................................ 5

Peter S. Menell and David Nimmer, "Pooh-Poohing Copyright Law's
  'Inalienable' Termination Rights," 57 J. Copyright Soc'y U.S.A. 799
  (Summer 2010) ...................................................................................... 3

1   Plaintiffs Thomas Steinbeck ("T. Steinbeck") and Blake Smyle ("Blake")

2   (collectively, "Plaintiffs"), John Steinbeck's only remaining blood and statutory

3   heirs,[1] *see* 17 U.S.C. § 304(c)(2),[2] hereby oppose all three Motions to Dismiss

4   brought by Defendants under Fed. R. Civ. Pr. 12(b)(6) (collectively, the "Motions").

5   ## I.   INTRODUCTION

6   The Motions mislead the Court by arguing, in large part, that Plaintiffs' claims

7   raised in the instant action were decided in previous litigation.  Untrue. To reach this

8   unsupportable conclusion, the Motions distort Plaintiffs' allegations and the decades-

9   long litigation history among these parties, mischaracterizing Plaintiffs' lawsuit

10  before this Court as the "latest salvo" in a "campaign" to interfere with the

11  Defendants' supposed rights in and to the works of John Steinbeck, as provided in a

12  1983 Settlement Agreement.

13  However, as the operative First Amended Complaint (Doc. # 21) (the "FAC")

14  makes plain, this lawsuit is a well-pled action seeking to (1) affirm and protect

15  Plaintiffs' *statutory rights* under the United States Copyright Act which by law

16  prevail over anything to the contrary set forth in the 1983 Settlement Agreement, and

17  (2) hold the Estate and M&O to their contractual obligations to Plaintiffs to account

18  for and pay to them monies due and owing for exploitation of the works of John

19  Steinbeck.[3]

20

21  _____

22  [1] All of the Estate Defendants are the progeny (and in the case of Jean Anderson

23  Boone, a sister) of John Steinbeck's third wife, Elaine, who predated his marriage to John.  None of the Estate Defendants are statutory heirs under the Copyright Act's termination provisions, *see* 17 U.S.C., 304, yet the Estate Defendants (along with co-

24  Defendants Dramatists Play Service, Inc. ("DPS") and McIntosh & Otis ("M&O")) dubiously seek to prevent Plaintiffs from exploiting Plaintiffs' rights under the Act as John Steinbeck's statutory, blood heirs.

25  [2] Unless otherwise specified, all statutory references are to Title 17 of the U.S. Code.

26  [3] DPS disingenuously asserts that it is "hypocritical," DPS MTD at 15, for Plaintiffs to (i) assert their statutory rights in arguing that the 1983 Settlement Agreement is invalid under the Copyright Act as an "agreement to the contrary" and (ii) sue for

27  breaches of the 1983 Settlement Agreement.  However, even if *arguendo* these are inconsistent claims, there is no hypocrisy as Fed. R. Civ. Pr. 8(d) expressly permits

28  pleading inconsistent and/or alternative claims. *See also* fn. 27, *infra*.

Distorting the truth about what happened in earlier proceedings – where the Estate Defendants' and M&O's counsel were present – and incorrectly annotating John Steinbeck's family history with rank, irrelevant speculation concerning his motives in making his will and his relationship with his sons,[4] the Estate Defendants' Motion (in which M&O expressly joined and for which DPS in its brief parroted much of the arguments) is a disingenuous attempt to rewrite history and interfere with Plaintiffs' Congressionally mandated statutory rights to freely terminate previous copyright grants and enjoy unfettered control over those rights recaptured by termination (*i.e.,* the "Recaptured Rights"[5]).

As set forth below, because Plaintiffs' statutory rights (and Defendants' interference therewith) are manifest and well pled in the FAC, as is Plaintiffs' claim for breach of implied covenant of good faith and fair dealing, Defendants' Motions should be denied.

## II.   FACTS

This lawsuit is not about re-litigating the past. FAC ¶2.

This lawsuit is about drawing the line where the rights of John Steinbeck's statutory heirs override anything to the contrary in the 1983 Settlement Agreement. A line which, contrary to Defendants' arguments, was only partially drawn by the Second Circuit in its decision concerning the *sui generis* facts of revocation and re-grant of *book publishing rights* (and the ancillary rights therein) to Penguin Group (USA) Inc.[6]

---

[4] Plaintiff Thomas Steinbeck is indeed the only witness left to testify about his relationship with his father.

[5] Unlike Defendants, who narrowly defined "Recaptured Rights" to include only rights gained by those terminations exercised during Elaine's lifetime (*i.e.,* rights in *The Grapes of Wrath* and *Tortilla Flat*), *see, e.g.,* Estate MTD at 8, Plaintiffs define and use "Recaptured Rights" herein more broadly to include all rights that have reverted (or, in the case of Unexercised Termination Rights, will revert (*see* fn. 17, *infra*)) to Plaintiffs from the exercise of statutory terminations rights, both during Elaine's lifetime and after.

[6] In *Penguin Group (USA) Inc. v. Steinbeck*, 537 F. 3d 193 (2d Cir. 2008), the Second Circuit *reversed* Judge Owen's opinion upholding Plaintiffs' right to

---

1      Here, in circumstances that were not before the Second Circuit, Plaintiffs seek
2  a declaration, and related relief, regarding Plaintiffs' unfettered ability to exercise
3  their statutory termination rights and to exploit their Recaptured Rights free from any
4  claims or interference by Defendants. *See*, FAC ¶¶47-53.

5      Moreover, as the FAC alleges, M&O and Waverly Kaffaga breached the
6  implied covenant of good faith and fair dealing within the 1983 Settlement
7  Agreement, by failing to account to Plaintiffs and pay them royalties they are due. In
8  the case of the stage rights to *Of Mice and Men*, M&O and Waverly Kaffaga
9  permitted M&O to take what amounts to a second commission on these rights at
10  Plaintiffs' expense. FAC ¶¶71-79.

11      Moreover, Plaintiffs seek to clarify and assert their rights, including but
12  without limitation, to the following sets of termination rights and resulting
13  Recaptured Rights concerning John Steinbeck's works:

14     •  The motion picture and ancillary rights in *Tortilla Flat,* which were
15  terminated by M&O in 1994;

16     •  The motion picture and ancillary rights in *The Grapes of Wrath*, which
17  were terminated in 1998 by John Steinbeck's (now deceased) widow Elaine;

18     •  The motion picture and ancillary rights in *The Long Valley* and *The Red*
19  *Pony*, both of which Plaintiffs legally terminated in 2004, as held by District Judge
20  Owen despite Defendants' incomplete, disingenuous, and factually incorrect
21  description of the prior litigation;

22     •  The non-professional stage rights in *Of Mice and Men*, which Plaintiffs
23  legally terminated in 2006; and

24

25  _____

26  terminate John Steinbeck's agreement with Penguin to publish his books, an
appellate decision that has been roundly criticized by Copyright scholars. *See, e.g.*,
27  Peter S. Menell and David Nimmer, "Pooh-Poohing Copyright Law's 'Inalienable'
Termination Rights," 57 J. Copyright Soc'y U.S.A. 799 (Summer 2010).  In any
28  event, that decision was *sui generis* to a fact pattern where the allegedly terminated
grant had been superseded by a subsequent agreement with the grantee, which is a
fact situation not present in any of the termination issues raised by the FAC.

