JENNER & BLOCK LLP
ANDREW J. THOMAS (SBN 159533)
ajthomas@jenner.com
LISA J. KOHN (SBN 260236)
lkohn@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA  90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

SUSAN J. KOHLMANN (Pro Hac Vice)
skohlmann@jenner.com
ALISON I. STEIN (Pro Hac Vice)
astein@jenner.com
JACOB TRACER (Pro Hac Vice)
jtracer@jenner.com
AVA U. MCALPIN (Pro Hac Vice)
amcalpin@jenner.com
919 Third Avenue, 38th Floor
New York, NY  10022
Telephone: (212) 891-1600
Facsimile: (212) 891-1699

*Attorneys for Defendants Waverly Scott Kaffaga, Jean Anderson Boone, David Scott Farber, Anderson Farber King, Jebel Kaffaga, and Bahar Kaffaga*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS STEINBECK, an individual; and BLAKE SMYLE, an individual,<br><br>                              Plaintiffs,<br><br>          v.<br><br>WAVERLY SCOTT KAFFAGA, an individual; JEAN ANDERSON BOONE, an individual; DAVID SCOTT FARBER, an individual; ANDERSON FARBER KING, an individual; JEBEL KAFFAGA, an individual; BAHAR KAFFAGA, an individual; DRAMATISTS PLAY SERVICE, a New York Corporation; MCINTOSH & OTIS, INC., a New York Corporation; and Does 1-10, inclusive,<br><br>                              Defendants. | Case No. 2:14-cv-08681-TJH (GJSx)<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THE ESTATE DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>**[Fed. R. Civ. P. 12(b)(6)]**<br><br>Hearing Date:     July 27, 2015<br>Hearing Time:    UNDER SUBMISSION<br>Courtroom:          17 – Spring Street |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................... 1

II.  ARGUMENT ......................................................................................... 3

    A.   The 1983 Settlement Agreement Bars Plaintiffs' Claims .................... 3

    B.   The 1983 Settlement Agreement Is Not an "Agreement to the Contrary." ...................................................................................... 5

        1.   Plaintiffs Cite No Authority for the Proposition That an Agreement Among All Heirs as to How To Manage Their Termination Rights Is an "Agreement to the Contrary." ........................................................................ 6

        2.   Plaintiffs Attempt To Have This Court Disregard All Legislative History by Improperly Characterizing the 1983 Settlement Agreement as an Agreement To Make a "Future Grant." ...................................................... 9

            a.   The 1983 Settlement Agreement Is Not an Agreement To Make a "Future Grant." ......................... 9

            b.   The 1983 Settlement Agreement Is Consistent With the Statutory Purpose and Legislative History of the Copyright Act ......................... 12

        3.   Plaintiffs Ignore That the 1983 Settlement Agreement Is an Agreement Among Heirs, Not an Agreement Between an Heir and a Third Party. .......................... 13

    C.   The Estate Defendants Are Not Precluded from Disputing the Validity of Plaintiffs' *Red Pony* and *Long Valley* Termination Notices. ................................................ 14

        1.   The History of the 2004 Litigation Confirms That the Stipulated Judgment Must Include the *Red Pony* and *Long Valley* Termination Notices. ............................. 15

        2.   Under New York Law, the Stipulated Judgment Unambiguously Encompasses the *Red Pony* and *Long Valley* Termination Notices. .................................... 18

    D.   Plaintiffs' Individual Claims Also Fail. ........................................ 20

        1.   Plaintiffs' Contributory Copyright Infringement Claim Must Be Dismissed Because Plaintiffs Do Not Possess an Exclusive Right Under a Copyright. ................ 20

        2.   Plaintiffs Abandon Their Breach of Contract Claim. ............... 21

        3.   Plaintiffs Cannot and Do Not Allege Any Breach of

i

Estate Defendants' Reply Memorandum in Further Support of Motion To Dismiss the First Amended Complaint
CASE NO.  2:14-cv-08681-TJH (GJSx)

the Implied Covenant of Good Faith and Fair Dealing
Related to the Exploitation of Early Steinbeck Works ............. 22

    E.    Further Amendment Would Be Futile. ................................................. 25

III.    CONCLUSION ............................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Estate Defendants' Reply Memorandum in Further Support of Motion To Dismiss the First Amended Complaint
CASE NO.  2:14-cv-08681-TJH (GJSx)

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*833 N. Corp. v. Tashlik & Assoc.*,
256 A.D.2d. 535 (N.Y. App. Div. 1998) ........................................................ 19, 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 2

*Bank of N.Y. Trust, N.A. v. Franklin Advisors, Inc.*,
522 F. Supp. 2d 632 (S.D.N.Y. 2007) ................................................................. 20

*Banos v. Rhea*,
25 N.Y.3d 266 (2015) ...................................................................................... 19, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................ 2

*Celador Int'l Ltd. v. Walt Disney Co.*,
347 F. Supp. 2d 846 (C.D. Cal. 2004) ................................................................. 23

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008) ............................................................................... 11

*Cook v. Brewer*,
637 F.3d 1002 (9th Cir. 2011) ............................................................................... 2

*Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*,
97 A.D.3d 781 (N.Y. App. Div. 2012) ................................................................. 23

*F.T.C. v. EDebitPay, LLC*,
695 F.3d 938 (9th Cir. 2012) ............................................................................... 18

*Gilligan v. Jamco Dev. Corp.*,
108 F.3d 246 (9th Cir. 1997) ................................................................................. 2

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ............................................................................... 2

*In re Yahoo! Litig.*,
251 F.R.D. 459 (C.D. Cal. 2008) ........................................................................ 18

*Jackson v. Carey*,
  353 F.3d 750 (9th Cir. 2003) ...................................................................... 25

*Jeffrey v. Foster Wheeler LLC*,
  No. 14-cv-5585, 2015 WL 1004687 (N.D. Cal. Mar. 2, 2015) .......................... 2

*Kass v. Kass*,
  91 N.Y.2d 554 (1998) ................................................................................ 19

*Kinzli v. City of Santa Cruz*,
  539 F. Supp. 887 (N.D. Cal. 1982) .............................................................. 18

*Larson v. Warner Bros. Entm't*,
  No. 04-cv-8400, 2013 WL 1688199 (C.D. Cal. Apr. 18, 2013) ...................... 12

*Legend Autorama, Ltd. v. Audi of Am., Inc.*,
  100 A.D.3d 714 (N.Y. App. Div. 2012) ........................................................ 23

*Levitt v. Yelp! Inc.*,
  765 F.3d 1123 (9th Cir. 2014) ...................................................................... 2

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) .................................................................... 25

*Marvel Characters, Inc. v. Simon*,
  310 F.3d 280 (2d Cir. 2002) ..................................................................... 5, 6

*Mills Music Inc. v. Snyder*,
  469 U.S. 153 (1985) ......................................................................... 10, 11, 12

*Milne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) ......................................................... 5, 6, 8, 12

*Mohamad v. Palestinian Auth.*,
  132 S. Ct. 1702 (2010) ............................................................................... 11

*Mueller v. Auker*,
  700 F.3d 1180 (9th Cir. 2012) .................................................................... 25

*Penguin Grp. (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2d Cir. 2008), *cert. denied* 556 U.S. 1253 (2009) ............... passim

*PHL Variable Ins. Co. v. Marquez Bros. Int'l, Inc.*,
  No. 12-cv-3750, 2014 WL 215071 (N.D. Cal. Jan. 17, 2014) ........................ 25

iv

*Ray Charles Found. v. Robinson*,
  919 F. Supp. 2d 1054 (C.D. Cal. 2013)..........................................................8, 9

*Riggio v. Serv. Corp. Int'l*,
  476 F. App'x 135 (9th Cir. 2012)......................................................................17

*Sarbaz v. Wachovia Bank*,
  No. 10-cv-3462, 2011 WL 830236 (N.D. Cal. Mar. 3, 2011)...........................23

*Silva v. U.S. Bancorp*,
  No. 10-cv-1854, 2011 WL 7096576 (C.D. Cal. Oct. 6, 2011)..........................22

*Silvers v. Sony Pictures Entm't, Inc.*,
  402 F.3d 881 (9th Cir. 2005).............................................................................20

*Sparks v. S. Kitsap Sch. Dist.*,
  No. 13-cv-5682, 2014 WL 1047217 (W.D. Wash. Mar. 18, 2014) ....................2

*Steinbeck v. McIntosh & Otis, Inc.*,
  433 F. Supp. 2d 395 (S.D.N.Y. 2006)............................................................4, 16

