1   David W. Kesselman (SBN 203838)
    *dkesselman@kbslaw.com*
2   Trevor V. Stockinger (SBN 226359)
3   *tstockinger@kbslaw.com*
    KESSELMAN BRANTLY STOCKINGER LLP
4   1230 Rosecrans Avenue, Suite 690
5   Manhattan Beach, CA 90266
    Telephone: (310) 307-4555
6   Facsimile: (310) 307-4570

7
8   Joshua G. Graubart (admitted *pro hac vice*)
    *jggraubart@graubartlaw.com*
9   LAW OFFICES OF JOSHUA GRAUBART, P.C.
10  6 E. 39th Street, 6th Floor
    New York, NY  10016
11  Telephone:  (646) 781-9321
12  Fax:  (646) 224-8088

13  *Attorneys for Defendant*
    DRAMATISTS PLAY SERVICE, INC.
14

15
                **UNITED STATES DISTRICT COURT**
16
                **CENTRAL DISTRICT OF CALIFORNIA**
17

18  THOMAS STEINBECK, *et al*.,          CASE NO. 14-cv-08681-TJH-FFM

19              Plaintiffs,              **REPLY MEMORANDUM OF**
                                         **POINTS AND AUTHORITIES IN**
20      v.                               **SUPPORT OF DEFENDANT**
                                         **DRAMATISTS PLAY SERVICE,**
21  WAVERLY SCOTT KAFFAGA, *et            **INC.'S MOTION TO DISMISS**
    al*.,                                **PLAINTIFFS' FIRST AMENDED**
22                                       **COMPLAINT**
                Defendants.
23

24
                                         Date:        July 27, 2015
25                                       Time:        UNDER SUBMISSTION
26                                       Courtroom:   17, Spring Street
                                                      Hon. Terry J. Hatter, Jr.
27

28

1

## TABLE OF CONTENTS

2

**Page**

3

4

I.     PRELIMINARY STATEMENT ................................................................. 1

5

II.    ARGUMENT ........................................................................................... 3

6

       A.    The "Agreement to the Contrary" Language of
7            § 304(c)(5) is Ambiguous. .................................................................. 3

       B.    Congress intended that § 304 benefit authors and their
8            heirs as against publishers. ................................................................. 3

9      C.    The 1983 Settlement Agreement Does Not Extinguish
             the Heirs' Termination Right, Nor Is It an Agreement to
10           Make  a Future Grant .......................................................................... 5

11
       D.    The 1983 Agreement May Not be Disregarded as Contrary
12           to Section 304(c)(5). .......................................................................... 7

13     E.    *Ray Charles Foundation v. Robinson* does not control and
             cannot bear the weight placed on it by Plaintiffs. .......................... 10
14

       F.    Agreements among heirs to administer their rights
15           efficiently further, rather than thwart, Congressional intent. ......... 12

16     III.   CONCLUSION ..................................................................................... 15

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 14-cv-08681-TJH-FFM

DPS'S REPLY MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

5 *Batjac Prods. Inc. v. Goodtimes Home Video Corp.*,

6      160 F.3d 1223 (9th Cir. 1998) ........................................................................ 12

7 *Classic Media, Inc. v. Mewborn*,

8      532 F.3d 978 (9th Cir. 2007)................................................................... 4, 5, 8

9 *Fred Fisher Music Co. v. M. Witmark & Sons*,

10      318 U.S. 643, 63 S. Ct. 773, 87 L. Ed. 1055...................................................... 4

11 *Hart v. Massanari*,

12      266 F.3d 1155 (9th Cir. 2001)  ...................................................................... 11

13 *Kessler v. Assocs. Fin. Servs. Co.*,

14      573 F.2d 577 (9th Cir. 1977) ......................................................................... 11

15 *Larry Spier, Inc. v. Bourne Co.*,

16      953 F.2d 774, 778 (2d Cir. 1992). ........................................................... 14

17 *Larson v. Warner Bros. Entm't, Inc.*,

18      2013 U.S. Dist. Lexis 55950 (C.D. Cal. Apr. 18, 2013)................................ 8

19 *Marvel Characters v. Simon*,

20      310 F.3d 280 (9th Cir. 2002)........................................................................ 4

21 *Milne v. Stephen Slesinger, Inc.*,

22      430 F.3d 1036 (9th Cir. 2005)....................................................... 3, 4, 8, 12

23 *Nat'l Fed'n of Indep. Bus. v. Sebelius*,

24      567 U.S. ___, 132 S.Ct. 2566 (2012). ........................................................ 12