1    • The professional stage rights in *Of Mice and Men*, which Plaintiffs

2    legally terminated in 2014.

3    Despite Plaintiffs' statutory rights and objections, Defendant DPS, induced by

4    the Estate and M&O, continues to exploit the stage rights in *Of Mice and Men*

5    (which Plaintiffs contend have reverted solely to Plaintiffs upon termination) and pay

6    Plaintiffs' share of such monies to M&O after M&O admittedly has continued to

7    help itself to an unauthorized "second" commission. This constitutes primary

8    copyright infringement, for which DPS is liable (FAC ¶¶59-66) and Waverly

9    Kaffaga and M&O are liable as contributory infringers (FAC ¶¶67-70).

10   For the reasons set forth here and in the FAC, these Motions should be denied,

11   and Plaintiffs should be permitted to pursue their case.

12   **III.   LEGAL STANDARD FOR MOTION TO DISMISS**

13   On a motion to dismiss under FRCP 12(b)(6), the Court must assume that all

14   of the facts alleged in the complaint are true, construe those facts in the light most

15   favorable to Plaintiffs, and draw all reasonable inferences in favor of Plaintiffs. *See*

16   *Pareto v. F.D.I.C.,* 139 F. 3d 696, 699 (9th Cir. 1998).

17   Rule 12 (b)(6) motions are disfavored and *rarely granted. Gilligan v. Jamco*

18   *Development Corp.*, 108 F. 3d 246, 249 (9th Cir. 1997) (emphasis added). Moreover,

19   a Rule 12(b)(6) dismissal is proper only in "extraordinary" cases, *United States v.*

20   *City of Redwood City*, 640 F. 2d 963, 966 (9th Cir, 1981), and even then, leave to

21   amend is "freely granted," *Simonyan v. Ally Fin. Inc.*, 2013 WL 45453, at *2 (C.D.

22   Cal. Jan. 3, 2013) (citing *DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655, 658

23   (9th Cir.1992)).

24   **IV.   ARGUMENT**

25   **A.   The 1983 Settlement Agreement is an Agreement to the Contrary**

26   **Proscribed by the Copyright Act**

27   Defendants argue that the 1983 Settlement Agreement (including the

28   accompanying Power of Attorney) prevents Plaintiffs from exercising and benefiting

---

4                                          Case No. 14-cv-08681-TJH-GJS

1  from the inalienable rights the Copyright Act provides them, notwithstanding the

2  Act's proscriptions against the enforcement of such agreements.

3       As the FAC makes plain, the 1983 Settlement Agreement, which provides that

4  "Elaine Steinbeck and/or her agent shall have the complete power and authority to . .

5  . authorize and take action with respect to  . . . the works of John Steinbeck in which

6  John Steinbeck IV and Thom Steinbeck have or will have . . . termination rights,"

7  Ex. B.[7] ¶ 5, does two things that the Copyright Act does not allow: (1) prevents

8  Plaintiffs from exercising their existing and future termination rights, by purporting

9  to transfer control over Plaintiffs' termination rights to Elaine (now, her Estate) and

10  (2) purports to grant the Estate and M&O complete power to administer Plaintiffs'

11  Recaptured Rights.

12       For these reasons, the 1983 Settlement Agreement is void as an "agreement to

13  the contrary."  §304(c)(5).

14         1.   To the Extent the 1983 Settlement Agreement Purports to Prevent

15             Plaintiffs from Exercising Their Termination Rights, it is Plainly

16             Void as an "Agreement to the Contrary"

17      As stated in copyright's seminal treatise, 3 *Nimmer on Copyright*

18  §11.07[D][1]:

19       [T]ermination of the grant may be effected notwithstanding 'any

20       agreement to the contrary' plainly means that authors and their

21       successors may terminate copyright assignments in spite of any

22       contractual device that purports to divest them of the right.

23      Indeed, this Court's decision in *Ray Charles Foundation v. Robinson*, 919

24  F.Supp.2d 1054 (C.D. Cal. 2013), further supports the crystalline proposition that

25  agreements preventing the exercise of termination rights—such as the 1983

26  Settlement Agreement—are "agreements to the contrary."  Prior to his death, Ray

27

28  [7] Where not otherwise specified, citations to Exhibits are to those attached to the FAC.

Charles executed an agreement with his statutory heirs, giving each $500,000 in exchange for not making a claim against his estate ("Ray Charles Agreement"). When his heirs purported to exercise their termination rights to some of Ray Charles' songs, the Court held that the Ray Charles Agreement was an "agreement to the contrary." *Id.* at 1066. The Court reasoned that the Ray Charles Agreement, while not expressly eliminating the heirs' termination rights, was unenforceable. Why? Because it "penalized" the heirs for exercising termination rights and was, therefore, just "a more creative way of preventing the exercise of termination rights in the first place." *Id.* Here, the 1983 Settlement Agreement blatantly purports to "prevent[] the exercise of termination rights in the first place," *id.*, and is therefore unenforceable as an "agreement to the contrary." [8]

> **2.** **To the Extent the 1983 Settlement Agreement Purports to Grant the Estate the Ability to Exploit the Recaptured Rights, it is Void as an Unambiguous Example of a Statutorily Proscribed Agreement "To Make Any Future Grant"**

Section 304(c)(5) of the Copyright Act makes plain that an agreement to make any future grant is void as an agreement to the contrary. At the time of the 1983 Settlement Agreement, Plaintiffs held no copyright (ownership) interest in any of the rights to any of the Steinbeck works in question. Since in 1983 Plaintiffs had no such rights, Plaintiffs could not grant Elaine or her Estate (or any putative agents) control

---

[8] If enforced, the 1983 Settlement Agreement would effectively place the ability to exercise John Steinbeck's termination rights into the hands of non-"Steinbeck" heirs, who, by statute, hold no termination interest. When Elaine died in 2003, her termination rights to the Steinbeck Works descended, by statute, to John Steinbeck's child and grandchild (*i.e.* Plaintiffs), not Elaine's Estate or the Estate's beneficiaries (*i.e.*, the Estate Defendants). *See* § 304(c)(2)(B). The Estate Defendants have every economic incentive to try to block the exercise of Plaintiffs' termination rights, because the Estate Defendants would lose all rights to the recaptured works. *See* § 304(c)(6) ("all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant"). Section 304(c)(5) cannot reasonably be interpreted to allow Defendants – who hold no termination interest – from using the 1983 Settlement Agreement to prevent John Steinbeck's statutory heirs – who hold the entire termination interest – from exercising their termination rights.

over rights in any such Steinbeck works. Yet, the 1983 Settlement Agreement purported to grant Elaine control over Plaintiffs' future Recaptured Rights in the Steinbeck works.  This is plainly unenforceable. As the Ninth Circuit has held, "only once a copyright grant is terminated and the right has reverted to an author or his statutory heirs may the reverted copyright interest be effectively assigned." *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 986 (9th Cir. 2008).