*Steinbeck v. Steinbeck Heritage Found.*,
  400 F. App'x 572 (2d Cir. 2010).........................................................................4

*Stewart v. Abend*,
  495 U.S. 207 (1990) ............................................................................................4

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008)...........................................................................24

*Tait v. Asset Acceptance, LLC*,
  No. 12-cv-9532, 2013 WL 3811767 (C.D. Cal. July 22, 2013)........................22

*United States v. City of Redwood City*,
  640 F.2d 963 (9th Cir. 1981)...............................................................................2

**STATUTES**

17 U.S.C. § 304...................................................................................................10

28 U.S.C. § 1291.................................................................................................17

**RULES**

Fed. R. Civ. P. 54(b) ..........................................................................................16

**LEGISLATIVE HISTORY**

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976) ........................................ 11, 12

**OTHER AUTHORITIES**

Ann Bartow, *A Restatement of Copyright Law as More Independent and Stable Treatise*, 79 Brook. L. Rev. 457 (Winter 2014) ........................................ 8

Peter S. Menell & David Nimmer, *Pooh-Poohing Copyright Law's Inalienable Termination Rights*, 57 J. Copyright Soc'y U.S.A. 799 (Summer 2010) ...................................................................................................... 7

Aaron J. Moss & Kenneth Basin, *Copyright Termination and Loan-Out Corporations: Reconciling Practice and Policy*, 3 Harv. J. Sports & Ent. 55 (Winter 2012) ............................................................................................... 7

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2015) ................ 8

Sean Stolper, *Termination Rights: An In-Depth Look at Looming Issues Under the Copyright Act of 1976*, 13 Tex. Rev. Ent. & Sports L. 33 (Fall 2011) ...................................................................................................................... 7

Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, (3d ed. 2015) ....................................................................................................... 17

# I.   INTRODUCTION[1]

Plaintiffs' lawsuit to upend the 1983 Settlement Agreement, from which they have been reaping benefits for decades, cannot stand.  Plaintiffs' opposition confirms that very little in the Estate Defendants' motion to dismiss is actually disputed by Plaintiffs.  For example, Plaintiffs do not dispute that the clear and unambiguous terms of the 1983 Settlement Agreement gave Elaine, and now give the Estate, the *exclusive* authority both to issue termination notices on behalf of Thom, John IV, and Blake, and to exercise control over any such Recaptured Rights that are the result of a valid termination notice.[2]  *See* Mot. 11-16.  Nor do Plaintiffs dispute the fact that Thom and John IV entered into the 1983 Settlement Agreement knowingly and without coercion, *see id.* at 12; that in return for the power and authority that they granted to Elaine, the Agreement entitles them to increased royalty payments in the Late Steinbeck Works, *see id.* at 3-4; and that they have been collecting such increased royalty payments for decades as a result of the Agreement, *see id.* at 1, 4.  Critically, Plaintiffs do not dispute that Elaine and M&O validly exercised termination rights on Plaintiffs' behalf pursuant to the Agreement, that Plaintiffs have collected royalties based on those very termination notices, and indeed that some of their claims in the instant lawsuit are *based* on

---

[1] Capitalized terms have the meanings ascribed to them in the Memorandum of Points and Authorities in Support of the Estate Defendants' Motion to Dismiss the First Amended Complaint, Dkt. 60-1 (hereinafter "Mot.").  Plaintiffs' Opposition to Defendants' Motions to Dismiss, Dkt. 73, will be referred to herein as "Opp."

[2] Plaintiffs confusingly define the phrase "Recaptured Rights" to "include all rights that have reverted (or, in the case of Unexercised Termination Rights, will revert . . . ) to Plaintiffs from the exercise of statutory termination rights, both during Elaine's lifetime and after."  Opp. 2 n.5.  But the parties agree that the termination notices that Elaine and M&O issued during Elaine's lifetime—under the very Agreement that Plaintiffs now challenge—were and remain valid.  AC ¶¶ 37, 39.  The purported termination notices that Thom and Blake issued *after* Elaine died and seek to issue in the future are in direct contravention of the parties' decades-old Agreement.  *See* Mot. 14-16; *infra*, pp. 3-4.  For the sake of clarity, the Estate Defendants will thus continue to define "Recaptured Rights" to mean only those rights recaptured as a result of the pre-1978 grants and licenses that have indisputably been terminated by Elaine or M&O *before* Elaine died, and will use the term "Wrongful Termination Notices" to describe the termination notices Thom and Blake issued after Elaine died.  *See* Mot. 8.

1

those very termination notices.  AC ¶¶ 37, 39; Opp. 24 & n.28.  Nonetheless, Plaintiffs attempt to have their cake and eat it too by now contending that the 1983 Settlement Agreement giving Elaine and her successors control over the Steinbeck Works (including termination rights) cannot be enforced against them because it is an "agreement to the contrary."  Opp. 4-12.  However, Plaintiffs do not cite any authority that supports that contention.

As set forth below, all of Plaintiffs' claims should be dismissed.  Relying on outdated cases for the motion to dismiss standard of review,[3] Plaintiffs prefer to disregard the authority that makes clear that the "agreement to the contrary" language is *not* intended to foreclose the power of private parties to contract.  Similarly, Plaintiffs seek to rewrite the procedural history of the prior litigation between the parties, and they ignore the import of a stipulation and order signed by their prior counsel invalidating two termination notices that Judge Owen had initially upheld.  Finally, Plaintiffs' claims against the Estate Defendants for contributory copyright infringement, breach of contract, and breach of the implied covenant of good faith and fair dealing all must fail.  Plaintiffs' copyright infringement claim depends on their (incorrect) contention that the 1983 Settlement Agreement is unenforceable.  Plaintiffs make no effort to defend, and

---

[3] Plaintiffs incorrectly argue that "Rule 12(b)(6) motions are disfavored and *rarely granted*" and that dismissal under Rule 12(b)(6) "is proper only in 'extraordinary' cases."  Opp. 4 (emphasis in original).  The cases Plaintiffs cite in support of these assertions—*Gilligan v. Jamco Development Corp.*, 108 F.3d 246 (9th Cir. 1997) and *United States v. City of Redwood City*, 640 F.2d 963 (9th Cir. 1981)—were both decided well before the Supreme Court imposed a heightened pleading standard that requires Plaintiffs to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Twombly*, 550 U.S. at 556.  As numerous district courts within the Ninth Circuit have recognized, "*Gilligan* was decided years before *Iqbal* and *Twombly* and does not control over the pleading standards articulated in those cases."  *Jeffrey v. Foster Wheeler LLC*, No. 14-cv-5585, 2015 WL 1004687, at *1 n.2 (N.D. Cal. Mar. 2, 2015); *accord Sparks v. S. Kitsap Sch. Dist.*, No. 13-cv-5682, 2014 WL 1047217, at *3 (W.D. Wash. Mar. 18, 2014).  After *Twombly* and *Iqbal* were decided, the Ninth Circuit has routinely upheld dismissals of complaints under Rule 12(b)(6) where the claims, as those here, fail as a matter of law.  *See, e.g.*, *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108-10 (9th Cir. 2013); *Cook v. Brewer*, 637 F.3d 1002, 1004, 1006-08 (9th Cir. 2011).

1   thus have abandoned their breach of contract claim.[4]  And Plaintiffs cannot state a

2   claim for breach of the implied covenant of good faith and fair dealing to enforce

3   an alleged benefit that is nowhere to be found in the 1983 Settlement Agreement.

## II.     ARGUMENT

### A.     The 1983 Settlement Agreement Bars Plaintiffs' Claims.

6         The Estate Defendants' motion to dismiss argued that this case is

7   fundamentally about the 1983 Settlement Agreement and "a matter of simple

8   contract law."  Mot. 1.  Nothing in Plaintiffs' opposition suggests otherwise.

9         It is undisputed that the 1983 Settlement Agreement embodied a

10  straightforward bargain that imposed binding "contractual obligations" on the

11  parties.  AC ¶¶ 72-75; *see also* Mot. 12.  It gave Elaine (and her heirs and assigns)

12  "the complete power and authority to negotiate, authorize and take action with

13  respect to the exploitation and/or termination of rights in the works of John

14  Steinbeck in which John Steinbeck IV and Thom Steinbeck have or will have

15  renewal or termination rights."  AC Ex. B ¶ 5.  In exchange for giving up any

16  claim to control any right related to any Steinbeck Work, Thom's and John IV's

17  royalty shares in the Late Steinbeck Works increased from 25 percent each to one-

18  third each.  *See id.* ¶ 2; Mot. 3-4.