25 *Penguin Group (USA) Inc. v. Steinbeck*,

26      537 F.3d 193 (2nd Cir. 2008)................................................................. 4, 7

27 *Ray Charles Found. v. Robinson*,

28      919 F. Supp. 2d 1054 (C.D. Cal. 2013) ................................................. 10, 11

DPS'S REPLY MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

1

## <u>TABLE OF AUTHORITIES (con't)</u>

2

**Page(s)**

3

*Steinbeck v. McIntosh & Otis, Inc.*,

4
    2009 U.S. Dist. Lexis 34841 (S.D.N.Y. March 31, 2009) .......................... 6, 7

5

*Steinbeck v. McIntosh & Otis, Inc.*,

6
    2009 U.S. Dist. Lexis 35607 (S.D.N.Y. March 31, 2009) ........................... 15

7

**STATUTES**

8

17 U.S.C. § 304 ..................................................................................................*passim*

9

17 U.S.C. § 203 ................................................................................................... 4, 9

10

11

Copyright Act of 1909, ch. 320, § 23, 35 Stat. 1075, 1080 ................................. 9

12

U.K. Copyright Act 1911 § 5(2) (1 & 2 Geo 5. Ch. 46). ................................... 13

13

**OTHER AUTHORITIES**

14

15

H.R. No. 94-1476, at 124 (1976) ......................................................................... 4

16

H.R. No. 60-2222, at 14 (1909) ........................................................................... 4

17

3 Nimmer on Copyright § 9.02. ......................................................................... 4

18

19

20

21

22

23

24

25

26

27

28

## I.   PRELIMINARY STATEMENT

Plaintiffs' sole claim against DPS[1] is for copyright infringement.  To succeed, Plaintiffs must show that they, and not the Estate Defendants, are the owners of the copyright in the *Of Mice & Men* stage play.  To do that, they must show that they had authority to issue the 2006 termination notice addressed to DPS.  For that to be the case, the 1983 Settlement Agreement must be an "agreement to the contrary" under § 304(c)(5) of the Copyright Act.  It isn't.

Although courts have considered the "agreement to the contrary" language of § 304(c)(5) before, none has done so in the context of an organizational agreement **among heirs** regarding the exercise of their rights.  In the case at bar, the Court must determine whether an agreement

- solely among heirs,
- freely and knowledgably entered into after more than 40 years of exploitation,
- in exchange for substantial financial consideration,
- under no coercion or duress,
- with explicit reference to termination rights,
- that does not extinguish the right to terminate transfers, but rather, concentrates in a single heir the authority to **effect** termination,

may nonetheless be disregarded as an agreement contrary to § 304.  Viewed, as it must be, through the lens of legislative intent to protect authors and their heirs from unremunerative transfers to publishers, this Court should find that it may not.

Congressional intent is clear, well-documented, and has been well-settled in several prior cases.  In enacting § 304, Congress intended to protect authors and their heirs from sophisticated publishers and similar market gatekeepers, and to

---

[1] Unless defined herein, capitalized terms have the definitions assigned to them in DPS's Memorandum in Support of its Motion to Dismiss, Docket No. 63-1. Plaintiffs' Opposition to Defendants' Motions to Dismiss, Docket No. 73, is referred to herein as "Opp. Mem."

1    ensure that authors and their heirs received fair remuneration for successful works.

2    Prior to the enactment of § 304, authors had too frequently given away their

3    copyrights to publishers without an opportunity to determine the market value of

4    the work.  Termination of transfers under § 304 thus allowed the author and his

5    heirs to "recapture" a later phase of the copyright term and re-sell it once a market

6    track record existed on which to base an assessment of its real value.

7           Contrary to Plaintiffs' contentions, the "agreement to the contrary"

8    language of § 304(c)(5) is not absolute.  In several prior cases, Courts of Appeals

9    have found that an agreement limiting a particular heir's exercise of termination

10   rights under § 304 is nonetheless not an "agreement to the contrary."  The Ninth

11   Circuit has held that where an heir agrees – **even with a publisher –**

12          i.     freely and intelligently, with knowledge of the value of the work

13                 derived from decades of market exploitation,

14          ii.    with explicit recognition of the existence of termination rights,

15          iii.   absent any coercion, and

16          iv.    in exchange for increased remuneration,

17   to forbear from exercising a termination right, such an agreement may not be

18   classified as an "agreement to the contrary."  If such agreements with **publishers**

19   may be upheld, surely similar agreements **among heirs** must also be upheld.