More particularly, when Elaine was alive, the Act gave her a 50% termination interest and gave the remainder to John Steinbeck's children and grandchildren, not Elaine's testamentary heirs. *See* § 304(c)(2)(A). When Elaine died in 2003, all of John Steinbeck's termination rights descended, by statute, to his son Thomas and his granddaughter Blake[9] (*i.e.,* Plaintiffs). *See* §304(c)(2)(C).

Yet, Defendants dubiously assert that, by operation of the 1983 Settlement Agreement, Plaintiffs lose all ability to exploit the Recaptured Rights. Estate MTD at 13-14. This assertion is squarely belied by Congress' statutory mandate that "*all* of a particular author's rights…covered by a terminated grant revert, upon the effective date of termination, …to the persons *owning* [the author's] termination interest," §304(c)(6) (emphasis added).  Defendants – who upon termination purport to have exclusive administration rights over Plaintiffs' Recaptured Rights via the 1983 Settlement Agreement – cannot invoke that agreement to compel Plaintiffs to grant any "sticks" within the bundle of Plaintiffs' post-1983 Recaptured Rights. Accordingly, the 1983 Settlement Agreement falls squarely within the Copyright Act's proscriptions against an "agreement to make any future grant," § 304(c)(5), of those rights that, under §304(c)(6), statutorily revert to Plaintiffs upon termination. *See* § 106 ("[T]he *owner of copyright*…has the *exclusive rights to do and to authorize* any of the following….") (emphasis added), *Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007) ("Like other forms of property ownership, copyright ownership is a

---

[9] Blake's father, John Steinbeck's son John Steinbeck IV died in 1991.

1  'bundle of discrete rights' regarding the *owner's ability to use his property*.")

2  (emphasis added), *Classic Media*, *supra*.[10]

3          3.     **In any Event, Defendants' Contortion of Legislative Intent and**

4                     **the Statute's Express Language Should Be Rejected**

5          Despite the language of Section 304(c)(5) being crystalline for the reasons set

6  forth above, Defendants mislead the Court by relying on inapposite cases and making

7  a sweeping generalization that the statute's language is facially ambiguous.

8  Therefore, Defendants argue, the Court should not apply the statutory text, but rather

9  render its decision merely by relying on snippets of legislative history.  *See, e.g.,*

10  Estate MTD at 17.

11          The cases cited by Defendants found this statutory language ambiguous only

12  as applied to the inapposite facts of those cases.  For example, the Court in *Marvel*

13  *Characters, Inc. v. Simon*, 310 F. 3d 280, 290 (2d. Cir. 2002) held that "whether

14  §304(c)(5)'s phrase 'any agreement to the contrary' includes *a settlement agreement*

15  *stating that a work was created for hire* is not clear from the text of the statute

16  itself.") (emphasis added).  Likewise, the Ninth Circuit in *Milne v. Stephen Slesinger,*

17  *Inc.*, 430 F. 3d 1036. 1043 (9th Cir. 2005) found the statutory language ambiguous

18  because, unlike here, the agreement in question did not fit into one of the two

19  statutory examples of an "agreement to the contrary" (*i.e.,* "agreement to make a

20  will" or "agreement to make any future grant").

21          Accordingly, "[r]eliance on legislative history is unnecessary in light of the

22  statute's unambiguous language." *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702,

23  1709 (2012).  In any event, Defendants mischaracterize the legislative intent behind

24  

---

25  [10] This holds true even for those grants terminated by Elaine during her lifetime,

26  where upon the effective date of termination, those Recaptured Rights reverted to both Elaine and Plaintiffs.  Indeed, the Estate Defendants effectively concede that the 1983 Settlement Agreement operates as an (impermissible) "agreement to make [a]

27  future grant" with respect to such Recaptured Rights:  "*On the dates* the *Grapes of Wrath* and *Tortilla Flat* Termination Notices became effective, control over the

28  Recaptured Rights *transferred* to Elaine exclusively under the 1983 Settlement Agreement." Estate MTD at 13 (emphasis added).

1  §304(c) and contort its express language. For example, Defendants argue termination

2  rights are solely meant to safeguard against "unremunerative transfers," due to

3  unequal bargaining power. Estate MTD at 17. Therefore, according to Defendants, an

4  "agreement to the contrary" must be made with the grantee and does not involve

5  "agreements *among* heirs." Estate MTD at 17-18 (emphasis in the original). They

6  advance a broad interpretation of the ability for heirs to contract around termination

7  rights. Under Defendants' proposed rule, an agreement between heirs is valid, if

8  entered into "freely and knowingly" and the heirs "receiv[e] some sort of benefit for

9  abandoning the termination right."[11] Estate MTD at 18; *See also* DPS MTD, at 13.[12]

10  However, the statute unambiguously prevents Defendants' interpretation.

11  Section 304(c)(5) states "[t]ermination . . . may be *effected* notwithstanding *any*

12  agreement to the contrary." (emphasis added). Congress did not specify the nature of

13  the parties, because the nature of the parties is irrelevant; any agreement attempting

14  to waive the exercise of termination rights or "make a future grant" is void as a

15  matter of law. The broad prohibition *is* consistent with Congress' intent: "although

16  affirmative action is needed to effect a termination, the right to take this action

17  *cannot be waived in advance or contracted away*." H.R. Rep. 94-1476 at 125

18  (emphasis added). As the Supreme Court and Ninth Circuit stated, termination rights

19  are "inalienable." *Stewart v. Abend,* 495 U.S. 207, 230 (1990); *Classic Media, Inc. v.*

20  *Mewborn,* 532 F.3d 978, 985 (9th Cir. 2008). Defendants' interpretation would,

21  effectively, make alienable that which Congress intended to be inalienable and

22  inappropriately rewrite the statute to include the following italicized words that

23

24

25

---

26  [11] This proposed rule is further refuted in Section IV.A.4, *infra*.

27  [12] Defendant DPS advances a similar rule: "[A]n agreement is not one 'to the contrary' where (i) parties "freely and intelligently" agree to transfer or forbear from exercising their rights of termination; (ii) that agreement is not the product of coercion; (iii) the transferring or forbearing party receives increased remuneration in exchange; and (iv) the agreement explicitly references the existence of termination rights."). DPS MTD at 13.