19        The Second Circuit has already held that the 1983 Settlement Agreement is

20  "unambiguous and forecloses any argument that the parties intended the Steinbeck

21  sons to retain control over Elaine Steinbeck's exercise of the authority conferred

---

[4] Plaintiffs acknowledge that raising a claim for breach of contract under the 1983 Settlement Agreement is "inconsistent" with their position that the Agreement is unenforceable as an "agreement to the contrary" under the Copyright Act.  Opp. 1 n.3.  Plaintiffs argue this inconsistency is excusable because Federal Rule of Civil Procedure 8(d) "expressly permits pleading inconsistent and/or alternative claims." *Id.*  However, nothing in Rule 8(d) allows Plaintiffs to do what they are attempting to do with this lawsuit, namely, recover damages from multiple inconsistent legal theories.  Plaintiffs cannot retain the royalties they have received for decades because of the Agreement while simultaneously (i) asking that the Court void the Agreement *and* (ii) alleging that the Estate Defendants have breached that same Agreement.  Plaintiffs cite no support for that outrageous proposition and no such rule permits it.

3

Estate Defendants' Reply Memorandum in Further Support of Motion To Dismiss the First Amended Complaint
CASE NO.  2:14-cv-08681-TJH (GJSx)

upon her." *See* The 2004 Litigation, 400 F. App'x 572, 575 (2d Cir. 2010).  As part of the exclusive authority conferred upon Elaine (and now conferred on the Estate), the terms of the 1983 Settlement Agreement bar Plaintiffs from (1) exercising control over the Recaptured Rights in *Tortilla Flat* and *The Grapes of Wrath*, *see* Mot. 12-14, (2) issuing termination notices after Elaine died, *see id.* at 14-15, and (3) claiming the right to issue any termination notices in the future, *see id.* at 15-16.[5]  Plaintiffs do not dispute that, if enforceable, the plain language of the 1983 Settlement Agreement does not allow them to claim the rights they allege they possess and prevents them from taking any actions with respect to the Steinbeck Works in question.[6]  Because the 1983 Settlement Agreement is enforceable as written, this action must be dismissed.

---

[5]  Plaintiffs dispute the scope of possible Unexercised Termination Rights, contending that Unexercised Termination Rights exist not only in the Steinbeck Works at issue in this lawsuit, but also in *Molly Morgan* (© 1957) and *The Short Reign of Pippin IV* (© 1957).  Opp. 12 n.17.  Plaintiffs are incorrect.  Those two Works are both Late Steinbeck Works for which no Unexercised Termination Rights could possibly exist.  As the Estate Defendants set forth in their motion to dismiss, *see* Mot. 15-16, any grant or license John Steinbeck may have made in any Late Steinbeck Work did not continue into the work's renewal term, which began after Steinbeck's death.  *See Stewart v. Abend*, 495 U.S. 207, 219-221 (1990); The 2004 Litigation, 433 F. Supp. 2d 395, 402-03 (S.D.N.Y. 2006).  Plaintiffs offer no rebuttal to this black-letter law.

[6]  Relying only on their own rhetoric, Plaintiffs suggest that the 1983 Settlement Agreement should not be read "effectively [to] place the ability to exercise John Steinbeck's termination rights into the hands of non-'Steinbeck' heirs, who, by statute, hold no termination interest."  Opp. 6 n.8.  Plaintiffs' argument is nonsensical.  When Thom and John IV entered into the 1983 Settlement Agreement and gave Elaine the complete power and authority to exercise their termination rights, they knew that, although Elaine was a statutory heir under Section 304, Elaine would eventually die and the Agreement would pass to her "heirs, successors and assigns" who would not be statutory heirs under Section 304.  AC Ex. B ¶ 14.  Thus, Thom and John IV accepted any uncertainty arising from the Estate's inevitable control over a small number of possible terminations (*i.e.*, only the ones at issue in this lawsuit), in exchange for increased royalties in all of the Late Steinbeck Works and royalties arising from Elaine's exercise of termination rights.  And Plaintiffs have certainly reaped the benefits of that bargain.  In addition to decades of increased royalties from the Late Steinbeck Works, Plaintiffs acknowledge that they have shared in revenues from the Recaptured Rights that flowed from the *Grapes of Wrath* Termination Notice, which Elaine issued on their behalf.  Opp. 24 n.28.  In short, Elaine's death in 2003—a full 20 years after Thom and John IV entered into the 1983 Settlement Agreement—does not change the fact that Plaintiffs have benefitted from their side of the bargain for decades.

**B.    The 1983 Settlement Agreement Is Not an "Agreement to the Contrary."**

Plaintiffs' entire lawsuit depends upon this Court finding that the 1983 Settlement Agreement is an "agreement to the contrary."  It is not.  As the Estate Defendants set forth in detail in their motion to dismiss, courts have made clear that the "agreement to the contrary" language contained in the Copyright Act is *not* intended to prevent statutory heirs from agreeing among themselves how to exercise their termination rights.   Mot. 16-20.   Plaintiffs urge the Court to disregard that authority, but do not cite any compelling authority of their own. Instead, Plaintiffs baldly assert that the 1983 Settlement Agreement must be an "agreement to the contrary" because it has the effect of extinguishing their termination rights.  Opp. 5-6.  In other words, it is an "agreement to the contrary" because Plaintiffs say it is.   For the reasons set forth below, this *ipse dixit* reasoning must be rejected.

As set forth in the Estate Defendants' motion to dismiss, the Copyright Act does not define "agreement to the contrary."  Mot. 17.  Notwithstanding Plaintiffs' repeated description of that phrase as "crystalline," Opp. 5, 8, courts have found that the phrase is ambiguous and that an analysis of legislative history is required to understand its meaning.  *See Milne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1045 (9th Cir. 2005); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002).   The legislative history is clear that the rationale behind the termination provision was to "'safeguard[] authors against unremunerative transfers' and improve the[ir] 'bargaining position . . .' by giving them a second chance to negotiate more advantageous grants in their works after the works had been sufficiently 'exploited' to determine their 'value.'"   *Milne*, 430 F.3d at 1046 (quoting H.R. Rep. No. 94-1476 at 124, 94th Cong., 2d Sess. (1976)) (alteration added).  In light of this legislative history, the small number of courts that have interpreted the "agreement to the contrary" language have all found that the

language is intended to prevent the recipients of grants of copyright rights—*i.e.*, "litigation-savvy publishers" or producers—from using their superior bargaining power to compel authors and their heirs to relinquish their termination rights.  *See, e.g.*, *Marvel*, 310 F.3d at 290-91 ("[T]he clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract.").  Courts have made clear that, outside of that narrow context, the language is not intended to prevent statutory heirs from agreeing among themselves how to manage their termination rights and indeed should *not* be read "so broadly that it would include any agreement that has the effect of eliminating a termination right." *Penguin Grp. (USA) Inc. v. Steinbeck* ("*Penguin Group*"), 537 F.3d 193, 202 (2d Cir. 2008); *see also Milne*, 430 F.3d at 1046-47.

Rather than engage with this legislative history or the Second Circuit's decision in *Penguin Group*, Plaintiffs simply urge the Court to ignore or disregard all of Plaintiffs' cited authority.  Specifically, Plaintiffs argue that: (1) this Court should ignore *Penguin Group* because that decision has been called into question by a single secondary source; (2) this Court should ignore all legislative history because the 1983 Settlement Agreement is an agreement to "make a future grant," and thus can be found to be an "agreement to the contrary" without turning to the legislative history; and (3) this Court should disregard all of the "revocation and regrant" case law because that case law is inapposite.  None of these arguments supports the conclusion that the 1983 Settlement Agreement is an "agreement to the contrary."

### 1. Plaintiffs Cite No Authority for the Proposition That an Agreement Among All Heirs as to How To Manage Their Termination Rights Is an "Agreement to the Contrary."