20          Finally, where an author has died, effecting terminations of transfers can be

21   impracticable.  Consequently, agreements among heirs to efficiently administer

22   their termination rights serve, rather than thwart, Congressional purpose.  Such

23   efficient arrangements, however, would be rendered unworkable if the death of an

24   heir could at any time upset the entire deal.

25

26

27

28

1   **II.      ARGUMENT**

2          **A.      The "Agreement to the Contrary" Language of § 304(c)(5) is**

3                    **Ambiguous.**

4          Facing a nearly identical contention regarding statutory ambiguity to that

5   advanced by the Plaintiffs,[2] the Ninth Circuit definitively ruled that "**the phrase**

6   **'agreement to the contrary' is unclear.**  [T]he phrase is not defined by the

7   statute, and the Second Circuit has expressly found the phrase ambiguous and that

8   **an analysis of legislative history is required to glean its meaning**." *Milne v.*

9   *Stephen Slesinger, Inc.*, 430 F.3d 1035, 1045 (9th Cir. 2005) (emphasis added).

10         **B.      Congress intended that § 304 benefit authors and their heirs as**

11                   **against publishers.**

12         Numerous Courts of Appeals have laid out a concise legislative history of

13  Congress' attempts to remedy a perennial problem afflicting authors:  unlike other

14  forms of property, creative works cannot effectively be valued prior to their

15  exploitation, and therefore publishers and other market gatekeepers, as actors with

16  vastly greater bargaining power, may obtain from the author – outright and at the

17  outset – his copyright in his creative works for very little remuneration.

18  Massively successful works, therefore, could profit their publishers without

19  benefiting their authors.

20         As the House of Representatives committee report of 1909 stated, "It not

21  infrequently happens that the author sells his copyright outright to a publisher for

22  a comparatively small sum.  If the work proves to be a great success and lives

23  beyond the term of twenty-eight years, your committee felt that it should be the

24  exclusive right of the author to take the renewal term, and the law should be

25

26  [2] "[Plaintiff] criticizes the district court's approach to statutory construction,

27  arguing that section 304(c)'s meaning is clear on its face and that there was no
    need for the district court to consider legislative history. … We disagree." *Milne*,

28  430 F.3d at 1045.

1    framed … so that he could not be deprived of that right."  *Classic Media, Inc. v.*

2    *Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008), *quoting* H.R. No. 60-2222, at 14

3    (1909); *see also Milne*, 430 F.3d at 1038.

4           In 1909, therefore, Congress enacted the prior Copyright Act.  The 1909

5    Act made provision for two terms of copyright:  an "initial" term of 28 years, and

6    a "renewal" term of an additional 28 years."  By creating a renewal term,

7    Congress intended that – after 28 years of exploitation – a market value would be

8    established, and the author could then exploit the copyright for the renewal term at

9    a price fairly reflective of the work's real value.  *Marvel Characters, Inc. v.*

10   *Simon*, 310 F.3d 280, 282-83 (2d Cir. 2002); *see also* 3 NIMMER ON COPYRIGHT §

11   9.02.[3]

12          However, the 1909 Act's two-tier structure did not adequately remedy the

13   problem.  Publishers simply insisted that authors assign both terms of copyright at

14   the outset.  In a 1943 case, *Fred Fisher Music Co. v. M. Witmark & Sons*,[4] the

15   Supreme Court held that such assignments at the outset were valid (at least if the

16   author still lived at the time of renewal), notwithstanding the rationale which

17   underlay the two-tier structure.  *Mewborn*, 532 F.3d at 983-84; *see also Penguin*

18   *Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197-198 (2d Cir. 2008).

19          Thus frustrated in its aims, when Congress enacted the current Copyright

20   Act in 1976, it tried a new approach.  The 1976 Act includes § 304,[5] which

21   provides a procedure whereby the author or his heirs can, within a certain time

22

23   [3] Renegotiation after decades of exploitation had established a work's value
     likewise underlies Congressional enactment of the present § 304.  *See, e.g.*, H.R.
24   No. 94-1476, at 124, quoted by *Milne*, 430 F.3d at 1046.

25   [4] 318 U.S. 643, 63 S. Ct. 773, 87 L. Ed. 1055 (1943).

26   [5] § 304 is concerned with works created and transferred before the effective date
     of the 1976 Act, January 1, 1978.  There is an additional section, § 203, concerned
27   with works created or transfers made after that date, but that section is not at issue
28   in the instant case.