1  Congress did *not* include in the statute: "Termination of a grant may be exercised
2  notwithstanding any agreement to the contrary *made with the grantee only."*

3             **4.**    **The Instant Case Does Not Fall Into the "Narrow Factual**
4                   **Scenario" Where Courts Have Found Extinguishment of Statutory**
5                   **Termination Rights**

6          The Ninth and Second Circuits have found extinguishment of statutory
7  termination rights by agreement, only in the "narrow factual scenario," *Ray Charles*
8  *Found.*, 919 F. Supp. 2d at 1066, when the new agreement revokes and supersedes
9  the prior grant. *See Milne ex rel. Coyne v. Stephen Slesinger, Inc.,* 430 F.3d 1036,
10 1044-47 (9th Cir. 2005), *Classic Media,* 532 F.3d at 983 n.2 (describing the "nature
11 of the agreement at issue in *Milne*" as "*sui generis*"), 985-90 (stating this narrow,
12 extinguishment rule and surveying the case law to demonstrate its consistency);
13 *Penguin Books (USA), Inc. v. Steinbeck,* 537 F.3d 193, 200 (2d Cir. 2008) (same as
14 *Milne*). By doing so, the termination rights holder effectively exercises the
15 termination right through the agreement, rather than a termination notice. *Classic*
16 *Media,* 532 F.3d at 987-88; *Milne,* 430 F.3d at 1046-47; *Penguin Books,* 537 F.3d at
17 202-03. This interpretation is consistent with Congress' intent: "[N]othing in this
18 section or legislation is intended to change the existing state of the law of *contracts*
19 concerning the circumstances in which an author may *terminate* a license, transfer or
20 assignment." *Milne,* 430 F.3d at 1045-46 (quoting H.R. Rep. 1476 at 142) (emphasis
21 added). Indeed, every single case Defendants cite is generally inapposite[13] and/or

22

23 _____

24 [13] *Mills Music, Inc. v. Snyder,* 469 U.S. 153 (1985) is inapposite, because it
   addressed the issue of whether lawfully licensed derivative work can survive
25 termination under § 304(c)(6)(A). *Larson v. Warner Bros. Entm't Inc.,* No. 2:04-CV-
   08776-ODW, 2013 WL 1688199, at *5 (C.D. Cal. Apr. 18, 2013) is inapposite
26 because it involved a settlement agreement between the heirs and the grantee for
   works subject to the heirs' *previously* filed termination notice. "[T]his kind of
27 renegotiation appears to be exactly what was intended by Congress." *Id.* "[I]t was an
   agreement consistent with, and which fully honored [the Plaintiffs'] right of
28 termination they undoubtedly intended to exercise" by filing the termination notice.
   *Id.* at *6 (internal quotations omitted).

1  specifically requires that the agreement extinguish termination rights by revoking

2  and superseding the prior grants.[14] No case Defendants cite found effective

3  extinguishment without a superseding grant[15] or a grant made in response to a

4  termination notice[16] —none of which occurred here.

5          And although the *Milne* and *Penguin* Courts found superseding grants

6  extinguish termination rights when the heir(s) entered into the agreement "freely and

7  knowingly" and received increased remuneration, *see, e.g.,* Estate MTD at 19, it was

8  only due to those cases' "narrow factual scenario[s]." *Ray Charles Found.*, 919 F.

9  Supp. at 1066.  Thus, whether a party "freely and knowingly" enters into a

10  financially rewarding agreement that purports to extinguish termination rights, which

11  are ordinarily inalienable, is at best, a necessary, but not sufficient factor for whether

12  those rights have indeed been extinguished.

13          Indeed, the 1983 Settlement Agreement cannot be interpreted as effectively

14  exercising termination rights by revoking and superseding any prior grant, let alone

15  any grant to Elaine. To the contrary, the 1983 Settlement Agreement states that "the

16  Parties hereby *ratify and confirm* all existing contracts and agreements previously

17  executed by them or by M&O." Ex. B ¶ 7.  And, ratification and confirmation is

18  clearly not the same as termination.  *See, e.g., Davis v. Carroll,* 937 F. Supp. 2d 390,

19  426 (S.D.N.Y. 2013) ("Ratification is the express or implied adoption, *i.e.,*

20  recognition and approval, of the unauthorized acts of another.").  Additionally, the

21

22  [14] *Classic Media,* 532 F.3d at 985; *Milne*, 430 F.3d at 1046; *Penguin Books,* 537 F.3d
23  at 200; *Ray Charles Found.,* 919 F.Supp.2d at 1066 n.9; *DC Comics v. Pac. Pictures Corp.*, No. CV 10-3633 ODW RZX, 2012 WL 4936588, at *4-7 (C.D. Cal. Oct. 17, 2012) *aff'd,* 545 F. App'x 678 (9th Cir. 2013).
24  [15] *Compare Classic Media,* 532 F.3d at 986 (subsequent agreement transferring
25  motion picture rights was an "agreement to the contrary," because it did not terminate and supersede prior grant), *Ray Charles Foundation,* 919 F.Supp.2d at
26  1066 n.9 (agreement penalizing statutory heirs for exercising termination rights did not extinguish termination rights), *Marvel, Inc. v. Simon,* 310 F.3d at 292
27  (subsequent agreement re-characterizing the work as a "work made for hire" was an agreement to the contrary) *with Milne,* 430 F.3d at 1046 (subsequent agreement that
28  terminated and superseded prior grant was effective use of termination rights), *Penguin Books,* 537 F.3d at 200 (same).
[16] *Larson*, 2013 WL 1688199, at *5.

Plaintiffs' Opposition to Defendants' Motions To Dismiss

1 Ninth Circuit has rejected confirming an existing agreement as an effective exercise

2 of termination rights. *Classic Media,* 532 F.3d at 989 ("Unlike…Milne's 1983

3 assignment, which expressly revoked the earlier…assignments and simultaneously

4 re-granted the same rights, Mewborn's 1978 Assignment explicitly stated that it

5 granted rights 'in addition to' the rights granted in the 1976 Assignment and

6 confirmed that the 1976 Assignment had been recorded in the U.S. Copyright

7 Office.")

8        Therefore, for this reason and the other stated herein, the 1983 Settlement

9 Agreement did not and could not extinguish Plaintiffs' ability to exercise termination

10 rights and exploit the Recaptured Rights.[17]

11    B.    Plaintiffs Have Sufficiently Averred that Judge Owen's Decision Bars

12          Defendants from Challenging the *Red Pony* and *Long Valley*

13          Terminations

14        In an attempt to confuse the Court, Defendants argue that Plaintiffs' claim for

15 declaratory relief based on the *res judicata* effect of Judge Owen's summary

16 judgment validating Plaintiffs Thomas Steinbeck and Blake Smyle's 2004

17 termination of the motion picture rights to *The Red Pony* and *Long Valley,* should be

18 dismissed because of a stipulated judgment dated December 2, 2009, among the

19

20

21

22

─────────────────

23 [17] The Estate Defendants argue that there are no other rights in Steinbeck works (other than the ones delineated thus far in this case) that can be subject to termination. *See* Estate MTD at 15-16 (arguing there are no "Unexercised

24 Termination Rights"). This is erroneous as Plaintiffs have statutory rights under Section 304(d) to terminate the yet-to-be-terminated rights in other Steinbeck works,

25 such as *Molly Morgan* (Play rights; copyrighted in 1957; termination window: 2013-2018), *The Short Reign of Pippin IV* (Movie rights; copyrighted in 1957; termination

26 window: 2013-2018), and various letters and articles penned by John Steinbeck. Although Plaintiffs contend they have adequately pled their claim with respect to

27 such Unexercised Termination Rights, Plaintiffs ask the Court for leave to amend in the event the Court determines otherwise. *See Simonyan*, 2013 WL 45453, at *2

28 (leave to amend should be "freely granted").