As set forth in the Estate Defendants' motion to dismiss, Mot. 19-20, the Second Circuit in *Penguin Group* recognized that a decision among heirs that effectively extinguishes the termination rights of statutory heirs is not an

"agreement to the contrary."  537 F.3d at 202.  That court held that the statutory language should not be read "so broadly that it would include any agreement that has the effect of eliminating a termination right," and further noted that "[i]f the holders of a majority of an author's termination interest were to agree that they would not exercise their termination rights, this would have the effect of eliminating a termination right."  *Id.*  The court went on to make clear that "such an agreement could not be held ineffective as an 'agreement to the contrary.'"[7]  *Id.*

In their opposition, Plaintiffs do not address *Penguin Group*, other than disingenuously claiming that the decision has been "roundly criticized" and citing to a single secondary source, David Nimmer and Peter Menell's article titled *Pooh-Poohing Copyright Law's 'Inalienable' Termination Rights*, 57 J. Copyright Soc'y U.S.A. 799 (Summer 2010).[8]  Opp. 2 n.6.  Mr. Nimmer is hardly an objective commentator.  He propounded the very same arguments on behalf of his client, the granddaughter of A. A. Milne, in the Ninth Circuit *Milne* case, and lost, and later as amici on behalf of Thom and Blake in *Penguin Group*, and, again, lost.  *See supra*, p. 7 n.8.

---

[7] As the Estate Defendants noted in their motion to dismiss, if an agreement among a subset of heirs not to terminate is not an "agreement to the contrary," regardless of whether some of the heirs change their minds or other heirs dissent, then it certainly is not the case that the 1983 Settlement Agreement, an agreement among *all* statutory heirs that preserves the exercise of termination rights on behalf of all the heirs, is an "agreement to the contrary."  Mot. 19-20.

[8] Nimmer and Menell's article—a revised version of an amicus brief to the U.S. Supreme Court in support of grant of certiorari (subsequently denied) that the authors submitted on behalf of Thom and Blake, the losing parties in *Penguin Group*—has not been cited by a single court as a source of authority.  Conversely, several other works of academic scholarship recognize that *Penguin Group* accurately states the law governing termination rights, undermining Plaintiffs' misleading suggestion that a broad, unanimous consensus of legal academics view the case critically.  *See* Aaron J. Moss & Kenneth Basin, *Copyright Termination and Loan-Out Corporations: Reconciling Practice and Policy*, 3 Harv. J. Sports & Ent. 55, 59 n. 17 (Winter 2012); Sean Stolper, *Termination Rights: An In-Depth Look at Looming Issues Under the Copyright Act of 1976*, 13 Tex. Rev. Ent. & Sports L. 33, 47 (Fall 2011).  Moreover, when presented with the opportunity to review *Penguin Group* and correct what Nimmer and Menell perceive as "overstep[ping] judicial authority within our constitutional structure," 57 J. Copyright Soc'y U.S.A. at 814, the Supreme Court denied certiorari, effectively preserving the Second Circuit's holding on this question.  *See* 556 U.S. 1253 (2009).

In fact, Plaintiffs do not cite *any* authority actually supporting their contention that an agreement among all heirs as to how to manage their termination rights can be an "agreement to the contrary."  Plaintiffs' only citations for their reading of the "agreement to the contrary" language are yet another Nimmer secondary source and *Ray Charles Foundation v. Robinson*, 919 F. Supp. 2d 1054 (C.D. Cal. 2013), both of which are consistent with the conclusion that an agreement among statutory heirs is *not* an "agreement to the contrary."[9]  Opp. 5-6.

---

[9] Plaintiffs cite Nimmer's criticism of the *Penguin Group* and *Milne* decisions, but fail to bring to the Court's attention that, notwithstanding Nimmer's personal feelings about those decisions, Nimmer concedes that courts have found that an agreement having the effect of eliminating a termination right is not *per se* an "agreement to the contrary."  *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 11.07[C][2] (noting that the Second Circuit in *Penguin Group* concluded that "neither the plain language nor legislative intent of the Copyright Act precluded authors and their statutory successors from losing the right to terminate a pre-1978 grant by renegotiating it"); *see also id.* § 11.07[C][1] (noting that the Ninth Circuit in *Milne* "rejected the assertion that the statutory provision at issue—'termination . . . may be effected notwithstanding any agreement to the contrary—was plain on its face").  Moreover, both the Second and Ninth Circuits considered Nimmer's analysis of termination rights, but ultimately rejected his musings.  *See Penguin Grp.*, 537 F.3d at 201-202; *Milne*, 430 F.3d at 1047-48.  Finally, the "lengthy attack" on the *Penguin Group* and *Milne* decisions contained in Nimmer's treatise has itself been the subject of criticism, with one commenter suggesting that Nimmer's "intense fervence" may have been an emotional response to the Second Circuit "explicitly pars[ing] and reject[ing]" his preexisting treatise analysis in *Penguin Group* or his "role as the losing attorney in the Ninth Circuit 'Pooh Properties' *Milne* case."  *See* Ann Bartow, *A Restatement of Copyright Law as More Independent and Stable Treatise*, 79 Brook. L. Rev. 457, 481-82 (Winter 2014).  Regardless of the sources of Nimmer's frustration, his approach "failed big when it was field tested" in *Penguin Group* and *Milne*.  *Id.* at 482.

*Ray Charles Foundation* is also inapposite.  Before his death, Ray Charles entered into an agreement with each of his twelve children in which they acknowledged a trust fund of $500,000 as their entire inheritance and waived any future claims against Charles's estate.  919 F. Supp. 2d at 1060.  Charles left his music rights to the Ray Charles Foundation.  *Id.*  Some of Charles' children issued termination notices terminating certain grants under which the Foundation received royalties.  The Foundation challenged the termination notices on various grounds including that they involved works for hire, renegotiated grants not subject to Section 304, or unpublished works or were the subject of new transfers.  *Id.* at 1060-61.  None of the grantees challenged the termination notices.  *Cf. id.* at 1072.  The court dismissed the complaint, holding that the Foundation had no standing to challenge the termination notices.  *Id.*  The court noted "Congress did not even require the statutory heirs to provide [the Foundation] with statutory notice of the termination, let alone give it a seat at the table during the termination process."  *Id.* at 1071.  The court also noted that a hypothetical agreement forcing statutory heirs to choose between, on the one hand, incurring a significant financial penalty (at

8

### 2. Plaintiffs Attempt To Have This Court Disregard All Legislative History by Improperly Characterizing the 1983 Settlement Agreement as an Agreement To Make a "Future Grant."

To steer clear of the legislative history behind the "agreement to the contrary" language, Plaintiffs argue that the 1983 Settlement Agreement is an agreement to "make a future grant." Opp. 6-8. It is not. This Court must consider the legislative history of the Copyright Act, which uniformly supports the conclusion that the 1983 Settlement Agreement is not an "agreement to the contrary."

#### a. The 1983 Settlement Agreement Is Not an Agreement To Make a "Future Grant."

Plaintiffs contend that the 1983 Settlement Agreement is an agreement to make a "future grant" because it "purported to grant Elaine control over Plaintiffs' future Recaptured Rights in the Steinbeck Works." Opp. 7.

However, the 1983 Settlement Agreement is not an agreement to grant any copyright interests, let alone an agreement to make a future grant. It is undisputed that the 1983 Settlement Agreement was entered into to settle a 1981 lawsuit among the statutory heirs and that it increased Thom and John IV's shares in certain copyright revenues in exchange for granting Elaine and her successors

least $500,000) for breaching an agreement or, on the other, abandoning their termination rights, would be an "agreement to the contrary." *Id.* at 1066. The court noted that such a choice would be simply "a more creative way of preventing the exercise of termination rights in the first place." *Id.* Here, by contrast, all of the statutory heirs came together in 1983 and agreed that Elaine and her successors could determine how to manage their termination rights in exchange for more money. Further, unlike in *Ray Charles Foundation*, Plaintiffs did not face *any* financial penalty in the event that their termination rights were exercised. To the contrary, Plaintiffs have *benefited* from Elaine's exercise of termination rights on their behalf under the 1983 Settlement Agreement. And, unlike the heirs in *Ray Charles Foundation*, Plaintiffs' termination rights have been exercised, as evidenced by this very lawsuit and the claims concerning the *Tortilla Flat* and *Grapes of Wrath* Termination Notices, which the parties agree were valid. Finally, although Plaintiffs rely heavily on *Ray Charles Foundation*, they fail to bring to this Court's attention that the decision is currently pending on appeal before the Ninth Circuit. *See Ray Charles Found. v. Robinson*, No. 13-55421 (9th Cir.) (argued February 12, 2015).

control over the Steinbeck Works (including termination rights).  The Agreement surely did not confer upon Elaine any "grant" as the Supreme Court has interpreted that term is used in Section 304.  In *Mills Music Inc. v. Snyder*, the Supreme Court held that the word "grant" as used in Section 304(c)(6)(A), and consistently throughout Section 304, "must refer" to a transfer or license *issued by an author or his heirs to a publisher*.  469 U.S. 153, 165 & n.33 (1985).  What the 1983 Settlement Agreement gave Elaine was not a transfer or license issued by an author or his heirs to a publisher, and thus, simply put, it was not a "grant" for the purposes of Section 304.