1  window, terminate assignments or licenses of the copyright in a work; an

2  additional window was subsequently added by Congress in 1998 under the Sonny

3  Bono Copyright Term Extension Act.  *Mewborn*, 532 F.3d at 985.  Copyright in

4  such works revert to these terminators, who may then re-grant or otherwise exploit

5  them.  Thus, as the Ninth Circuit has said, "authors or their heirs are able to

6  negotiate additional compensation for previously granted rights."  *Mewborn*, 532

7  F.3d at 984.

8      In order to ensure that authors did not trade away their termination rights, as

9  had too frequently been the case with renewal rights under the 1909 Act, Congress

10 included § 304(c)(5), which provides that "termination of [a] grant may be

11 effected notwithstanding any agreement to the contrary, including an agreement to

12 make a will or to make any future grant."  17 U.S.C. § 304(c)(5).  As the Ninth

13 Circuit has stated,

> Congress enacted the inalienability of termination rights provision in
>
> § 304(c)(5) to resurrect the fundamental purpose underlying the two-
>
> tiered structure of the duration of copyrights it originally adopted [in
>
> 1909]:  to award to the author [and his heirs], and not to the assignee
>
> of the right to exploit the copyright during its initial term, the
>
> monetary rewards of a work that may have been initially
>
> undervalued, but which later becomes a commercial success.

21 *Mewborn*, 532 F.3d at 983.

22      **C.      The 1983 Settlement Agreement Does Not Extinguish the Heirs'**

23              **Termination Right, Nor Is It an Agreement to Make a Future**

24              **Grant**

25      Plaintiffs' contention that the 1983 Settlement Agreement is an agreement

26 to make a future grant is a straw man.  Plaintiffs misleadingly conflate the right to

27 terminate grants and licenses (the "right to terminate") and copyrights obtained as

28 the result of the exercise of a right to terminate (the "reverted rights").  The First

1  Amended Complaint lumps both of these disparate rights together and labels them

2  "Recaptured Rights."  Opp. Mem. at 2.  Plaintiffs then mischaracterize the 1983

3  Settlement Agreement as purporting to confer on Elaine and her heirs "future

4  Recaptured Rights," a mischaracterization which underlies the entire argument set

5  forth in section IV.A.2 of Plaintiffs' Memorandum in Opposition to the instant

6  motion.  Opp. Mem. at 6-8.

7          The 1983 Settlement Agreement does not purport to grant to Elaine and her

8  heirs any interest in "reverted rights."  Instead, it allocates to Elaine and her heirs

9  the **exclusive authority** to exercise the "right to terminate" prior grants.  In the

10  event that Elaine or her heirs exercises the right to terminate the 1940 License

11  Agreement – as Elaine did during her lifetime with respect to other Steinbeck

12  works (*see, e.g.*, FAC ¶¶ 37-39) – the "reverted rights" would vest in the Author's

13  statutory heirs.  *See* Memorandum of Points and Authorities in Support of the

14  Estate Defendants' Motion to Dismiss the FAC, Docket No. 60-1, at 4.

15          The 1983 Settlement Agreement therefore does not extinguish Plaintiffs'

16  termination right as against the 1940 License Agreement with DPS; rather, it vests

17  in Elaine Steinbeck and her heirs the authority to trigger the right to terminate:

18          Elaine Steinbeck and/or her agent shall have the complete power and

19          authority to negotiate, authorize and take action with respect to the …

20          termination of rights in the works of John Steinbeck in which [the

21          Plaintiffs] have or will have renewal or termination rights.

22  FAC, Ex. B at ¶ 5.

23          Plaintiffs agreed that these rights should be descendible:  "Paragraph 14 of

24  the 1983 Settlement Agreement states that '[t]his Agreement shall bind the Parties

25  and their heirs, successors and assigns.'"  *Steinbeck v. McIntosh & Otis, Inc.*, 2009

26  U.S. Dist. Lexis 34841 at *12 (S.D.N.Y. March 31, 2009), *quoting* FAC, Ex. B at

27  ¶ 14.  Consequently, following Elaine's 2003 death, the authority to exercise the

28  right to terminate the 1940 Agreement with DPS remained with Elaine's heirs.  *Id.*

DPS'S REPLY MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

1   at \*11-12.  The right to terminate that agreement may still be effected, but not by

2   the Plaintiffs; they surrendered their authority to effect termination of the 1940

3   License Agreement to Elaine and her heirs under the 1983 Settlement Agreement.

4        Plaintiffs' resultant impotence does not render the 1983 Settlement

5   Agreement an "agreement to the contrary" under § 304(c)(5); rather, as the

6   Second Circuit has found, Congress implicitly contemplated that effective

7   authority to exercise a right to terminate a grant would not always lie with a

8   particular heir or group of heirs.  In *Penguin Group*, the Court of Appeals held

9   that § 304 clearly contemplates that the rights of some heirs to terminate (or not) a

10  prior transfer may be rendered ineffective as the inevitable result of an agreement

11  by a majority of co-heirs to take the opposite course of action.  Though such an

12  agreement would neutralize the minority heirs' rights to terminate, it "could not be

13  held ineffective as an 'agreement to the contrary' inasmuch as § 304 itself

14  contemplates elimination of termination rights in this manner."  537 F.3d at 202.