─────────────────

1   parties in the 2004 Litigation[18] (Estate's RJN Ex. 6) (the "Stipulated Judgment").[19]

2   Defendants' interpretation of the Stipulated Judgment is illogical and incorrect and is

3   especially suspicious since the Estate Defendants' and M&O's counsel here signed

4   that Stipulated Judgment. At the very least, the history of this document raises

5   questions of fact that preclude dismissal of this claim here.  *See Kinzli v. City of*

6   *Santa Cruz*, 539 F. Supp. 887, 900 (N.D. Cal. 1982) ("[A] stipulated judgment must

7   be construed as any other contract.") (internal quotation marks omitted), *In re Yahoo!*

8   *Litig.*, 251 F.R.D. 459, 472 (C.D. Cal. 2008) ("[T]he case must proceed beyond the

9   pleadings so that the court may consider the evidence bearing on whether the

10  contract was reasonably susceptible to a different interpretation.") (internal citations

11  and quotation marks omitted), *Bank of New York Trust, N.A. v. Franklin Advisors,*

12  *Inc.*, 522 F.Supp.2d 632, 637 (S.D.N.Y. 2007) ("The Court's role on a 12(b)(6)

13  motion to dismiss is not to resolve contract ambiguities.").

14          In the 2004 Litigation, *five* of Plaintiffs' 2004 copyright terminations were

15  challenged by the Estate: (1) the grant to Twentieth Century Fox of motion picture

16  rights, limited publication rights, radio rights, film, television and commercial tie-up

17  rights to the film rights for *The Wayward Bus*, (2) the grant to Rogers &

18  Hammerstein and MGM of all motion picture, radio and television rights to *Cannery*

19  *Row,* (3) the grant to Paramount Pictures Corporation of motion picture, radio and

20  limited publication rights in *The Long Valley* and the collection of short stories

21  included therein, (4) the grant to Paramount Pictures Corporation of motion picture,

22  radio and limited publication rights in *The Red Pony* and the collection of short

23  stories included therein, and (5) the grant to Penguin Group (USA) Inc., of book

24

25

26  [18] *Thomas Steinbeck & Blake Smyle v. McIntosh & Otis, Inc., et al.*, S.D.N.Y. Case
    No.04 Civ. 5497.

27  [19] Estate MTD 7:3-11; 14:8-12; 20:10-22:10. The Estate also suggests that "If
    anything, Plaintiffs' stipulation collaterally estops them from disputing the invalidity

28  of *The Red Pony* and *The Long Valley* termination notices."

1   publishing rights in several of John Steinbeck's novels, including *The Grapes of*

2   *Wrath* and *Of Mice and Men*.[20]

3          Judge Owen granted summary judgment on all five terminations, and thereby

4   ruled in favor of Plaintiffs' Thomas Steinbeck and Blake Smyle on numbers 3-5 (*The*

5   *Long Valley, The Red Pony* and all of the Penguin terminations were valid), and

6   against them on numbers 1-2 (*The Wayward Bus* and *Cannery Row* terminations

7   were invalid).  *See* 2004 Litigation, *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp.

8   2d 395, 400-404 (S.D.N.Y. 2006).

9          Judge Owen certified the decision on grant number 5 (Penguin Books) for

10  appeal so the Estate Defendants could (along with Penguin) appeal, and stayed the

11  rest of the case.[21]

12         The Second Circuit reversed Judge Owen on the Penguin Books contract

13  alone, and held that the Penguin termination notice was invalid because of a certain

14  1994 agreement because it was a revocation and re-grant, and therefore not an

15  "agreement to the contrary."  *See generally Penguin Group (USA) Inc. v. Steinbeck*,

16  537 F. 3d 193 (2d Cir. 2008).  The Second Circuit reversed and remanded with

17  respect to Penguin only but not with respect to the Estate Defendants.[22]

18         On remand and re-assignment of the case to Judge Daniels, the Estate's

19  motion for summary judgment on the remaining 2004 claims was granted. Plaintiffs

20  Thomas Steinbeck and Blake Smyle appealed. However, the Second Circuit was

21  concerned that certain issues below had not been made "final," *see* Estate's RJN Ex.

22  6 at 2, and Judge Daniels entered an order based upon the parties' stipulation in

23  pertinent part:

24

25  _____

26  [20] The Estate Counterclaims were set forth in a document attached to the Estate's
    RJN Ex. 3.
27  [21] Estate's RJN Ex. 4.
    [22] *See* Plaintiffs' Request for Judicial Notice ("RJN")  Ex. 1 (Mandate from the
28  Second Circuit) ("[T]he judgment of the district court is REVERSED and the case
    REMANDED for *entry of judgment in favor of Penguin in accordance with the*
    *opinion of this court*.") (emphasis added).

With respect to the Counterclaims filed by Jean Anderson Boone:

3b)     Judgment shall be entered in favor of Jean Anderson Boone on Counterclaim Two (Validity of Termination Notices) for the reasons stated in the Second Circuit's decision in *Penguin Group (USA) Inc. v. Steinbeck*, 537 F. 3d 193 (2d Cir. 2008)….

With respect to the Counterclaims filed by [the Estate].

5b)     Judgment shall be entered in favor of the Estate on Counterclaim Two (Validity of Termination Notices) for the reasons stated in the Second Circuit's decision in *Penguin Group (USA) Inc. v. Steinbeck*, 537 F. 3d 193 (2d Cir. 2008).

This Stipulated Judgment did not specifically address terminations claims 1-4 above, apparently since Judge Owen's summary judgment ruling had disposed of those claims. The Stipulated Judgment could only apply to the fifth termination claim regarding the Penguin grant, because the Second Circuit's reversal and remand only applied to Penguin and there had never been a judgment entered with respect to the other parties.