Moreover, nothing in the 1983 Settlement Agreement obligates Elaine or her heirs to undertake any action with respect to any recaptured right; as such, it is simply not an agreement to *make* any future grant.  That is, the Agreement does not contemplate any particular future grant being made, it is not conditioned on the making of any future grant, and it does not contain a promise to make any future grant.  If Elaine or her heirs did not lift a finger to license any of the Recaptured Rights, they would not be in breach of any term in the 1983 Settlement Agreement.

In addition, the repeated use of the word "grant" specifically in Section 304(c)(5) makes clear that Congress intended "future grant" to refer to a transfer or license of copyright rights that could itself be subject to termination.  Before referring to a "future grant," Section 304(c)(5) refers—in the same, single sentence—to "[t]ermination of the grant."  *See* 17 U.S.C. § 304(c)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.").  Accordingly, as used in Section 304(c)(5), a "grant" must confer a transfer or license issued by an author or his heirs to a publisher, that is capable of being terminated.  *See Mills Music*, 469 U.S. at 164-65 (concluding that the word "grant" is used consistently in Section 304 when it is used multiple times "in the same sentence").  Plaintiffs' reading disregards the bedrock principle of statutory

interpretation that a "'legislative body generally uses a particular word with a consistent meaning in a given context.'" *Id.* at 165 n.31 (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)).  That "presumption surely [is] at its most vigorous when a term is repeated within a given sentence." *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1708 (2010).[10]

Finally, the legislative history of the Copyright Act further supports the conclusion that an agreement to make a "future grant" is intended to apply to promises to make a subsequent grant to a third party publisher who is the grantee of the original grant. *See* H.R. Rep. No. 94-1476, at 127, 94th Cong., 2d Sess. (1976) (purpose of termination right is "to avoid the situation that has arisen under the present renewal provision, in which *third parties* have bought up contingent future interests as a form of speculation") (emphasis added).[11]

Here, Plaintiffs attempt to stretch the word "grant" to include an agreement among statutory heirs giving one heir the authority to decide if and when to exercise the heirs' termination rights and how to exploit any recaptured rights. Plainly, such an agreement could not possibly be subject to termination under Section 304.

For all of these reasons, the 1983 Settlement Agreement cannot be an agreement to make a "future grant" within the meaning of the statute.

---

[10] Plaintiffs cite *Mohamad* for the proposition that reviewing legislative history is "unnecessary" when a statute is unambiguous.  Opp. 8.  But *Mohamad* analyzed *eight* citations from the legislative record, which it ultimately found "telling." 132 S. Ct. at 1710.

[11] Indeed, Plaintiffs' citation to *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 986 (9th Cir. 2008), supports this point.  Opp. 7.  That case concerned Section 304(c)(6)(D)'s prohibition on "further grants" of existing copyrights.  *Mewborn* merely confirms that, in enacting a prohibition on "further grants," Congress likewise intended to "provide additional protection for authors and their heirs from unremunerative transfers" to publishers (*i.e.,* to prevent a situation in which a publisher convinces an author to grant the publisher both an original license and then an automatic renewal of that license prior to the time of termination).  532 F.3d at 985.

### b.   The 1983 Settlement Agreement Is Consistent With the Statutory Purpose and Legislative History of the Copyright Act.

Because no party contends the 1983 Settlement Agreement is an agreement to make a will, and because the Agreement is not an agreement to make a future grant, the Court must look to legislative history to determine the meaning of "agreement to the contrary." *See Milne*, 430 F.3d at 1042, 1045-46.  As set forth in the Estate Defendants' motion to dismiss, *see* Mot. 17, the legislative history has already been parsed by multiple courts.  The termination provision was designed to "'safeguard[] authors against unremunerative transfers' and to improve their 'bargaining position . . .' by giving them a second chance to negotiate more advantageous grants in their works after the works had been sufficiently 'exploited' to determine their 'value.'"  *Milne*, 430 F.3d at 1046 (quoting H.R. Rep. No. 94-1476 at 124) (alteration added); *accord* H.R. Rep. No. 94-1476, at 127 (termination right meant "to avoid the situation . . . in which third parties have bought up contingent future interests as a form of speculation").

Plaintiffs simply ignore the statutory purpose—to prevent publishers from deploying their superior bargaining power to compel authors and their heirs to relinquish their termination rights—in analyzing the 1983 Settlement Agreement. The Agreement does not thwart the statutory purpose because it is an agreement *among* statutory heirs and does not involve a third-party publisher at all.[12]  Thus, it is clear that the 1983 Settlement Agreement is not an agreement to the contrary.

---

[12] Plaintiffs interpret the legislative history entirely out of context.  *See* Opp. 9 (citing H.R. Rep. No. 94-1476, at 125).  In fact, the passage of legislative history cited by Plaintiffs immediately follows the section discussing the purpose of termination rights.  Tellingly, of the many courts that have interpreted the legislative history of termination rights, the Estate Defendants have found *no* case that cites the passage quoted by Plaintiffs.  By contrast, many federal courts— including the Supreme Court, the Ninth Circuit, and this district—have cited the legislative history describing the purpose of termination rights.  *See, e.g.*, *Mills Music*, 469 U.S. at 186; *Mewborn*, 532 F.3d at 984; *Larson v. Warner Bros. Entm't*, No. 04-cv-8400, 2013 WL 1688199, at *3-4 (C.D. Cal. Apr. 18, 2013).  In short, unlike the legislative history cited by Plaintiffs, the passages cited by the Estate Defendants are not mere "snippets of legislative history," Opp. 8, but rather widely adopted expressions of Congressional purpose.  Notably, elsewhere,

12

### 3. Plaintiffs Ignore That the 1983 Settlement Agreement Is an Agreement Among Heirs, Not an Agreement Between an Heir and a Third Party.

Finally, Plaintiffs note that the 1983 Settlement Agreement does not fall into "the narrow factual scenario" in which a new agreement revokes and supersedes a prior grant, thus effectively extinguishing an heir's ability to terminate that prior grant. Opp. 10-12. The parties are in complete agreement that the instant case does not present a "revocation/regrant" scenario.

The Estate Defendants cited the "revocation/regrant" cases in their motion to dismiss to make the important point that none of the agreements at issue in the case law was *among* all statutory heirs (such as the 1983 Settlement Agreement at issue here). Mot. 18. And, even with respect to those agreements between publishers and heirs that eliminate an heir's termination right—*i.e.*, the very agreements that fall squarely within the legislative purpose of the termination provision—the majority of courts reviewing those agreements have found that they are not actually "agreements to the contrary" because the heir "freely and knowingly" entered into the agreement, was aware of the fact that his termination rights were at stake, and was receiving some sort of benefit in exchange for abandoning the termination right.[13] *See id.* The Estate Defendants identified only three decisions in which a court found that an agreement eliminating an heir's termination right was an "agreement to the contrary," and those involved situations that clearly implicated the purpose of the provision, namely, to protect heirs against publishers

---

Plaintiffs cite *Milne*'s reliance on legislative history for the proposition that Section 304(c) does not alter "the existing state of the law of contracts." *Id.* at 10 (quoting 430 F.3d at 1045-46). The Estate Defendants agree that a private contract among heirs that does not extinguish a collective statutory termination right against publishers falls squarely within black letter contract law unaltered by the Copyright Act's termination provisions.

[13] Plaintiffs assert that whether a party "freely and knowingly" enters into the agreement that may extinguish a termination right is a necessary but not a sufficient factor. Opp. 11. However, they do not cite to a single case in which a court found that an agreement that was freely and knowingly entered into was an "agreement to the contrary."

---

with superior bargaining power or to protect heirs who were unaware of the fact that they were relinquishing their termination rights.  *Id.* at 18 n.19.

Despite this clear presentation of the relevant case law, Plaintiffs say nothing in response to the fact that (1) all case law that has addressed whether an agreement is an "agreement to the contrary" has concerned either agreements between publishers and heirs or agreements in which heirs gave up termination rights unknowingly;[14] (2) all but three of those cases held that the agreements at issue were not actually "agreements to the contrary"; and (3) those three cases are distinguishable.  *Id.* at 16-20.