15       **D.      The 1983 Agreement May Not be Disregarded as Contrary to**

16       **         Section 304(c)(5).**

17       Plaintiffs suggest that DPS would have this Court read § 304(c)(5) as

18  though "termination of a grant may be [effected][6] notwithstanding any agreement

19  to the contrary **made with the grantee only**."  Opp. Mem. at 10 (emphasis in

20  original).  This is not the case.  Rather, DPS contends that the Court should follow

21  Ninth Circuit precedent and find that where agreements – even those with

22  publishers – accomplish, rather than thwart, the purposes of § 304, they are not

23  "agreements to the contrary."

24       The Ninth Circuit Court of Appeals has held that (i) where parties "freely

25  and intelligently" agree to transfer or forbear from exercising their rights of

26  termination; (ii) where that agreement is not the product of coercion; (iii) where

27  _____

28  [6] Plaintiffs for some reason substitute the word "exercised" where the statute says
    "effected."  Opp. Mem. at 10.

1  the transferring or forbearing party receives increased remuneration in exchange;

2  and (iv) where the agreement explicitly references the existence of termination

3  rights, such an agreement is not an "agreement to the contrary."  *Milne*, 430 F.3d

4  at 1046.

5      In *Milne*, the Ninth Circuit found that a 1983 agreement which renegotiated

6  a 1930 license between Christopher Milne (son of A.A. Milne, author of the

7  Winnie-the-Pooh stories), and SSI, the 1930 licensee, was not an "agreement to

8  the contrary" despite the explicit agreement of Christopher Milne not to pursue

9  termination rights. 430 F.3d. at 1039.  When Christopher Milne's daughter

10 attempted to terminate the 1983 agreement, the Ninth Circuit found that there was

11 no question that the parties thereto "freely and intelligently" entered the

12 agreement. *Id.* at 1044-45. Christopher was able to "obtain considerably more

13 money" in a "more lucrative" deal, after "more than 50 years of" exploitation of

14 the works "in the marketplace, [where] their value was sufficiently demonstrated."

15 *Id.* at 1044-46. *See also Larson v. Warner Bros. Entm't, Inc.*, 2013 U.S. Dist.

16 Lexis 55950 at *14-17 (C.D. Cal. Apr. 18, 2013) ("highly remunerative"

17 agreement that was "knowingly and intelligently" entered "as a direct result" of

18 notice of termination was not "agreement to the contrary" despite the surrender of

19 certain termination rights).

20      The Ninth Circuit affirmed its *Milne* ruling a few years later in *Classic*

21 *Media, Inc. v. Mewborn*.  Reiterating its *Milne* analysis, the *Mewborn* court found

22 that where an agreement did not expressly address termination rights, where the

23 evidence suggested that the heir "did not intend to waive her termination rights,"

24 and where it was concluded "without the advice of counsel and without

25 negotiati[on]" of its terms, the agreement – by contrast to that in *Milne* – **was** an

26 "agreement to the contrary."  532 F.3d at 989.

27      The 1983 Settlement Agreement likewise meets the requirements set out in

28 *Milne*. It was knowingly concluded by Plaintiffs, and it expressly referenced their

DPS'S REPLY MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

1  termination and exploitation rights in the Author's works.  The exchange of those

2  rights, used as leverage in negotiation, resulted in a more lucrative deal for

3  Plaintiffs, who obtained an increase from a 25 percent to a 33 percent share of

4  royalties in certain of the Author's works, while Elaine (and her heirs) received

5  control of all termination and exploitation rights, but proportionally reduced her

6  own royalty share in those works from 50 percent to 33 percent. Thus, the 1983

7  agreement is both highly remunerative for Plaintiffs and not the result of Elaine's

8  "superior bargaining power."  It fits within the framework the Ninth Circuit set

9  out in *Milne* and should not be set aside as an "agreement to the contrary."

10       Moreover, the 1983 Settlement Agreement was concluded more than 40

11  years after the *Of Mice and Men* stage play first entered the market, and

12  established its place as a mainstay of American theatre.  The parties, Plaintiffs

13  included, had a lengthy market record – longer, indeed, than the 28 years which

14  Congress had deemed sufficient in 1909,[7] or the 35 years which Congress deemed

15  sufficient for post-1978 works[8] – on which to base their valuation of the work.