The words of the Stipulated Judgment make this clear by referring to the termination being entered "for the reasons stated…in the [*Penguin*] decision," which was based on a revocation and re-grant that occurred vis-a-vis Penguin, which did not occur in the case of *The Red Pony* and *The Long Valley.  Compare generally Penguin*, 537 F. 3d 193 (2d Cir. 2008) *with McIntosh & Otis*, 433 F. Supp. 2d 395 (S.D.N.Y. 2006).  The reasoning of the Second Circuit's *Penguin* decision has no relation whatsoever to the validity of the terminations of *The Red Pony* and *The Long Valley*, and those paragraphs of the Stipulated Judgment do not and cannot reverse Judge Owen's summary judgment in favor of Plaintiffs with respect to these two titles.  Indeed, as the Notice of Appeal makes clear, *see* Estate's RJN Ex. 5, the

1   validity of only the Penguin terminations (and therefore not *The Red Pony* or *The*
2   *Long Valley* terminations) was before the Second Circuit.[23]

3         It is also illogical and incomprehensible that Plaintiffs would have converted
4   their summary judgment win on their terminations of *The Red Pony* and *The Long*
5   *Valley* into a defeat by stipulating to a judgment against them which would have
6   reversed Judge Owen's ruling.

7         In any event, it would be inappropriate to dismiss Plaintiffs' claims as to *The*
8   *Red Pony* and *The Long Valley* based on speculation as to what this Stipulated
9   Judgment was meant to include without extrinsic evidence.  *See* p. 13, *supra*.

10       C.    Collateral Estoppel Does Not Bar Plaintiffs from Exercising Their
11           Termination Rights and Dominion over Recaptured Rights

12         M&O speciously claims Plaintiffs are collaterally estopped from challenging
13   the 1983 Settlement Agreement as an "agreement to the contrary" under 17 U.S.C. §
14   304(5) because of *Steinbeck v. McIntosh & Otis, Inc.,* Case No. 4-cv-5497 (GBD),
15   2009 WL 928171 (S.D.N.Y Mar. 31, 2009) and *Steinbeck v. Steinbeck Heritage*
16   *Foundation,* 400 F.App'x. 572 (2nd Cir. 2010). *See* M&O MTD at 9-13. [24]

17         Collateral estoppel requires: "(1) the issue necessarily decided at the previous
18   proceeding is *identical* to the one which is sought to be litigated; (2) the first
19   proceeding ended with a final judgment on the merits; and (3) the party against
20   whom collateral estoppel is asserted was a party or in privity with a party at the first
21   proceeding." *Hydranautics v. FilmTec Corp.,* 204 F.3d 880, 885 (9th Cir 2000)
22   (emphasis added).

23

24

---

25   [23] For this reason, the authority cited by the Estate MTD at 21 is inapposite because
26   the Second Circuit did not "'expressly decline[] to rule' on *The Red Pony* or *The*
*Long Valley* terminations, nor did it '"expressly limit[]' the scope of its decision and
27   'decline[] to decide' the question [of those two terminations]." *Id.*
[24] The Estate Defendants and DPS do not explicitly argue collateral estoppel but
28   nevertheless engage in similar sleight of hand by erroneously insinuating that the
parties' prior actions determined the issues presently before this Court. Estate MTD
at 13; DPS MTD at 1, 14-15.

As a threshold matter, M&O cannot demonstrate that the issues in this case are "identical" to the issues decided in previous litigation. The central issue in this case is whether the 1983 Settlement Agreement (along with the accompanying Power of Attorney) was an "agreement to the contrary" under 17 U.S.C. § 304(c)(5), insofar as it prevents Plaintiffs from exercising their termination rights and whether M&O's appointment and the Estate's Power of Attorney survives termination (*i.e.,* whether M&O (and the Estate) can intermeddle with respect to Plaintiffs' Recaptured Rights).

Neither of the previous cases addressed these federal issues; both cases were decided on state law grounds. *McIntosh & Otis* addressed whether, under New York contract and agency law, the 1983 Settlement Agreement (and the accompanying Power of Attorney) survived Elaine's death, which gave her sole discretion to terminate M&O's appointment. 2009 WL 928171. *Steinbeck Heritage Foundation* addressed whether, under New York contract and agency law, the 1983 Settlement Agreement (and accompanying Power of Attorney) placed fiduciary duties on the Estate and M&O for the Plaintiffs' benefit. 400 F.App'x at 575-577.

The Estate Defendants even admit as much: "the Second Circuit expressly declined to rule on the question of whether the 1983 agreement was an 'agreement to the contrary' [and] on remand, Judge Daniels recognized that the 'issue was not resolved by the Second Circuit.'" Estate MTD at 22. (quoting *Steinbeck v. McIntosh & Otis, Inc.* 2009 WL 928189, at *7 n.10). Therefore, Plaintiffs are not collaterally estopped from challenging the 1983 Settlement Agreement (and accompanying) Power of Attorney), insofar as it is unenforceable under the federal Copyright Act.

D.   Plaintiffs Have Adequately Pled a Claim for Direct and Contributory Copyright Infringement Concerning the Exploitation of the Non-Professional Stage Rights in *Of Mice and Men*

Contrary to Defendants' misguided assertions, Plaintiffs have adequately pled cognizable claims of direct and contributory copyright infringement.

### 1. Direct Infringement

Defendants claim Plaintiffs hold no ownership interest to sue for copyright infringement because Plaintiffs' 2006 termination notice regarding the non-professional stage rights in *Of Mice and Men* was invalid under the 1983 Settlement Agreement.[25] For all the reasons stated above, the 1983 Settlement Agreement did not invalidate Plaintiffs' 2006 termination notice. *See* pp. 4-12, *supra*. Upon termination, all rights reverted to Plaintiffs, since Defendants hold no termination interest in Steinbeck's works terminated after Elaine's death. *See* §§304(c)(2)(B) & 304(c)(6). Therefore, Plaintiffs are the *sole* owners of these Recaptured Rights. Since the Estate and DPS only defense to copyright infringement is the validity of the 1983 Settlement Agreement, they implicitly concede they have no defense if the 1983 Settlement Agreement is invalid in this regard. Accordingly, Plaintiffs have adequately stated a claim of direct copyright infringement.

### 2. Contributory Infringement

M&O argues that, even if the notices are valid, M&O's conduct does not rise to contributory liability, because M&O did not "materially contribute" to infringement. M&O MTD at 14-15. M&O's theory ignores the Supreme Court's and Ninth Circuit's precedent, recognizing "inducement" as a form of contributory infringement. *MGM v. Grokster ("Grokster"),* 545 U.S. 913, 935-37 (2005); *Perfect 10, Inc. v. Amazon.com, Inc. ("Amazon"),* 508 F.3d 1146, 1170 (9th Cir. 2007); *Perfect 10, Inc. v. Visa Intern. Service Ass'n ("Visa"),* 494 F.3d 788, 295 (9th Cir

---

[25] Estate MTD at 23 ("Here, Plaintiffs cannot state a claim for any direct copyright infringement. For the reasons stated…all the Wrongful Termination Notices – including the DPS Termination Notice – were invalid. Accordingly, Plaintiffs do not possess any rights related to the play version of *Of Mice and Men.* Any claim alleging infringement of a copyright interest Plaintiffs do not possess must be dismissed."); DPS MTD at 5 ("As set forth below, the 2006 Termination Notice is invalid as Plaintiffs lack the authority to issue termination notices under the 1983 Settlement Agreement."); M&O MTD at 14 ("Plaintiffs' third cause of action for contributory infringement fails because Plaintiffs hold no copyright interest in the rights allegedly infringed, as the Purported Termination Notices allegedly giving rise to such an interest were invalid.")