In sum, other than asserting that the Court should disregard all relevant authority, Plaintiffs do not offer any support for their position that an agreement among all heirs as to how to manage their termination rights can constitute an "agreement to the contrary."  For the reasons set forth in the Estate Defendants' motion to dismiss, such an agreement is not an "agreement to the contrary."

## C. The Estate Defendants Are Not Precluded from Disputing the Validity of Plaintiffs' *Red Pony* and *Long Valley* Termination Notices.

As the Estate Defendants argued, *see* Mot. 20-22, Plaintiffs stipulated to the invalidity of the *Red Pony* and *Long Valley* Termination Notices in the December 2, 2009 Stipulation and Order in the 2004 Litigation (the "Stipulated Judgment").  *See* RJN Ex. 6 ¶¶ 3(b), 5(b).  The Stipulated Judgment was entered by the Southern District of New York, *see id.* at 7, but Plaintiffs argue that the Court should disregard it.  In making this argument, Plaintiffs mischaracterize the history of the

---

[14] Plaintiffs assert that the identity of the parties is irrelevant to this analysis.  Opp. 9.  However, courts have made clear that the parties to the agreement are indeed relevant to an analysis of whether that agreement is an "agreement to the contrary." *See Penguin Grp.*, 537 F.3d at 202 (noting that "[i]f the holders of a majority of an author's termination interest were to agree that they would not exercise their termination rights, this would have the effect of eliminating a termination right" but would not be an "agreement to the contrary").  Moreover, Plaintiffs do not cite a single case in which a court held that anything but an agreement between a third party publisher and an heir was an "agreement to the contrary."  *See supra*, p. 8 n.9.

Estate Defendants' Reply Memorandum in Further Support of Motion To Dismiss the First Amended Complaint
CASE NO.  2:14-cv-08681-TJH (GJSx)

2004 Litigation and misread the scope of the Stipulated Judgment under the law that clearly applies to it.[15]

### 1. The History of the 2004 Litigation Confirms That the Stipulated Judgment Must Include the *Red Pony* and *Long Valley* Termination Notices.

Plaintiffs argue that, because the Second Circuit directed entry of judgment in favor of Penguin but not the Estate Defendants after its decision in *Penguin Group*, the Stipulated Judgment "could only apply" to the Penguin Termination Notice "because the Second Circuit's reversal and remand only applied to Penguin and there had never been a judgment entered with respect to the other parties." Opp. 15; *see also* Pls.' RJN Ex. 1 (Second Circuit Judgment).[16]  Plaintiffs further argue that there was no need for the Stipulated Judgment to address the other termination notices at issue in the 2004 Litigation because "apparently . . . Judge Owen's summary judgment ruling had disposed of those claims." Opp. 15.

Plaintiffs have it exactly backward.  As Judge Owen's certification order made clear, the court "direct[ed] entry of judgment pursuant to Rule 54(b) with respect to the validity of the Penguin Termination Notice" *only*.[17]  RJN Ex. 4 at 2. Judge Owen did *not* direct entry of judgment with respect to the validity of any of

---

[15] Plaintiffs suggest that the Estate Defendants' interpretation of and reliance on the Stipulated Judgment is "especially suspicious since the Estate Defendants' and M&O's counsel here signed that Stipulated Judgment." Opp. 13.  Plaintiffs do not explain why it is "suspicious" for any Defendant to rely on a document that supports the dismissal of Plaintiffs' claims.  Nor do Plaintiffs explain why they ignored the Stipulated Judgment in their original Complaint in this action, when their prior counsel signed the Stipulated Judgment as well.  *See* RJN Ex. 6 at 6.

[16] Plaintiffs ignore that the Second Circuit granted judgment in favor only of Penguin because its decision in *Penguin Group* disposed of all the claims in Penguin's declaratory judgment action against Thom and Blake, but not all the claims and counterclaims at issue in the 2004 Litigation.  *See* RJN Ex. 2 (*Penguin Group* Complaint).  Accordingly judgment could be entered only with respect to Penguin.

[17] Federal Rule of Civil Procedure 54(b) allows judges to direct entry of judgment as to some parts of a case following a non-final order, sometimes in order to certify a particular issue for immediate appeal.

the other termination notices at issue in the Estate Defendants' counterclaim.[18]  In fact, Judge Owen made clear that *all* parties to the Estate Defendants' counterclaim—including Thom and Blake—"have not waived their rights to seek certification of the entirety of the Court's [summary judgment opinion]."[19]  *Id.* at 3. Thus, Judge Owen recognized that his opinion did not constitute entry of judgment with regard to the other four termination notices at issue in the 2004 Litigation. *See* Fed. R. Civ. P. 54(b); Mot. 21 n.21.[20]

In fact, judgment was *never* entered as to the entirety of the Estate Defendants' counterclaim regarding the validity of Plaintiffs' termination notices prior to the Stipulated Judgment.  Plaintiffs leave out this critical fact by arguing that Judge Owen's opinion "apparently . . . disposed" of the Estate Defendants' counterclaim as it related to the other four termination notices.  Opp. 15.  Plaintiffs point to nothing in support of this conclusion, and for good reason.  Under Rule 54(b), "any order . . . that adjudicates fewer than all . . . the rights and liabilities of fewer than all the parties does not end the action . . . and may be revised at any time before the entry of a judgment adjudicating all . . . the parties' rights and liabilities."  It would thus have been improper for Judge Owen to enter judgment when his summary judgment opinion did not dispose of all the rights and liabilities of all the parties.

---

[18]  Plaintiffs are also incorrect in claiming that Judge Owen's certification order "stayed the rest of the [2004 Litigation]."  Opp. 14.  Nothing in Judge Owen's certification order suggests a stay would be imposed, nor was one.  *See* RJN Ex. 4.

[19]  This statement was necessary because Judge Owen held that some termination notices at issue in the 2004 Litigation were valid but that others were invalid.  *See* The 2004 Litigation, 433 F. Supp. 2d 395, 402-04 (S.D.N.Y. 2006).  Thus, Judge Owen recognized that Thom, Blake, and the Estate Defendants *all* could have sought appellate review of portions of his opinion.

[20]  Plaintiffs do not dispute that at the time the parties entered into the Stipulated Judgment, the Estate Defendants could have cross-appealed and sought review of those portions of Judge Owen's decision that related to the *Red Pony* and *Long Valley* Termination Notices.  *See* Mot. 21 n.21.  Nor do Plaintiffs dispute that such a cross-appeal was made unnecessary because of the Stipulated Judgment.  *See id.*

The point that judgment was never entered with regard to the entirety of the Estate Defendants' counterclaim is not academic.   The stated purpose of the Stipulated Judgment was "to achieve finality and thereby[] confer jurisdiction on the Second Circuit."  RJN Ex. 6 at 2.  Such finality could not exist without the entry of judgment as to the validity of *all* the termination notices at issue, including the four termination notices for which there had been no prior entry of judgment. *See* 28 U.S.C. § 1291 (courts of appeal have jurisdiction of appeals "from all final decisions" of U.S. district courts).  Accordingly, any attempt to read the Stipulated Judgment to apply to anything less than the entirety of the Estate Defendants' counterclaim would have deprived the Second Circuit of jurisdiction over Thom and Blake's appeal.

Plaintiffs contend that it would be "illogical and incomprehensible" that they "would have converted their summary judgment win . . . into a defeat" by agreeing to the Stipulated Judgment.  Opp. 16.  Yet Plaintiffs' rationale for agreeing to the Stipulated Judgment is eminently comprehensible from the face of the document itself, which states that Thom and Blake "desire to move forward with the appeal without any confusion concerning the finality of this matter in the District Court any [*sic*] without any doubt concerning the Second Circuit's jurisdiction over this matter."  RJN Ex. 6 at 3.  Because Plaintiffs' newly invented reading of the Stipulated Judgment would create "doubt concerning the Second Circuit's jurisdiction," it should be rejected.[21]

---

[21] Ironically, although Plaintiffs endeavor to give Judge Owen's opinion preclusive effect, their argument strips it of any.  It is well established that without certification under Rule 54(b), non-final orders are "not yet entitled to *res judicata* effect."  *See Riggio v. Serv. Corp. Int'l*, 476 F. App'x 135, 136 (9th Cir. 2012) (citing *Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1525 (9th Cir. 1987)); *see also* Wright & Miller, Fed. Prac. & Proc. § 2661 (3d ed. 2015) ("[I]f no certificate issues, the court's decision or order remains interlocutory.").  Accordingly, if the Stipulated Judgment did *not* cover the *Red Pony* and *Long Valley* Termination Notices, Judge Owen's opinion would remain a non-final order that cannot support a claim based on *res judicata* or collateral estoppel.