16  The 1983 Settlement Agreement simply is not the "agreement to the contrary"

17  envisioned by Congress in enacting § 304(c)(5).

18       Plaintiffs argue that "no case Defendants cite found effective

19  extinguishment without a superseding grant or a grant made in response to a

20  termination notice." Opp. Mem. at 11.  This, too, is a red herring.  First, as

21  discussed above, 1983 Settlement Agreement does not extinguish the right to

22  terminate the 1940 License Agreement; it merely allocates control over that right

23  to Elaine and her heirs, who may exercise it if they choose.  Second, Plaintiff's

24  assertion is inapposite:  to date, no court has considered whether an agreement **of**

25  **any type** among heirs constitutes an "agreement to the contrary" under

26  § 304(c)(5).  Plaintiffs, for their part, have cited no case, nor can they, where a

_____

27  [7] Copyright Act of 1909, ch. 320, § 23, 35 Stat. 1075, 1080.

28  [8] 17 U.S.C. § 203(a)(3).

DPS'S REPLY MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

1 court found that an agreement concluded by an heir with any party meeting the

2 criteria set out by the Ninth Circuit in *Milne* has been held to be an "agreement to

3 the contrary."

4       **E.**     ***Ray Charles Foundation v. Robinson* does not control and cannot**

5            **bear the weight placed on it by Plaintiffs.**

6      In every prior case – save one – construing § 304(c)(5), the agreement in

7 question has been one between, on the one hand, a publisher or equivalent party

8 and, on the other, an author or his heirs.  Such agreements are precisely those with

9 which Congress was concerned when it enacted § 304.

10      The only exception – to which Plaintiffs cling in desperation, lacking any

11 other jurisprudential support – is *Ray Charles Foundation v.* Robinson, 919 F.

12 Supp. 2d 1054 (C.D. Cal. 2013).[9]  In that case, the musician Ray Charles endowed

13 each of his children with a $500,000 trust in exchange for their agreement they

14 would not inherit any further assets from his estate and that they "waiv[ed] any

15 right to make a claim against his estate." *Id*. at 1060.  The agreements between

16 Charles and his children did not contain any explicit reference to copyright

17 interests or termination rights. *Id*.  When several of Charles' children subsequently

18 served termination notices on third parties from whom the Ray Charles

19 Foundation received royalties, the Foundation sought a declaratory judgment that

20 the termination licenses were invalid and that Charles' children had breached their

21 agreements.

22      The court found that the Foundation had no standing to challenge the

23 termination notices.  It was only in determining the Foundation's likelihood of

24 success on its breach of contract and related claims that the *Ray Charles* court

25 considered § 304(c)(5), and that only in a hypothetical exercise.  The court first

26

27 [9] Plaintiffs' appeal of this decision is presently pending before the Ninth Circuit. *See Ray Charles Foundation v. Robinson*, No. 13-55421 (9th Cir.) (argued

28 February 12, 2015).

1  found that the agreements were not breached as they purported to waive claims

2  against "the estate" only, which had closed by the time notices were served.

3  Additionally, the works which the heirs sought to recapture were "works made for

4  hire," and so were never a part of Charles' estate.  Only after making both of these

5  dispositive determinations did the court consider a hypothetical counterfactual:

6  assuming, *arguendo*, that the works at issue were not works for hire, and the estate

7  was not closed, could agreements between Charles and his children be construed

8  as "agreements to the contrary"?   The court concluded that they could be so

9  construed, insofar as the Foundation's proposed $500,000+ penalty for breaching

10  the agreements by exercising the termination rights "is just a more creative way of

11  preventing the exercise of termination rights in the first place."  *Id*. at 1065-66.

12        That tangential conclusion cannot support the weight placed on it by

13  Plaintiffs.  First, the *Ray Charles* case is not controlling precedent.  *Hart v.*

14  *Massanari*, 266 F.3d 1155, 1174 (9th Cir. 2001) ("[T]he binding authority

15  principle applies only to appellate decisions, and not to trial court decisions.");

16  *Kessler v. Assocs. Fin. Servs. Co.*, 573 F.2d 577, 579 (9th Cir. 1977) ("Decisions

17  of district courts ... are not binding in any other case, even before the same judge

18  who rendered the decision, nor upon any other court.").  Further, the

19  determination by the *Ray Charles* court with respect to § 304(c)(5) is mere dicta.