2007).   "One infringes contributorily by *intentionally inducing or encouraging direct infringement.*" *Grokster,* 545 U.S. at 930 (emphasis added); *Amazon,* 508 F.3d at 1170 (same).  In the Ninth Circuit, contributory liability has two elements: (1) knowledge of a third party's infringing activity, and (2) induces, causes, or materially contributes to the infringing conduct.   *Amazon,* 508 F.3d at 1171; *Visa,* 494 F.3d at 295 (same). *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir.2004) (same). "[D]irect evidence of unlawful purpose occurs when one induces commission of infringement by another, or entices or persuades another to infringe." *Grokster,* 545 U.S. at 935. (citation and internal quotations omitted). "Liability . . . may be predicated on actively encouraging (or inducing) infringement through specific acts." *Amazon,* 508 F.3d at 1170. One example is "communication of an inducing message." *Columbia Pictures,* 710 F.3d at 1036 (citing *Visa,* 494 F.3d at 801 & *Grokster,* 545 U.S. 937).

Plaintiffs have sufficiently pled contributory infringement against both M&O and the Estate.

*First*, Plaintiffs have pled sufficient facts to demonstrate the Estate and M&O had knowledge of infringement. *See Amazon,* 508 F.3d at 725. The Estate and M&O were copied on Plaintiffs' 2006 correspondence to DPS, terminating the grant of the non-professional stage rights in *Of Mice and Men* ("DPS Termination Notice"). FAC ¶ 41(C); Ex. H. The DPS Termination Notice stated the grant terminated on February 27, 2012. FAC ¶62. Despite the DPS Termination Notice, DPS continued to exploit the non-professional stage rights in *Of Mice and Men.* FAC ¶ 64, Ex. H. The Estate and M&O knew DPS continued to exploit rights and knowingly encouraged DPS to continue to exploit the work subject to the DPS Termination Notice and to pay M&O royalties. FAC ¶51.

*Second*, Plaintiffs also sufficiently pled that M&O and the Estate (through its agent M&O) "induced" or "caused" DPS to continue exploiting the non-professional stage rights in *Of Mice and Men.  See Amazon,* 508 F.3d at 1171. M&O and the

1  Estate encouraged DPS to continue exploiting the work, despite the DPS

2  Termination Notice. FAC ¶ 51.  Purporting to grant a third-party permission to

3  exploit a work – without authorization from the copyright owner – is contributory

4  infringement. *See Ryan v. Editions Limited West, Inc.*, 417 Fed.Appx. 669, 700 (9th

5  Cir. 2011) (finding cognizable contributory infringement when defendant gave a

6  third-party permission to reproduce and distribute the copyrighted work without the

7  authorization of the copyright owner).  M&O and the Estate further gave DPS

8  encouragement to disregard the DPS Termination Notice, by persuading DPS to

9  continue to pay M&O royalties. FAC at ¶51.

10        E.    Plaintiffs Have Adequately Pled Breach of the Implied Covenant of

11              Good Faith and Fair Dealing

12              1.    M&O is bound by the 1983 Settlement Agreement

13        M&O incorrectly argues it cannot be liable under the 1983 Settlement

14  Agreement, because it was not a signatory to it. M&O MTD at ¶ 17. Under

15  California and New York law[26], a non-signatory may be bound to the terms of an

16  agreement under certain circumstances, which are applicable here.

17        Under New York law, a "non-party" incurs contractual liability when the

18  "non-party manifests an *intent to be bound* by the contract." *Malmsteen v. Universal*

19  *Music Group* 940 F.Supp.2d 123, 136 (S.D.N.Y. 2013) (quoting *Horsehead Indus.,*

20  *Inc. v. Metallgesellschaft AG*, 239 A.D.2d 171, 657 N.Y.S.2d 632, 633 (1st Dep't

21  1997)) (emphasis added); *MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F. Supp.

22  2d 380, 396 (S.D.N.Y. 2009); *Travelers Cas. & Sur. Co. v. Dormitory Authority–*

23  *State of N.Y.*, 735 F.Supp.2d 42, 80 (S.D.N.Y.2010). A parent-subsidiary relationship

24  is not required; a non-party may incur contractual liability, "without being 'alter

25  egos,' if their actions show that they . . . *assumed obligations under the contract.*"

26

27  [26] Previous decisions interpreting the 1983 Settlement Agreement and accompanying
    Power of Attorney were decided under New York law. *See Steinbeck v. Steinbeck*
28  *Heritage Found.,* 400 Fed.Appx. 572 (2d Cir. 2010); *McIntosh & Otis,* 2009 WL
    928171.

*MBIA Ins. Corp.*, 706 F. Supp. 2d at 397 (emphasis added); *ESI, Inc. v. Coastel Corp.,* 61 F.Supp.2d 35, 73 (S.D.N.Y. 2009) (same)*; see also Schwartzco Enterprises LLC v. TMH Management, LLC*, 60 F.supp.3d 331 (E.D.N.Y. 2014) ("a non-signatory can be named as a defendant if he or she . . . assumed the obligations of the contract).  Moreover, under New York law, an entity can be found to have assumed the obligations of the contract when it "participated in the negotiations and drafting of the contract." *MBIA Ins. Corp.*, 706 F. Supp. 2d at 398 (quoting *ESI,* 61 F.Supp.2d at 73-74) (internal quotations omitted).

M&O clearly satisfies the New York standard. In *Steinbeck v. McIntosh & Otis,* the Court discussed M&O's involvement in formulating the 1983 Settlement Agreement and accompanying Power of Attorney:

> M&O was *intimately involved* in the process: M & O stood to benefit
> from both an appointment contained in the 1983 Settlement
> Agreement and from Thomas Steinbeck's stated forbearance of his
> right to assert previously unasserted claims against M & O for breach
> of fiduciary duty. Although, M & O was not a signatory to the 1983
> Settlement Agreement, M & O received a general release from both
> sons as a result of the agreement.

2009 WL 928171, at *2 (S.D.N.Y. Mar. 31, 2009) (emphasis added).  Therefore, M&O demonstrated an "intent to be bound," not only by assuming its obligation to administer the Steinbeck works, but also by its "intimate" involvement in the negotiation process and that it stood to benefit from the contract.

Under California law, M&O is liable under the 1983 Settlement Agreement, because "voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." C.C.P. § 1589. Under this provision, a non-party to an agreement "may accept the benefits of a contract made for his benefit, [but] such acceptance implies an acceptance of the obligations necessarily connected with

the contract." *Haas v. Palace Hotel Co. of San Francisco,* 101 Cal.App.2d 108, 117 (1950). M&O clearly satisfies this standard. Despite being a non-party, M&O stood to benefit from the resulting remuneration from 1983 Settlement Agreement's appointment of M&O to administer the Steinbeck's work and from a release of liability. *McIntosh & Otis,* 2009 WL 928171 at *2.