### 2. Under New York Law, the Stipulated Judgment Unambiguously Encompasses the *Red Pony* and *Long Valley* Termination Notices.

Plaintiffs also contend that the Stipulated Judgment must be read to apply only to the Penguin Termination Notice because the Stipulated Judgment explicitly refers to the Second Circuit's reasoning in *Penguin Group*. Opp. 15-16. The Stipulated Judgment says: "Judgment shall be entered in favor of [the Estate Defendants] on Counterclaim Two (Validity of Termination Notices) for the reasons stated in the Second Circuit's decision in *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008)." RJN Ex. 6 ¶¶ 3(b), 5(b). According to Plaintiffs, because the Second Circuit did not rule on the validity of the *Red Pony* and *Long Valley* Termination Notices, "those paragraphs of the Stipulated Judgment do not and cannot reverse Judge Owen's summary judgment in favor of Plaintiffs with respect to these two titles." Opp. 15. Yet under the law that clearly applies, Plaintiffs' myopic focus on a few isolated words in the Stipulated Judgment cannot trump the purpose of finality that the Stipulated Judgment was meant to achieve.

As a preliminary matter, it is clear that New York contract law applies to the Stipulated Judgment. Under Ninth Circuit law, courts interpreting consent judgments apply the "'contract law of the situs state.'" *F.T.C. v. EDebitPay, LLC*, 695 F.3d 938, 943 (9th Cir. 2012) (quoting *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990)). Here, the Stipulated Judgment clearly indicates that it was executed in "New York, New York." RJN Ex. 6 at 6. Accordingly, New York contract law applies.[22]

---

[22] For this reason, the cases Plaintiffs cite interpreting *California* contract law are inapposite. *See* Opp. 13. In *Kinzli v. City of Santa Cruz*, the Court relied on principles of contract interpretation set out in the California Civil Code. *See* 539 F. Supp. 887, 890-91, 900 (N.D. Cal. 1982). Likewise, the court in *In re Yahoo! Litigation* clearly applied California law. *See* 251 F.R.D. 459, 465-66 (C.D. Cal. 2008).

Under New York law, "[s]tipulations embody a compromise between competing parties that, if not ambiguous, must be construed according to their plain language, without relying on what a party may have been able to prove in litigation." *Banos v. Rhea*, 25 N.Y.3d 266, 276 (2015). "Whether a contract is ambiguous is a question of law, and courts may not resort to extrinsic evidence to aid in interpretation unless the document is ambiguous." *Id.*

In addition, "[w]here the document makes clear the parties' overall intention, courts examining isolated provisions should then choose the construction which will carry out the plain purpose and object of the agreement." *Kass v. Kass*, 91 N.Y.2d 554, 567 (1998) (internal quotations and alterations omitted). Finally, courts should not interpret a contract to produce "an absurd result which would not accord with the reasonable expectations of the parties." *833 N. Corp. v. Tashlik & Assoc.*, 256 A.D.2d 535, 537 (N.Y. App. Div. 1998).

Here, all of these principles counsel in favor of reading the Stipulated Judgment to include the four termination notices at issue in the 2004 Litigation not considered by the Second Circuit in *Penguin Group*. The Stipulated Judgment is clear that it was designed to "achieve finality and thereby[] confer jurisdiction on the Second Circuit," RJN Ex. 6 at 2, a purpose that could not be achieved under Plaintiffs' interpretation, *see supra*, pp. 15-17. Moreover, the order signed by Judge Daniels that accompanied the Stipulated Judgment made clear that "this matter, including all claims, counterclaims and intervenor claims, has been fully and finally resolved and this case is hereby dismissed in its entirety." RJN Ex. 6 at 7. As discussed above, that statement would not be true if, as Plaintiffs suggest, the Stipulated Judgment did not encompass the entirety of the Estate Defendants' counterclaim that *all* of Plaintiffs' termination notices were invalid. *See supra*, pp. 15-17. Finally, given that the purpose of the Stipulated Judgment was to confer jurisdiction on the Second Circuit, to read the Stipulated Judgment as not doing so

19

Estate Defendants' Reply Memorandum in Further Support of Motion To Dismiss the First Amended Complaint
CASE NO.  2:14-cv-08681-TJH (GJSx)

would be to produce an absurd result that in no way accorded with the parties' reasonable expectations.  *Cf. 833 N. Corp.*, 256 A.D.2d at 537.

Because the Stipulated Judgment must be read to give effect to the parties' intentions and avoid absurd results, it plainly must have entered judgment in favor of the Estate Defendants with regard to the validity of *all* Plaintiffs' termination notices at issue in the 2004 Litigation.[23]   Accordingly, Judge Owen's opinion regarding the validity of the *Red Pony* and *Long Valley* Termination Notices has no preclusive effect on the Estate Defendants.

### D.    Plaintiffs' Individual Claims Also Fail.

Because the 1983 Settlement Agreement is enforceable, it is clear that Plaintiffs' individual claims against the Estate for (1) contributory copyright infringement, (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing must be dismissed for the reasons stated in the Estate Defendants' motion to dismiss.  *See* Mot. 22-25.  Nothing in Plaintiffs' opposition alters this conclusion.

### 1.    Plaintiffs' Contributory Copyright Infringement Claim Must Be Dismissed Because Plaintiffs Do Not Possess an Exclusive Right Under a Copyright.

Plaintiffs do not dispute the fundamental proposition that, "[t]o be entitled to sue for copyright infringement, the plaintiff must be the legal or beneficial owner of an exclusive right under a copyright." *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 884 (9th Cir. 2005) (quotation and citation omitted); *see* Mot. 23. Instead, Plaintiffs contend they posses such a right because "the 1983 Settlement

---

[23] In addition, because the Stipulated Judgment is unambiguous as a matter of law, New York law prohibits resort to extrinsic evidence to determine its meaning.  *See Banos*, 25 N.Y.3d at 276.  Plaintiffs' sole citation to a case decided under New York contract law, *see* Opp. 13, only underscores this conclusion.  In *Bank of New York Trust, N.A. v. Franklin Advisors, Inc.*, the court denied a motion to dismiss and requested extrinsic evidence because it held as a matter of law that the contract at issue was "ambiguous."  522 F. Supp. 2d 632, 637-38 (S.D.N.Y. 2007).  Here, because the Stipulated Judgment is unambiguous, there is no need to resort to extrinsic evidence.

Agreement did not invalidate Plaintiffs' 2006 termination notice" related to the non-professional stage rights to the play version of *Of Mice and Men*.  Opp. 18. Plaintiffs identify no other source of any exclusive right that would allow them to sue for copyright infringement.

Accordingly, Plaintiffs admit that they can state a claim for copyright infringement only if the DPS Termination Notice is valid.  Yet, for all the reasons stated in the Estate Defendants' motion to dismiss, *see* Mot. 14-15, 16-20 & 22-23, and *supra*, pp. 3-14, all the Wrongful Termination Notices—including the DPS Termination Notice—are invalid.  Plaintiffs' contributory copyright infringement claim therefore must be dismissed.

## 2.   Plaintiffs Abandon Their Breach of Contract Claim.

Plaintiffs' claim for breach of the 1983 Settlement Agreement must be dismissed for the reasons set forth in the Estate Defendants' motion to dismiss and for the simple reason that Plaintiffs fail to defend it.

In their motion to dismiss, the Estate Defendants argued that the clear language of the 1983 Settlement Agreement "created a contractual obligation to compensate Plaintiffs only for" the domestic exploitation of Late Steinbeck Works. Mot. 23.  Because *Of Mice and Men* and *The Grapes of Wrath* (to the extent *The Grapes of Wrath* was included in Plaintiffs' breach of contract claim, *see* AC ¶¶ 71-75) are both Early Steinbeck Works, those works "are not subject to the royalty distributions in the 1983 Settlement Agreement."  Mot. 23-24.