20  The court had already determined that the termination notices could not be

21  deemed breaches of the agreement as they "could not be considered claims

22  'against' Charles's estate."  *Ray Charles Found*. at 1065.  Subsequent speculation

23  regarding (a) whether Charles, and therefore his estate, had ever had a copyright

24  interest in the works at issue, and (b) had he done so, whether the agreements

25  would have constituted "agreements to the contrary" under § 304(c)(5) ought not

26  to weigh heavily in the Court's thinking.  *Batjac Prods. Inc. v. Goodtimes Home*

27  *Video Corp.*, 160 F.3d 1223, 1232 (9th Cir. 1998) (rejecting dicta which are: "(1)

28

DPS'S REPLY MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

1    unnecessary to the outcome of the case; [or] (2) can be deleted without affecting

2    the argument ….").

3         Second, the facts in this case are clearly distinguishable from those in the

4    *Ray Charles* case.  The *Ray Charles* court hypothetically objected to the

5    agreements between Charles and his children to the extent that they might be

6    interpreted "to waive [the children's] rights to **recapture** the copyrights at issue"

7    under threat of a substantial penalty.  *Id*. at 1066.  The agreements make no

8    reference to termination rights, and it is doubtful whether the children knew of or

9    considered them.  In the present case, by contrast, the heirs clearly understood the

10   import of the 1983 Settlement Agreement, including its explicit reference to

11   termination rights.[10]

12        **F.    Agreements among heirs to administer their rights efficiently**

13              **further, rather than thwart, Congressional intent.**

14        Finally, as above, the legislative history of § 304 militates for a

15   determination that the 1983 Settlement Agreement is not an "agreement to the

16   contrary."  The Supreme Court has emphasized the importance of jurisprudence

17   that "give[s] practical effect to the Legislature's enactment."  *Nat'l Fed'n of*

18   *Indep. Bus. v. Sebelius*,  567 U.S. ___, ___, 132 S.Ct. 2566, 2598 (2012).[11]  An

19   agreement among heirs to vest in a single party the authority to effect terminations

20   of prior transfers furthers, rather than confounds, Congress's manifest intent to

21   enable authors and their heirs to terminate such transfers.

22

23

24

_____

25   [10] *See* FAC, Ex. B, at ¶ 5.

26   [11] Likewise, the Ninth Circuit in *Milne* underlined that the challenged agreement

27   in that case was not an "agreement to the contrary" because it "resulted in an
     increased royalty stream to the author's heirs –  the very result envisioned by

28   Congress when it enacted the termination provision."  *Milne*, 430 F.3d at 1047.

1    It is notable that Congress did not make termination automatic.[12]  Instead, it

2  opted to require that, where an author has died, his heirs must act in concert (at

3  least to the extent of requiring a majority of the interest) and take affirmative steps

4  within limited time windows to effect termination:  they must be corralled and

5  made to agree with respect to each grant or license (17 U.S.C. § 304(c)(1)); each

6  agreeing heir must sign the notice on his own behalf (17 U.S.C. § 304(c)(4)); and

7  notices must be served within certain narrow time windows (17 U.S.C.

8  § 304(c)(4)(A)).  One must infer from this that Congress did not expect that the

9  author or his heirs would wish to terminate each and every grant or license.

10  Instead, one must conclude that Congress intended that the heirs should organize

11  themselves to manage their termination rights, terminating some transfers and

12  retaining others.

13    The 1983 Settlement Agreement arose to settle then-pending litigation over

14  the administration of the Author's works.  Prior to that agreement, effective joint

15  administration would have been difficult, if not impossible, as each camp – Elaine

16  on the one hand, the Plaintiffs on the other – held a fifty percent interest, not

17  sufficient to effect a termination.  This stalemate was broken by the 1983

18  Settlement Agreement.  Under that Agreement, Plaintiffs, in exchange for

19  increased royalty shares, ceded to Elaine and her heirs authority to manage the

20  Author's literary properties, including termination rights.  As a result, for two

21  decades Elaine effectively managed the Steinbeck literary estate, evaluating the

22  existing grants and licenses and selectively exercising termination rights where

23  she judged it advantageous.  Such an efficient organization of authority over an

24  author's literary estate is a model to be emulated by the heirs of other authors.  If

25

26  [12] Other jurisdictions, considering the same concerns, did do so:  the United

27  Kingdom, for example, enacted the Copyright Act 1911, which contained an
automatic reversion of copyright to the author's heirs 25 years after the author's

28  death.  U.K. Copyright Act 1911 § 5(2) (1 & 2 Geo 5. Ch. 46).