Additionally, under California law, M&O incurs contractual liability under the 1983 Settlement Agreement, because "nonsignatories may be bound by the terms of an agreement if they are agents of a signatory." *Sanchez v. City of Fresno,* 914 F.Supp.2d 1079, 1120-21 (E.D. Cal 2012) (holding plaintiff's settlement agreement with the City was binding to City's agents, who were non-signatories).   M&O incurs contractual liability under this standard because the 1983 Settlement Agreement appoints M&O as an agent to exploit the Steinbeck works. *See* Ex. B ¶¶5, 7; *see also McIntosh & Otis,* 2009 WL 928171, at *2 (recognizing M&O as Elaine's agent). M&O continues to purport to exercise those rights, by, *inter alia,* licensing and collecting monies from the movie rights to *The Grapes of Wrath* and collecting royalties for the non-professional stage rights to *Of Mice and Men. See* FAC ¶ 40, 51-53, 76-78. Therefore, M&O incurs contractual liability under the 1983 Settlement Agreement because of M&O's agency.

<b>2.    Plaintiffs Have Stated a Cognizable Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing</b>

The Estate and M&O argue that the 1983 Settlement Agreement only requires them to pay Plaintiffs royalties received from the "Late Works," *i.e.,* those "works of John Steinbeck which entered their copyright renewal terms after his death," Estate MTD at 23; M&O MTD at 16, and does not require them to pay Plaintiffs their share of royalties received from the exploitation of *The Grapes of Wrath* and *Of Mice and Men.* Estate MTD at 23-24; M&O MTD at 16, both of which are "Early Works" –

*i.e.,* works whose copyrights John Steinbeck renewed before his death.[27] The Estate

and M&O then conclude that "there can be no violation of the covenant of good

faith" when there is "no contractual obligation." Estate MTD at 24; M&O at 17.

Even if *arguendo*, the 1983 Settlement Agreement's appointment of the Estate

and M&O to exploit Plaintiffs' Recaptured Rights survives termination, the Estate

and M&O are incorrect. It would indeed be illogical for M&O to be able to collect

royalties on behalf of works in which Plaintiffs have an interest and then have no

contractual obligation to pay Plaintiffs their share of such royalties.

Under New York and California law, the implied covenant of good faith and

fair dealing prevents them from using their appointment in a manner that wrongfully

withholds royalties. New York law states:

> Even if a party is not in breach of its express contractual obligations, it
>
> may be in breach of the implied duty of good faith and fair dealing
>
> when it exercises a contractual right as part of a scheme to realize
>
> gains that the contract implicitly denies or to deprive the other party of
>
> the fruit (or benefit) of its bargain.

*Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.,* 97 A.D.3d 781, 784, 949 N.Y.S.2d 115

(2012); *Legend Autorama, Ltd. v. Audi of Am., Inc.,* 100 A.D.3d 714, 716, 954

N.Y.S.2d 141 (2012).

---

[27] Upon further reflection and based upon information and belief, Plaintiffs respectfully request leave to amend the FAC's Fourth Claim for Relief (Breach of (Express) Contract Against Waverly and M&O) to allege that Waverly and M&O have breached the express language of the 1983 Settlement Agreement by failing to adequately compensate Plaintiffs for the "domestic exploitation during their copyright renewal terms of those works of John Steinbeck which entered their copyright renewal terms *after* his death." Ex. B ¶1 (emphasis added), Estate MTD at 23 (admitting that the 1983 Settlement Agreement expressly "created a contractual obligation" vis-à-vis these so-called "Late Works"). Plaintiffs also respectfully request leave to amend to add quasi-contractual/equitable claims, such as, for example, "accounting," "unjust enrichment," and "constructive trust," to compensate Plaintiffs for, upon information and belief, the underpayment of royalties as to both the Early and Late Works.

1    California law is nearly identical: "Even if the fact finder concludes that the

2    consensual terms of the contract did not impose such obligations on Defendants, the

3    fact finder could conclude that the actions of Defendants frustrated a benefit of the

4    contract." *Celador Intern. Ltd. v. Walt Disney Co.,* 347 F.Supp.2d 846, 853 (C.D.

5    Cal. 2004).

6    Plaintiffs have alleged sufficient facts that the Estate's and M&O's

7    administration of Plaintiffs' Recaptured Rights "frustrates" and "deprives" Plaintiffs

8    from the benefits of the 1983 Settlement Agreement. For *The Grapes of Wrath*,

9    Plaintiffs have alleged that the Estate granted a gratis license for a documentary film

10   which did not benefit Plaintiffs at all. FAC ¶53.[28] Even if the 1983 Settlement

11   Agreement contains no express duty to compensate Plaintiffs for their share of

12   royalties derived from rights in the Early Works, the implied covenant of good faith

13   and fair dealing prevents the Estate and M&O from exercising their putative

14   administrative authority to exploit Plaintiffs' rights in this manner.

15   Likewise, for the non-professional stage rights to *Of Mice and Men*, M&O and

16   the Estate were aware of Plaintiffs' termination notice to DPS, which upon the

17   effective date of termination reverted these Recaptured Rights solely to Plaintiffs.

18   FAC ¶ 41(C); Ex. H. Notwithstanding, the Estate and M&O convinced DPS to

19   continue exploiting these Recaptured Rights and pay them the royalties. FAC ¶¶51 &

20   78. Plaintiffs have not received any money DPS paid the Estate or M&O. FAC ¶¶ 52,

21   73 & 78.  If *arguendo*, the 1983 Settlement Agreement allows these Defendants to

22   re-grant DPS these Recaptured Rights without a duty to compensate Plaintiffs, the

23   Estate and M&O would potentially retain all the royalties to a work they do not own.

24   *See* §§304(c)(2)(B) & 304(6).

25

26

27

28   [28] Although Plaintiffs' FAC ¶53 also alleged that Waverly had not paid monies
concerning the DreamWorks license, subsequent to the filing of this lawsuit, M&O
paid Plaintiffs their share of the DreamWorks monies.

1    The implied covenant of good faith and fair dealing prevents them from using

2 their appointment to wrongfully withhold royalties, particularly to Recaptured Rights

3 they do not own.

4 V.    CONCLUSION

5    For the foregoing reasons, all three of Defendants' Motions to Dismiss should

6 be denied.  In the event the Court grants the Motions, in whole or in part, Plaintiffs

7 respectfully request leave to amend.  *See Simonyan*, 2013 WL 45453, at *2 (leave to

8 amend should be "freely granted").[29]

9  Dated:   June 29, 2015                       FREUNDLICH LAW

10

11                                              Kenneth D. Freundlich
                                                Michael J. Kaiser
12                                              Attorneys for Plaintiffs
                                                THOMAS STEINBECK and BLAKE
13                                              SMYLE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
_____

[29] *See also* fns. 17 & 27, *supra*.