Plaintiffs acknowledge the Estate Defendants' argument as to the breach of contract claim, but make no attempt even to discuss it.  Specifically, Plaintiffs recognize that the Estate "argue[d] that the 1983 Settlement Agreement only requires [the Estate and M&O] to pay Plaintiffs royalties received from the [Late Steinbeck Works]."  Opp. 22.  Similarly, Plaintiffs concede that both *Of Mice and Men* and *The Grapes of Wrath* are Early Steinbeck Works.  *See id.*  But Plaintiffs offer no reason why the Court should not interpret the 1983 Settlement Agreement

as the Estate does.  Because Plaintiffs "do[] not contest" the Estate's argument, they concede their breach of contract claim should be dismissed.  *Tait v. Asset Acceptance, LLC*, No. 12-cv-9532, 2013 WL 3811767, at *3 (C.D. Cal. July 22, 2013) (granting motion to dismiss when plaintiff failed in his opposition to respond to argument made by defendants); *see also Silva v. U.S. Bancorp*, No. 10-cv-1854, 2011 WL 7096576, at *3 (C.D. Cal. Oct. 6, 2011) (same).[24]

### 3. Plaintiffs Cannot and Do Not Allege Any Breach of the Implied Covenant of Good Faith and Fair Dealing Related to the Exploitation of Early Steinbeck Works.

As their opposition relates to the Estate Defendants, Plaintiffs argue that their claim for breach of the implied covenant of good faith and fair dealing should not be dismissed because the Estate Defendants have exploited *The Grapes of Wrath*[25] and the non-professional stage rights to *Of Mice and Men* to deprive Plaintiffs "from the benefits of the 1983 Settlement Agreement."   Opp. 24. Plaintiffs' argument must fail for two independent reasons.

First, Plaintiffs incorrectly include the right to receive royalty payments related to the exploitation of Early Steinbeck Works among "the benefits of the 1983 Settlement Agreement."  Under both California and New York law—and as argued by the Estate Defendants in their motion to dismiss—the covenant of good faith and fair dealing "applies only to conduct 'covered by the contract' between the parties."  Mot. 24-25 (quoting *Tessera, Inc. v. UTAC (Taiwan) Corp.*, No. 10-

---

[24] Rather than defend their claim for breach of contract, Plaintiffs seek leave to amend the claim "to allege that Waverly and M&O have breached the express language of the 1983 Settlement Agreement by failing to adequately compensate Plaintiffs" for the domestic exploitation of the *Late* Steinbeck Works.  Opp. 23 n.27.  Because the Amended Complaint alleges no facts suggesting that Plaintiffs have failed to receive royalties owed them for any Late Steinbeck Work, any such amendment would be futile.  *See infra*, p. 25.

[25] As with their breach of contract claim, Plaintiffs fail to mention *The Grapes of Wrath* in their Amended Complaint's claim alleging breach of the implied covenant of good faith and fair dealing.  *See* AC ¶¶ 76-79.  To whatever extent Plaintiffs' claim can be read to include *The Grapes of Wrath*, it must be dismissed for the reasons set forth herein.

cv-4435, 2012 WL 1067672, at *3 (N.D. Cal. Mar. 28, 2012)).  Put another way, to state a claim for breach of the implied covenant of good faith and fair dealing, a defendant must "fail[] to act in good faith *given the terms of the deal he actually had.*"  *Sarbaz v. Wachovia Bank*, No. 10-cv-3462, 2011 WL 830236, at *3 (N.D. Cal. Mar. 3, 2011) (emphasis in original); *see also* Mot. 24 (citing *Sarbaz*).  Because the parties agree that the 1983 Settlement Agreement does not address the distribution of royalty payments related to the exploitation of Early Steinbeck Works (which include both *The Grapes of Wrath* and *Of Mice and Men*), Plaintiffs can identify no term of the deal they actually had that would entitle them to state a claim for breach of the implied covenant of good faith and fair dealing.

Plaintiffs are silent as to the case law cited by the Estate Defendants, but nonetheless contend that under both California and New York law, their claim need not be dismissed because a party can breach the implied covenant of good faith and fair dealing even when not breaching its express contractual obligations.  Opp. 23-24.  Yet, in all three cases Plaintiffs cite for this proposition, the parties asserting claims for breach of the implied covenant of good faith and fair dealing sought to achieve a benefit to which they were actually entitled under their contracts.  *See Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 97 A.D.3d 781, 782 (N.Y. App. Div. 2012) (plaintiff sued to enforce exclusivity provision in contract with defendant); *Legend Autorama, Ltd. v. Audi of Am., Inc.*, 100 A.D.3d 714, 715 (N.Y. App. Div. 2012) (plaintiffs sued to enforce contractual rights associated with operation of franchised car dealerships); *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 853 (C.D. Cal. 2004) (plaintiff sued to enforce contractual right to receive "Contingent Compensation").  As the *Elmhurst Dairy* court made clear, the purpose of the implied covenant of good faith and fair dealing is to ensure that parties do not "act[] in bad faith to circumvent" their contractual obligations.  97 A.D.3d at 784.  Plaintiffs cannot point to any obligation in the 1983 Settlement Agreement that the Estate Defendants have sought to circumvent.

Second, even if Plaintiffs could somehow state a claim for breach of the implied covenant of good faith and fair dealing based upon royalty payments related to the exploitation of Early Steinbeck Works, they have failed to do so here. Plaintiffs identify three examples of allegations they contend show that the Estate and M&O have deprived Plaintiffs of the benefits of the 1983 Settlement Agreement. All three fail:

- Plaintiffs argue that "the Estate granted a gratis license for a documentary film [related to *The Grapes of Wrath*] which did not benefit Plaintiffs at all." Opp. 24. However, Plaintiffs ignore the fact that, because *The Grapes of Wrath* is an Early Steinbeck Work, the Estate owns the rights to the work that are not covered by the Recaptured Rights and may grant whatever licenses it chooses without regard to Plaintiffs' interests. Mot. 2. Moreover, even if the Estate's documentary license overlapped at all with the Recaptured Rights in *The Grapes of Wrath* that are co-owned by the Estate and Plaintiffs, the Estate could still grant a nonexclusive license. *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1146 (9th Cir. 2008).

- In their Amended Complaint, Plaintiffs alleged the Estate had "received monies from DreamWorks pertaining to the motion picture being made of *The Grapes of Wrath*." AC ¶ 53. Plaintiffs now admit in their opposition that, "subsequent to the filing of this lawsuit, M&O paid Plaintiffs their share of the DreamWorks monies."[26] Opp. 24 n.28.

- Plaintiffs argue that the Estate and M&O have continued to exploit the non-professional stage rights to *Of Mice and Men*. Opp. 24. For all the reasons stated above, Plaintiffs have no interest in these rights as the DPS Termination Notice issued by Plaintiffs is invalid. *See supra*, pp. 3-14; *see also* Mot. 25.

Because Plaintiffs cannot state a claim for breach of the implied covenant of good faith and fair dealing related to royalties from the exploitation of Early Steinbeck Works as a matter of law, and because Plaintiffs have not alleged any

---

[26] Just as Plaintiffs are collectively entitled to 50 percent of the royalties from any exploitation of the Recaptured Rights related to *The Grapes of Wrath*, the Estate is also entitled to 50 percent of such royalties. It naturally follows that if Plaintiffs have independently exploited the Recaptured Rights by entering into a contract with DreamWorks or any other third party, the Estate is entitled to 50 percent of the royalties from Plaintiffs' exploitation.

failure to pay royalties for any Steinbeck Work, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing must be dismissed.

### E.     Further Amendment Would Be Futile.

In their opposition, Plaintiffs raise facts not in their Amended Complaint and seek to further amend their pleading. *See* Opp. 3-4, 12 n.17 & 23 n.27. None of the facts Plaintiffs raise or the new claims Plaintiffs seek to allege change the fact that the 1983 Settlement Agreement bars Plaintiffs' claims. Therefore, for all the reasons stated in the Estate Defendants' motion to dismiss and for those stated above, any further amendment to Plaintiffs' pleading would be futile. *See Mueller v. Auker*, 700 F.3d 1180, 1191-92 (9th Cir. 2012); *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000); *PHL Variable Ins. Co. v. Marquez Bros. Int'l, Inc.*, No. 12-cv-3750, 2014 WL 215071, at *4 (N.D. Cal. Jan. 17, 2014) (dismissing case and denying leave to amend where case presented a "pure question of law based on the interpretation of a contract").

### III.   CONCLUSION

For all the foregoing reasons, as well as those in the Estate Defendants' Memorandum of Points and Authorities in Support of the Motion to Dismiss, the Estate Defendants respectfully request that the Court dismiss with prejudice all of Plaintiffs' claims as they relate to the Estate Defendants.

Dated:  July 13, 2015                    JENNER & BLOCK LLP


By:  /s/ Susan J. Kohlmann
                                          Susan J. Kohlmann

*Attorneys for Defendants Waverly Scott Kaffaga, Jean Anderson Boone, David Scott Farber, Anderson Farber King, Jebel Kaffaga, and Bahar Kaffaga*