1 instead the Court finds that the 1983 Settlement Agreement which enabled it is an

2 "agreement to the contrary" under § 304(c)(5), this will weaken, not strengthen,

3 the ability of authors' heirs to effect their termination rights.

4     Contrary to the situation in *Ray Charles Foundation v. Robinson*, the 1983

5 Settlement Agreement is not between the author and his heirs, but among heirs,

6 who voluntarily convened to agree on a plan by which their collective termination

7 rights could be efficiently administered.  As the Second Circuit has noted

8     Section 304(c) is not necessarily a provision for the effectuation of

9     the author's 'intent.' If the author's intent were the paramount

10     concern of the statute, then no termination of any kind would be

11     allowed, because most authors presumably 'intend' to make the

12     assignment that is the very object of Section 304(c)'s termination

13     provisions. …  Granting supremacy to the author's intent as against

14     the rights of the widow and children would obviate the reason that

15     Section 304(c) is in the Copyright Act to begin with and distort the

16     deliberate legislative choice made by Congress….

17 *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 778 (2d Cir. 1992).  An

18 informed and fully voluntary agreement among the heirs themselves is

19 substantively different:  unlike the author, who may act unilaterally during

20 his lifetime to terminate a grant pursuant to § 304, the heirs – especially if

21 there are many of them – must leap a series of practical hurdles in order to

22 effect the termination rights provided by § 304.

23     Undertaking to manage and effect termination rights, and to administer any

24 reverted rights, is a complex business.  The present case showcases the difficulties

25 that can arise with even a relatively small number of heirs.  It is not difficult to

26 imagine an author – such as a songwriter or photographer – with a catalog

27 containing hundreds of works or more, and with a multitude of children, perhaps

28

1   by several different parents.[13]  Regularly convening so large and potentially

2   fractious a group to consider, let alone to agree and timely act on, terminating

3   hundreds of existing grants and licenses would be a major undertaking:  a full-

4   time job.  If such a group of heirs cannot be organized by a long-term

5   administration agreement – and especially if each heir's death has the potential to

6   upend such an agreement – termination provisions may never be effected at all.

7   Such a result cannot be reconciled with Congress' clear intent to benefit authors

8   and their heirs by permitting them to terminate prior grants.

9   **III.   CONCLUSION**

10          The 1983 Settlement Agreement is not an "agreement to the contrary," it

11   continues to bind Plaintiffs.  Consequently, Plaintiffs' 2006 termination notice

12   regarding the *Of Mice and Men* stage play is invalid.  The termination notice being

13   invalid, there is no basis for Plaintiffs' copyright infringement claim against DPS.

14   / / /

15   / / /

16   _____

17   [13] For example, songwriter and performer Jalacy Hawkins (professionally known
as "Screamin' Jay Hawkins") was married six times and believed at his death that

18   he had fathered 57 children by numerous different women; a year after his 2000
death, a researcher seeking them believed she had identified 33.  *See*, *e.g.*, Alix

19   Spiegel, Papa Was A Rolling Stone, THE NEW YORK TIMES MAGAZINE
(Jan. 7, 2001), *available at* http://partners.nytimes.com/library/magazine/home/

20   20010107mag-hawkins.html.

21      Less extreme, but illustrative, is the case of the songwriter and performer James

22   Brown, who at his 2006 death left seven living children by several different
women (*see*, *e.g.*, Matt Birkbeck, Years After Death, Battle for James Brown's

23   Estate Rages On, ROLLING STONE (July 20, 2011), *available at*

24   http://www.rollingstone.com/music/news/years-after-death-battle-for-james-

25   brown-s-estate-rages-on-20110720#ixzz3fpRl25Tt) and an apparent widow whose
marital status vis-à-vis Brown is the subject of continuing litigation, as is the

26   validity of Brown's will.  *See*, *e.g.*, Larry Rohter, Judge Rules Tommie Rae Hynie

27   Brown Was Married to James Brown, THE NEW YORK TIMES (Jan. 23, 2015
3:09 p.m.), *available at* http://artsbeat.blogs.nytimes.com/2015/01/23/judge-rules-

28   tommie-rae-hynie-brown-was-married-to-james-brown/ .

DPS'S REPLY MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

1    DATED: July 13, 2015     By: _____ */s/ Joshua G. Graubart* _____

2

3                         LAW OFFICES OF JOSHUA GRAUBART, P.C.
                           Joshua G. Graubart

4

5                         KESSELMAN BRANTLY STOCKINGER LLP
                           David W. Kesselman

6                            Trevor V. Stockinger

7                        Attorneys for Defendant
                       DRAMATISTS PLAY SERVICE, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DPS'S REPLY MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS